C
1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**United States District Court**
**Southern District of Texas**
**FILED**

**SEP 1 4 2001**

**Michael N. Milby**
**Clerk of Court**

| | |
|---|---|
| **JORGE FLORES, ET AL** | § |
| | § |
| **PLAINTIFFS,** | § |
| | § |
| | § **CASE NO. B 01-CV-00057** |
| | § |
| | § |
| **PAUL O'NEILL,** | § |
| **SECRETARY OF THE TREASURY,** | § |
| | § |
| **DEFENDANT.** | § |

## DEFENDANT'S MOTION TO
## DISMISS THE AMENDED COMPLAINT

The Defendant, the Secretary of the Department of the Treasury, by and through the undersigned Assistant United States Attorney, respectfully moves this Court to grant Defendant's Motion to Dismiss the Amended Complaint, pursuant to Rules the Federal Rules of Civil Procedure. The arguments in support of this Motion are as follows:

### PROCEDURAL HISTORY

This action was filed on March 4, 2001, in the District Court of Cameron County, Texas, and removed to this Honorable Court by the Defendant.

On May 25, 2001, Defendant filed its Motion to Dismiss and Motion for More Definitive Statement.

Defendant's Motion to Dismiss and Motion for More Definite Statement were unopposed.

By Order dated August 17, 2001, this Court denied the Motion to Dismiss and granted the Motion for More Definite Statement. Defendant filed for reconsideration of Defendant's Motion to Dismiss and Motion for More Definite Statement. Subsequently, Plaintiff filed an amended complaint on August 30, 2001.

This Motion to Dismiss the Amended Complaint is responsive and dispositive of Plaintiff's Amended Complaint. Thus, the Amended Complaint should be dismissed for the reasons set forth below.

First, while Plaintiff correctly argues that 42 U.S.C. §1981 does not have an exhaustion requirement, this type of constitutional claim (including any Bivens' claim) is not a viable cause of action that can be asserted against the Federal Government by its employees. Second, Flores' individual exhaustion is insufficient to exhaust on behalf of the 107 individuals, as he does not have representational capacity. His claims are distinct from the 107 individuals and the F.R.C.P. Rule 23(a) requisites for a class action have not been met. Thus, the claims of the putative class (107 employees) should be dismissed, and only Flores' remaining individual claims should be subjected to this Court's jurisdiction.[1]

## FACTS REGARDING JORGE FLORES' INDIVIDUAL CLAIMS

### A.    Background

Plaintiff Flores' administrative and legal claims are wholly distinct from the claims of the putative class he seeks to represent. Flores' individual claims are so specific to his position as a top manager (port director) and are based upon subjective decisions, that he cannot represent the listed 107 employees. In fact, the requisites to bring a class action under F.R.C.P. Rule 23(a) have not been met as Flores' claim is not typical of the 107 employees, lacks commonality and even has interests conflicting with those in the class.

### B.    Administrative History

Flores has filed three administrative EEO cases with the Department of the Treasury. Flores has exhausted his administrative remedies, on two of these cases, numbers 99-2268 and 98-2284, as he was engaged in the administrative process at least 180 days. See 29 C.F.R. 1614.407. Flores opted out of the administrative process on March 26, 2001 for these two cases, so he had 90 days from that date to file in federal court. See 29 C.F.R. 1614.407. With regard to   Flores' third individual administrative case, 99-2009, the case was dismissed by the EEOC on February 15, 2000, and he had 90 days to file suit. As part of this dismissal,  Flores received a notice concerning his

---

[1]    Defendant is only presenting jurisdictional arguments in this motion. Defendant will likely challenge the merits of  Flores' case in a Motion for Summary Judgment.

appeal rights explaining that he had 90 days to file in United States District Court. The statute of limitations on case number 99-2009 has run. Flores has also previously filed administrative actions claiming whistleblower protection under 5 U.S.C. 2301, *et seq*. These cases have been dismissed by the Merit Systems Protection Board and one is in litigation before the Federal Circuit Court of Appeals, docket number 01-3231.

The following issues were accepted for investigation as an administrative EEO case, Treasury Department ("T.D.") Case No. 98-2284 regarding Jorge Flores as an individual complainant:

Whether [Complainant has been] subjected to a continuing pattern of discrimination and a hostile working environment based on [his] age (52; D.O.B. 06-06-46), national origin (Hispanic), sex (male) and/or reprisal for prior and/or reprisal for prior EEO complaint activity when:

(1)     On December 4, 1997, the South Texas CMC Director impounded the canine records of the Port of Brownsville without first consulting with or notifying [him] as the Director, Port of Brownsville;

(2)     On December 4, 1997, the CMC Director initiated a Headquarters' Management Review of the Canine Program in the Port of Brownsville without first consulting with or informing [Complainant] of the reason;

(3)     On December 9, 1997, the CMC Director requested in an e-mail message that [Complainant] justify [his] recommendation for the selection of a Supervisory Customs Inspector in the Port of Brownsville and in part stated, "We need to be able to articulate why we selected one and not the others . . .It is an awful way to do business, but unfortunately we have been forced to it by those that abuse the system and cry discrimination every time they don't like a decision management makes";

(4)     On April 1, 1998, the CMC Director postponed until further notice the filling of a Supervisory Canine Officer position in the Port of Brownsville without first consulting with or informing [Complainant];

(5)     On April 6, 1998, the CMC Director detailed a Supervisory Canine Officer from the Port of Hidalgo to the Port of Brownsville, without first consulting with or informing [Complainant]; and

(6)     Between December 1997 and May 1998, the Assistant Commissioner, Office Field Operations, failed to respond to [Complainant's] repeated requests to intervene in the CMC Director's actions. (Investigative File (IF) 98-2284, Ex. 2, p. 235-236).

The following issue was accepted for investigation in T.D. Case No. 99-2368 regarding Jorge Flores as an individual complainant:

Whether [Complainant was] subjected to a continued pattern of harassment because of [his] age: 53 (06-06-46), national origin (Hispanic), sex (male), and/or reprisal for [his] prior

.

EEO complaint activity, when on May 3, 1999, [he] received a directed reassignment to Norfolk, Virginia.[2]
(IF 99-2368, Ex. 3, p. 103).

C.  **Facts Regarding Flores' First Administrative Claim: T.D. No. 98-2284**

The administrative Investigative File[3] ("IF") shows that Complainant was a GS-14 Customs Port Director, assigned to Norfolk, Virginia at the time of the complaint.  From February 1996 to September 1999, his supervisor was the Director, Customs Management Center, (SES level) Maria Reba and at the time he was the Port Director of Brownsville, Texas. (IF, 98-2284, Ex. 18, p. 329, Ex. 6, p. 277; Ex. 16, p. 325). During this period, Ms. Reba supervised ten port directors.  (IF, 98-2284, p. 4 and IF, Ex. 16, p. 325). Ms. Reba's supervisor, at that time, was Assistant Commissioner Robert Trotter. (IF, 98-2284, Ex. 7, p. 283).

As Customs Assistant Commissioner Robert Trotter explained in his sworn testimony to the Office of Special Counsel, Flores's conduct and insubordination problems began to be noticed by upper management after Flores's previous supervisor, Audrey Adams, left around 1994 and gradually escalated through 1998.  According to Mr. Trotter, Flores worked with Ms. Adams for approximately 13 years and they were part of a "South Texas Group."  Mr. Trotter explained that Ms. Adams acted like a "mother bird" to her subordinates, and that when she left the "nest", Flores was unable to "step up" and "fly." Subsequent to Ms. Adams' departure, Flores would not take direction from Ms. Adams' acting successors, including Bob Page and Bruce Cramer.

As Mr. Trotter stated, Flores also had problems with another acting successor, Linda Wilcox, in 1994 or 1995. (IF, 98-2284, Ex. 9, p. 289). When Flores was counseled about his conduct towards Ms. Wilcox by Mr. Trotter's deputy, John McGowen, in 1994 or 1995, Mr. Trotter explained this is the period when Flores got "hard feelings." (IF, 98-2284, Ex. 9, p. 289).  This preceded Ms.

---

[2]    Complainant's reassignment was also the subject of an Office of Special Counsel investigation and a allegations of whistleblower reprisal to the MSPB. Both OSC and MSPB determined the Complainant did not make a protected disclosure and Customs had legitimate business reasons for making the reassignment.

[3]    The Investigative File will be filed under separate cover.

Reba's arrival of February 1996 and Flores's EEO activity.       In fact, soon after Ms. Reba's arrival in February 1996,   Flores' performance deficiencies became evident to her in early April 1996.   At this time, despite the Customs Service's primary mission to catch narcotics' smugglers, Flores's port released approximately 3,080 pounds of cocaine into the country.   As a result, Mr. Trotter determined, on or about May 11, 1996, that some type of employment action needed to be taken against Flores, such as a reassignment or downgrade.       However, because of "political connections" Flores had in the Department of the Treasury, the local Congressional delegation, and the trade, this action got stalled in May 1996.   While the action against Flores was being stalled, in late September 1996, Flores made his alleged "whistleblower" disclosure to Mr. Trotter, the FBI and IG about his supervisor, Ms. Reba.   At this time, Mr. Trotter was "chilled."   Mr. Trotter did take any action because he surmised that Flores made up this disclosure to shield himself, and Mr. Trotter was concerned about being accused of reprising against an alleged whistleblower.[4]

   Gradually, however, Flores's enforcement performance declined, and his insubordination escalated.      Any action by Mr. Trotter was held in abeyance until August 1998 when his performance and conduct reached a point that Mr. Trotter asked Agency Counsel to see if the Agency could reach a global settlement to resolve both the mismanagement concerns with the administrative cases. As Mr. Trotter's administrative declaration indicates, it was common to try to obtain a global settlement, which can involve a lump sum of cash in exchange for a retirement, when a high level manager has performance problems, conduct issues, and pending EEO/MSPB cases. (IF, 98-2384, Ex. 7, p. 283-284).

   The Agency Counsels assigned to Flores's cases made settlement offers to Flores. Thereafter, Flores made a counter-offer to the Agency that included a substantially larger cash payment. A reassignment was a term within a settlement offer and it was his option to accept or decline. (IF, 98-2384, Ex. 10, p. 290-294, Ex. 11, p. 295-296, IF 99-2369, Ex. 10, p. 155-156).   The

---

[4]       In fact, Mr. Trotter's sworn statements together with the decision in the first MSPB case show Appellant's alleged disclosure was a **convenient** disclosure rather than a **protected** disclosure.

Page 5

settlement proposal was to encompass all of Flores's administrative cases, as well as the deficiencies in his performance (narcotic enforcement deficiencies) and in his conduct (insubordination).[5]  (IF, 98-2384, Ex. 7, p. 283-284; AMEs 3 and 10).  The reassignment was part of the settlement because his professional relations with Ms. Reba were very strained and presented a management problem. (IF, 98-2384, Ex. 10, p. 290-294, and Ex. 7, p. 283-284).  Further, there was evidence that there were enforcement deficiencies and security breaches at the Brownsville border crossing.[6]  The settlement negotiations subsequently ceased, as the parties could not reach an agreement.

Just prior to the settlement offer, between December 1997 and May 1998, as mentioned previously, Flores complained to the Assistant Commissioner Trotter, concerning alleged wrongdoing by Flores's supervisor, Ms. Reba. Mr. Trotter, himself, referred these allegations to the Inspector General. Sometime thereafter, Mr. Trotter had a conversation with Flores.  Flores informed Mr. Trotter that he too had referred these allegations outside of the Agency to the FBI.  Mr. Trotter explained that since the allegations referred to an outside agency, he could no longer be involved. (IF, No. 98-2284, Ex. 7, p. 283).  Mr. Trotter understood that there was a later determination by IG that none of the allegations had merit.  (IF, No. 98-2284, Ex. 7, p. 283).

Subsequently, Mr. Trotter offered to send a mediator to Laredo and Brownsville to address the concerns.  However, Flores refused.  Mr. Trotter had sent a mediator back in 1994 when Flores complained about his previous boss, Linda Wilcox. (IF, No. 98-2284, Ex. 7, p. 283).

Mr. Trotter left the position of Assistant Commissioner, Office of Field Operations in early 1999. (IF, No. 98-2284, Ex. 6, p. 119). He was replaced by Charles Winwood in February 1999. (IF, No. 98-2368, Ex. 5, p. 115).  When Mr. Winwood assumed his position he began a major

---

[5]  Flores filed No. 99-2009 as an EEO complaint regarding settlement discussions, as he did not get what he wanted in settlement. This same matter was dismissed by the Agency and the EEOC because settlement discussions do not constitute an employment action.

[6]  Both the strained relationship and the security breaches began in April 1996 with the cocaine incident, well before his EEO activity.

reorganization in the Office of Field Operations. Approximately 25 reassignments were made at the same time as Flores. Each reassignment was made in order to improve on past deficiencies in several ports and work locations. (IF, No. 98-2368, Ex. 5, p. 115-116). Flores's reassignment was based on the fact that the Brownsville port had drug enforcement deficiencies, but he had the necessary people skills to address the communication problems the Port of Norfolk had with the public.

Mr. Winwood was new to the position of Assistant Commissioner, Office of Field Operations, and was not implicated in any way in prior EEO actions. The Commissioner of Customs was also new to that position. The evidence in the administrative OSC case indicated that Commissioner Raymond Kelly desired to change Customs and that he directed staff members, including Mr. Winwood, to reorganize and improve the agency structure. As part of this mandate, the evidence showed that Mr. Winwood made a number of changes, to include moving, at a minimum 25 managers, including at least six port directors, nationwide. (IF, No. 98-2368, Ex. 5, p. 115 and Ex. 11, p. 168-169).

Mr. Winwood's statements, which explain the basis for each move, show that he focused on the weaknesses of each port and the strengths of each director. Mr. Winwood perceived that Flores was very strong with community and public relations and determined that Norfolk had a weakness in that area, because Norfolk had experienced frequent friction between USCS and the local trade and business entities. On the other hand, Mr. Winwood perceived that Brownsville had a problem with enforcement issues and selected a port director that he believed had strengths in that area. [7](IF, No. 98-2368, Ex. 5, p. 116). The evidence in the administrative file shows that each move was based on legitimate and defensible reasons. Therefore, the fact that Mr. Winwood had no apparent motive

---

[7] The prior management attempted to address these deficiencies in the enforcement area with the prior settlement attempts in 99-2009.

CONPDF - www.tevino.com

to discriminate, and in light of the evidence that Flores's reassignment was part of a significant reorganization of Field Operations for Customs, which was directed by the incoming Commissioner, there is no evidence of discrimination.

### D.   Facts Regarding Flores' Second Administrative Claim: T.D. No. 98-2284

In late 1997, Nat Aycox, the Director, Customs Canine Program Team, in Customs Headquarters was responsible for sending managers, Mr. Nestlerode and Mr. Gabel to do a Canine management review at the Brownsville Port. (IF, No. 98-2284, Ex. 1, p. 94-120.). There had been previous issues raised concerning the lost cocaine shipment and claims by Flores' subordinate, Supervisory Canine Enforcement Officer ("SCEO") Collentine who claimed the Canine Enforcement Officers ("CEOs") did not receive equal treatment with the inspectors from Port Director Flores. (IF, No. 98-2284, Ex. 1, p. 94-95, 99 and Ex. 6, p. 280). In preparation for the Headquarters' review, the Director, Field Operations in Laredo, Flores's Supervisor, asked Supervisory Canine Enforcement Officer Mahen to look at the canine records in Brownsville. Ms. Reba wanted to make sure the records were all in order to facilitate the upcoming review. SCEO Brian Collentine had complained about the conditions in Brownsville to Canine Chief Gene Garza in Laredo, including the following: (1) He was stopped at every step of the way when he wanted to make improvements; (2) the Canine Program was treated unfairly; (3) that he was accused of being a traitor to the port; and, (4) that enforcement was non-existent at the Brownsville Port. Since SCEO Collentine had not been replaced yet and he claimed the Port Director was part of the problem, Ms. Reba wanted to make sure the records were complete. (IF, No. 98-2284, Ex. 6, p. 280, AME 17).

Flores was not notified that SCEO Mahan was going to review the records because he was out of the office at the time. The acting port director was notified by SCEO Mahan that he was going to review the records. (IF, No. 98-2284, Ex. 6, p. 280). SCEO Mahan was stationed in Hidalgo, Texas so it was more efficient to take records with him rather than to spend the day looking at them in Brownsville and then return them to his post of duty. SCEO Mahan took the records back to his

office, reviewed them, found nothing missing and had them returned. (IF, No. 98-2284, Ex. 6, p. 280).

Mr. Aycox of Customs Headquarters was in charge of the Canine review of Brownsville. It was Headquarters' decision and Ms. Reba was not involved in the decision to do the review.[8] (IF, No. 98-2284, Intro. p. 4; Ex. 1, p. 94-120 and Ex. 6, p. 280). Headquarters notified Flores of their intention to conduct the review. When the review had to be postponed again they notified him of the postponement. When the new date was selected, he was again notified of the new date. (IF, No. 98-2284, Ex. 6, p. 279-280).

Flores asserted in his administrative case that Ms. Reba somehow discriminated against him by asking Mr. Ernie Tijerina, a Chief Inspector, for a detailed justification of his recommendation for Supervisory Selection, GS-12. In her declaration, Ms. Reba explained that she follows the same procedure for all ports. As her practice, she asked the Port Directors or Chief Inspectors for a recommendation and then she makes a decision based on their recommendation. In this case, Chief Inspector Tijerina gave the recommendation on behalf of the Port Director. Ms. Reba felt it did not explain enough in detail why the proposed selectee was the best. (IF, No. 98-2284, Ex. 6, p. 278-279). As a result, she sent it back asking for a better explanation saying the Agency needed a better reason. She thought that Mr. Tijerina was treating this as a pro forma request and did not realize how critical it was that the agency have a good reason. Ms. Reba further explained how, when a selection is made, there will be challenges by those who were not selected and she wanted to be prepared. Ms. Reba stated that she sent Flores a copy of her message to Mr. Tijerina since he was Mr. Tijerina's boss. (IF, No. 98-2284, Ex. 6, p. 278-279).

In April 1998, the Director Reba cancelled the vacancy announcement for a Canine Supervisor and instead sent Canine Chief James Wilder from Hildago to Brownsville on detail. She

---

[8] The actual review, itself, shows it was a Headquarters' Review. (IF 98-2284, p. 94-99).

did this because the management review conducted by Headquarters had just been finished, and there were a series of recommendations on mismanagement and drug enforcement deficiencies that had to be addressed. She determined that it was not fair to expect a brand new supervisor to not only learn a new job but also to address deficiencies that had been out there for some time. Additionally, the Canine Supervisors already in Brownsville were there when the situation developed.

She needed an outside manager to come in and evaluate the situation. Ms. Reba thought it made more management sense to bring in a seasoned manager, with experience from the training academy to come in, address the deficiencies and solve some of the problems. (IF, No. 98-2284, Ex. 6, p. 279). Once that was accomplished, Ms. Reba felt she could then select a supervisor to maintain what had been accomplished rather than perpetuate past mismanagement. Chief Wilder had extensive national experience and a strong personality. She believed that he would not be intimidated while trying to correct past mismanagement. This was important to Ms. Reba since the reason that SCEO Collentine was unable to correct the enforcement deficiencies and to endure the pressures of the job in Brownsville. (IF, No. 98-2284, Ex. 6, p. 279).

The aforementioned facts relating to  Flores' individual case are clearly related to his management position and are based on alleged subjective decisions made by Ms. Reba and/or Mr. Winwood. In his administrative cases, Flores claimed that his first level supervisor was the main alleged discriminating official. Ms. Reba directly supervised him as a port director. None of the 107 on the list attached to the Amended Complaint reported directly to Ms. Reba and none were at the port director level.

## FACTS PERTAINING TO THE 107 INDIVIDUALS IN FLORES' EXHIBIT "A"

The Amended Complaint fails to articulate any specific facts to support the a Title VII claim on behalf employees 107 whom Flores' attempts to represent. The reason for this is obvious: Flores' claims are totally distinct and distinguishable from those whom he cannot  represent in this action..

Regardless of what the specific facts may be, Flores' case is and will be  specifically distinct from any claims which could be brought buy those 107 individuals.  Flores claims (discussed in

Page 10

detail *supra)* are specifically based on his position as a port director, as the allegations pertain to the management and/or the mismanagement of the Brownsville Port and Flores' reassignment as a port director.  The main alleged discriminating official in Flores' cases is Ms. Reba. Her name is not mentioned in the Amended Complaint pertaining to the 107 employees. Flores was one of the highest-ranking Customs management officials in South Texas. He is the only GS 14 Port Director listed in this case as a Plaintiff and class representative. Ironically, his counterpart, Port Director David Higgerson of Hildago, is alleged to be one of the discriminating officials in the Amended Complaint regarding the 107 employees. This is not surprising as the 107 employees include many subordinate bargaining unit employees at the Hildago Port, along with the Brownsville Port. Yet, Flores was in the same position as Mr. Higgerson and he was part of the same management team. *In fact*, in Flores' individual administrative cases, Mr. Higgerson is not an alleged discriminating official.

Flores' position was a non-uniformed, non-bargaining unit, executive position. All of the 107 individuals on the list are uniformed lower level employees, mainly from the Ports of Brownsville, Hildago/Pharr, with some from the Ports of Laredo, Progresso, San Antonio, and Sodus Point, New York.[9]  Approximately 101 of the individuals on the list are bargaining unit employees, including several union stewards and union officers. Six of the individuals are GS 12-13 uniformed supervisors.  As a port director like Mr. Higgerson, Flores was responsible for making decisions and recommendations regarding the employees on the list that worked at the Brownsville Port. Additionally, he reported to different first level supervisors than the 107 listed individuals. As a result, since he was part of the same management team that several of the 107 employees may have allegations against, he has a conflict of interest in his representation of these lower level employees, and his individual claims are not typical of the putative class.

---

[9]     An affidavit in support of these statements will be filed under separate cover.

Page 11

## ARGUMENT AND ANALYSIS

### A.    The Requirement to Exhaust the Administrative Process

Title VII prohibits discrimination with respect to "personnel actions" in federal employment on the basis of "race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-16(a). Federal agencies are also prohibited from taking adverse employment actions in order to retaliate against an employee for participating in the Title VII process.    Resort to the administrative mechanisms is mandatory. Indeed, 42 U.S.C. § 2000e-16(c) explicitly notes that federal employees are required to exhaust the available administrative procedures before they may bring a Title VII claim in United States District Court. Fitzgerald v. Secretary, United States Department of Veteran's Affairs; 121 F.3d 203, 206 (5th Cir. 1997); Randel v. United States Department of the Navy, 157 F.3d 392, 394 (5th Cir. 1998); see also Brown v. General Servs. Admin., 96 S.Ct. 1961, 1967 (1976) (reversed by statute on other grounds); see also Porter v. Adams, 639 F.2d 273, 276 (5th Cir. 1981); Mosely v. Pena, 100 F.3d 1515, 1518 (10th Cir. 1996).

### B.    Allegations of the 107 Individuals Listed in Plaintiff's Exhibit "A" Have Not Been Exhausted and Should be Dismissed

#### 1)    Plaintiff's assertion that section 1981 or a Bivens claim may be used to circumvent Title VII's exhaustion requirement is incorrect and contrary to the Supreme Court's jurisprudence.

Pursuant to 42 U.S.C. § 2000e-16(c), employees of the federal government are required to initiate and exhaust their administrative remedies before they may litigate a Title VII claim in a United States District Court. Plaintiff Flores is apparently aware of this requirement, because he has included in his Amended Complaint blanket allegations that he has been in the EEO process more than 180 days

Not surprisingly, the relevant case law overwhelmingly confirms that plaintiffs must satisfy Title VII's "rigorous administrative exhaustion requirements and time limitations" in order to litigate their claims in federal district court. See Brown, 425 U.S. 820, 829-835; Porter v. Adams, 639 F.2d at 276. For these reasons, Title VII's procedural requirements have been "strictly enforced" by the

Page 12

judiciary.  See United Air Lines v. Evans, 97 S.Ct. 1885 (1977));  see also Irwin v. Department of Veterans Affairs, 111 S.Ct. 453, 456 (1990) (noting that requirements codified in § 2000e-16(c) act as a "condition to the waiver of sovereign immunity and thus must be strictly construed") (citing Library of Congress v. Shaw, 106 S.Ct. 2957 (1986)).

In his Amended Complaint, Plaintiff erroneously cites case law pertaining to 42 U.S.C. § 1981 to support an argument in opposition to the exhaustion requirement.  Though Plaintiff correctly asserts that there is no exhaustion requirement for Section 1981 claims, he fails to mention that Section 1981 claims are not actionable against the Federal Government, including its Executive Branch agencies. In fact, the Supreme Court has determined that there is no 42 U.S.C. § 1981 cause of action against the Federal Government. In other words, it is well established precedent in the Supreme Court and the Fifth Circuit, that Federal employees cannot bring constitutional torts (including Bivens' actions)[10] against their employer, the Federal government.  Federal Deposit Insurance Corp. v. Meyer, 510 U.S. 471, 484-487 (1994); Bush v. Lucas, 462 U.S. 367 (1983); Brown 425 U.S. at 829-835; Irwin v. Veterans Adm., 874 F.2d 1092 (5th Cir. 1989);  Newbold v. United States Postal Service, 614 F.2d 46 (5th Cir. 1980) (per curiam), cert. denied, 449 U.S. 878 (1980); Robinson v. Rubin, 77 F.Supp.2d 784, 790 (S.D.Tex. 1999); Munoz v. Orr, 559 F.Supp. 1017 (W.D. Tex. 1983).

In Brown, supra., the Supreme Court explained in detail the reasons why constitutional torts cannot be brought against a Federal agency by its employees.  In Brown, the Supreme Court examined the legislative history and the structure of the 1972 amendment to Title VII that extended its protections to federal employees.  In consideration of a racial discrimination claim raised by a General Services Administration employee, the Brown court held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." The Court found that

---

[10] Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

the "balance, completeness, and structural integrity of § 717" were inconsistent with the contention that the Title VII remedy was intended to supplement other putative judicial relief. 425 U.S. at 832. Additionally, the Court found as federal employees are subject to the Civil Service Reform Act ("C.S.R.A.", as codified in Title 5 of the U.S. Code), they may raise constitutional claims other than Title VII discrimination in that forum.

Similarly, the Fifth Circuit, in <u>Newbold v. United States Postal Service</u>, 614 F.2d 46 (5th Cir. 1980), refused to allow a suit for employment discrimination to proceed under 42 U.S.C. § 1981, and followed the <u>Brown</u> pronunciation regarding the exclusivity of Title VII relief in Federal government employment law. The plaintiff in <u>Newbold</u> had filed suit against Postal Service, the American Postal Workers Union, the Equal Employment Opportunity Office, and the attorneys with whom the plaintiff had consulted in pursuing his claim. The Fifth Circuit relied on the <u>Brown</u> Court's broad language on preemption and exclusivity to find that there was no cause of action under § 1981 *et seq.* <u>Brown</u>, 614 F.2d at 47.

Similarly, district courts of the Fifth Circuit have relied on the Brown progeny. <u>See</u>, <u>e.g.</u>, <u>Cazales v. Department of Justice</u>, 569 F.Supp. 213 (E.D. La. 1983) <u>aff'd</u> (5th Cir.); <u>Robinson v. Rubin</u>, 77 F. Supp. 2d 784 (S.D. Tex. 1999); <u>Munoz v. Air Force</u>, 559 F.Supp. 1017 (W.D. Tex. 1983). In <u>Cazales</u>, the court reasoned that, as an employee of an executive agency, Mrs. Cazales was subject to the Merit System Principles of the Civil Service Reform Act (C.S.R.A.) regarding her constitutional claims and subject to Title VII regarding discrimination claims. Thus, the Court found that the plaintiff, desiring to raise her constitutional claims, is only thus entitled to avail herself of the procedures established by the statutory scheme in the CSRA in 5 U.S.C. § 2301 *et seq.* and Title VII.

The Court's reasoning was stated as follows:

> When confronted with statutory remedies, the very passage of which manifests a congressional intention to provide its own remedial scheme, the Court cannot maintain an alternate cause of action. Furthermore, with no compelling reason to justify a transgression of the prevailing Supreme Court and Fifth Circuit directives nor of the established administrative relief, the Court finds that Mrs. Cazalas' status as a government employee serves as a special factor which counsels hesitation in

recognizing a constitutional cause of action in the absence of affirmative action by Congress. <u>Cazales v. Department of Justice</u>, 569 F.Supp. at 213.

This foregoing reasoning is certainly applicable in the instant case as the Supreme Court has already determined that constitutional torts are unavailable in Federal agency employment actions as Congress has enacted specific statutory procedures and remedies for Federal employee claims. Therefore, Plaintiffs cannot rely on constitutional claims to avoid the exhaustion requirement of Title VII as no constitutional claims can be brought in this case.

> **2. Flores' individual exhaustion is insufficient to exhaust on behalf of the 107 employees on the Exhibit "A" list, as his matter is distinct, dissimilar, and he is not an adequate class representative**

Flores asserts that because he exhausted the administrative process in his individual capacity, then the 107 individuals listed in his Exhibit "A" can rely on his exhaustion. The type of automatic exhaustion for all 107 individuals regardless of the similarity of their actions would violate established Supreme Court precedent. <u>See</u> <u>General Telephone Co. v. Falcon</u>, 457 U.S. 147 (1982); <u>Redditt v. Mississippi Extended Care Centers, Inc.</u>, 718 F.2d 1381, 1387 (5th Cir. 1981); <u>Griffin v. Dugger</u>, 823 F.2d 1476, 1491 (7th Cir. 1987), <u>cert. denied</u>.

It seems Plaintiff is also referring to case law pertaining to the "single filing rule" exception to the exhaustion requirement. However, this "single filing rule" waives exhaustion requirements for plaintiffs whose claims arise out of the same discriminatory acts in the same time period alleged by a complainant who properly exhausted his administrative remedies. <u>See,e.g.</u>, <u>Alexander v. Fulton, Co.</u> 207 F.3rd 1303 (11th Cir. 2000), <u>reh'g denied</u>; <u>Griffin</u>, 823 F.3rd at 1493; <u>Redditt</u>, 718 F.2d at 1387; <u>Hill v. AT&T Technologies, Inc.</u> 731 F.2d 175, 185 (4th Cir. 1984).

Even though Flores exhausted his individual claims, this does not mean that the 107 people listed in his Exhibit "A" have exhausted. As Flores and the 107 do not constitute a proper class, they cannot fall within the "single filing rule." To fall within the single filing rule, the 107 employees claims would have to arise of the same alleged discriminatory acts in the same time period and Flores would have to be a proper class representative. <u>See</u> <u>General Telephone Co. v. Falcon</u>, 457 U.S. 147 (1982); <u>Allen v. United States Steel Corp.</u>, 665 F.2d 689, 695 (5th Cir. 1982); <u>see also</u>

Griffin, 823 F.3rd at 1493; Redditt, 718 F.2d at 1387. Additionally, a conflict of interest between the class representative and the putative class would certainly contravene the single filing rule.

In Falcon, the Supreme Court, for all practical purposes, overruled and repudiated what used to be termed "the across-the-board theory" of Title VII class actions. Flores seems to be asserting an across the board type theory as his individual case is distinct. Under the across-the-board theory, a plaintiff was permitted to raise class claims that were different in type from his or her own personal claims. Courts previously allowing certification of an across-the-board class generally reasoned, or assumed, that when an employer discriminated on the basis of a class characteristic such as race, the discrimination pervaded--in an across-the-board fashion--all of the employer's personnel policies and practices.

In rejecting this across-the-board theory, the Supreme Court reasoned in Falcon:

> There is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

Falcon, 457 U.S. at 157.

In Falcon, the Supreme Court cautioned against use of a presumption that generalized class claims are encompassed within the personal claims of an individual plaintiff. Instead, the Court stressed that a Title VII class action should be certified only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Falcon, 457 U.S. at 161; see also, Griffin v. Dugger, 823 F.2d 1476 (11th Cir. 1987), cert. denied, 486 U.S. 1005 (1988). The fact that a plaintiff alleges ethnic discrimination is not enough to justify certification of a class. Conclusory allegations based on ethnicity are insufficient under Falcon.

In this case, there has been no showing that Flores' claims are in any way similar to the listed 107, mostly uniformed and bargaining unit employees. As Flores was a manager over many of these employees, it is likely he took part in employment actions or recommendations relating to such employees. Moreover, the issues in Flores administrative cases pertain to certain management action

that would only pertain to a director of a port of entry, and not to individual employees. None of the individuals on the list of 107 are port directors. Similarly, as Flores was a port director in Brownsville, it is likely he made decisions or recommendations affecting employees on the Exhibit "A" list. As a result, the conflict and the dissimilarity of Flores' case with the claims of the 107 employees listed on Exhibit "A" are quite obvious. Consequently, as Flores has interests adverse to the 107 subordinate employees, he is not a proper class representative. Thus, the 107 employees cannot rely upon Flores' exhaustion in his dissimilar individual case.

> 3. **Even if the exhaustion requirement was met, Plaintiff has failed to meet the requirements of numerosity, commonality, typicality and adequacy of representation for a class pursuant to Federal Rule 23(a)**

Litigants seeking to represent a class under Title VII must meet the requirements of Federal Rule of Civil Procedure 23(a). See, e.g., Falcon, 457 U.S. at 156. Under Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

As the Supreme Court noted, "'Careful attention to the requirements of Fed. Rule Civ. Proc. 23 remains...indispensable ....'" Falcon, 457 U.S. at 157, (quoting East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 405 (1977)). The Supreme Court further determined that, "a Title VII action may only be certified if the trial court is satisfied, after rigorous analysis that the prerequisites of Rule 23(a) have been satisfied". Falcon, 457 U.S. at 156; see Castano v. American Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996); Applewhite v. Reichhold Chemical Co., Inc., 67 F.3d 571, 573 (5th Cir. 1995); Zeidman v. J. Ray McDermott & Co. Inc., 651 F. 2d 1030, 1038 (5th Cir. 1981).

In order to maintain a class action, in addition to the requirements of Rule 23(a), a representative suit must also comply with the requirements of Rule 23(b). Ford v. NYLCare Health Plans, 190 F.R.D. 422 (S.D. Tex. 1999) (Judge Hittner). Rule 23(b) provides:

Page 17

(b) Class Actions Maintainable. An action may be maintained as a class action
if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the
class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of
the class which would establish incompatible standards of conduct for the party
opposing the class, or
(B) adjudications with respect to individual members of the class which would
as a practical matter be dispositive of the interests of the other members no
parties to the adjudications or substantially impair or impede their ability to
protect their interests; or
(2) the party opposing the class has acted or refused to act on grounds generally
applicable to the class, thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the class as a whole; or
(3) the court finds that the questions of law or fact common to the members of
the class predominate over any questions affecting only individual members, and
that a class action is superior to other available methods for the fair and efficient
adjudication of the controversy....

Plaintiff bears the burden of proving that the elements of Fed. Rule Civ. Proc. 23 are
satisfied, since the Plaintiff is seeking the class certification. See Falcon, 457 U.S. at 156;
Applewhite, 67 F.3d at 573; Kelley v. Galveston Autoplex, 196 F.R.D. 471 (S.D. Tex. 2000) (Judge
Kent); Latson, et al v. G C Services, 2000 U.S. Dist. Lexis 6295 (S.D. Tex. 2000) (M.J. Botley);
Washington v. C.S.C. Credit Services, Inc., 199 F.3d 263 (5th Cir. 2000); Castano 84 F.3d at 740;
Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977); Blackie v. Barrack,
524 F.2d 891, 901 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976). Plaintiff has failed to present
any factual or legal support for class certification. Plaintiff must present a sufficient factual basis,
not mere "vague and conclusory statements with little specific content", from which the court may
make a reasonable judgment concerning the satisfaction of the elements of Fed. Rule Civ. Proc.
23(a). See Falcon, 457 U.S. at 156; Doninger, 564 F.2d at 1309; Blackie, 524 F.2d at 901, n. 17.
Plaintiff's presentation of speculation and conclusory statements does not meet his burden of
satisfying the elements of numerosity, commonality, typicality and adequacy of representation, and
therefore, the class should not be certified. Falcon, 457 U.S. at 159.

1. **Numerosity**

In order for a class to be certified, the class must be so numerous that joinder of all members
is impracticable. The burden of showing impracticability rests with the class representative seeking

certification. The class representative need not determine exactly how many members the class will contain, but on the other hand, should not engage in mere speculation as to the size of the class. Kelley, 196 F.R.D. at 474; Fed. Rule Civ. Proc. 23(a)(1). To support the contention of proposed class plaintiff has only listed 107 individuals without any meaningful explanation. Plaintiff has made no showing as to the impracticability of individual claims or joinder.

## 2. Commonality

Plaintiff also fails to establish that there are questions of law or fact common to members of the alleged class pursuant to Fed. Rule Civ. Proc. 23(a)(2). See Falcon, 457 U.S. at 159; Kelley v. Galveston Autoplex, 196 F.R.D. at 471-474 (finding where alleged violations take many different forms there is no common issue of law or fact. Where individual issues predominate over the alleged class issues, the case is inappropriate for class certification). See Jamerson v. Board of Trustees of University of Alabama, 80 F.R.D. 744, 747 (N.D. Ala. 1978), aff'd, 662 F.2d 320 (5th Cir. 1981); O'Connell v. Teachers College, 63 F.R.D. at 639-640. Although Jamerson and O'Connell involve claims of discrimination in university settings, they are applicable to the instant litigation in that the individuals' qualifications and personal characteristics were the pivotal matters in both cases.

In this case, several different violations are alleged. Some involve bargaining unit issues and others involve actions only pertaining to supervisors. In fact, the putative class representative, Flores, is complaining about the subjective decision relating to his directed reassignment as a port director and the subjective decisions addressing management issues relating to his port director position. However, it seems none of the 107 listees have also been the subject of a directed reassignment to a lateral GS 14 position for mismanagement and subject to management reviews of port operations. Many of those listed are bargaining unit employees, not high level managers like Flores.

The alleged actions regarding the putative class are not specifically based on subjective decision-making like Flores' administrative cases, but are objective and generalized. They vary to

include discipline, promotions, libel, slander, transfers, training and overtime. There is no explanation of **"what, when, where, and how"** these putative class members suffered these alleged harms. Moreover, there is a claim that bargaining unit inspectors at the GS 11 have no status at the McAllen Port. It is not clear what is meant by this allegation, how it pertains to Hispanic national origin, and it does not pertain to former GS 14 Port Director Flores.

To the contrary, as a non-uniformed port director, Flores is not subject to the same overtime provisions applicable to uniformed employees, and as a port director, Flores was part of the discipline and selection processes involving his subordinates. In fact, his administrative cases do not even pertain to training, discipline, overtime or non-selection. Rather, his administrative case pertains to alleged subjective decision-making affecting his the location of port director position and reviews of his management skills. As a result, his individual case lacks commonality with the 107 employees listed on Exhibit "A". See Griffin, 823 F.3rd at 1493; Redditt, 718 F.2d at 1387; Wheeler v. City of Columbus, 703 F.2d 853, 855 (5th Cir. 1983)(per curium).

Additionally, Flores was one of the management officials, and a part of the same management team, with decision-making authority over GS 11 inspectors. Therefore, this action is inappropriate for class certification since the members of the class lack the requirement of commonality under Fed. Rule Civ. Proc. 23(a)(2).

## 3. Typicality

The third requirement for class certification is that the claims or defenses of the representative party are typical of the claims or defenses of the class. Fed. Rule Civ. Proc. 23(a)(3); see Falcon, 457 U.S. at 159; Kelley, 196 F.R.D. at 476. In order to meet this requirement, the Plaintiff must establish that his claims are typical of the claims of the alleged class. Redditt, 718 F.2d at 1387; Kelley, 196 F.R.D. at 476. One of the chief purposes is to prevent representation by a representative preoccupied with a defense only for himself. See Warren v. Reserve Fund, 728 F.2d 741, 747 (5th Cir. 1984), reh'g denied.

Plaintiff has made no showing that any other members of the proposed class would be similarly situated to himself, and therefore, Plaintiff's claims and defenses have not been established to be typical of the proposed class members. Falcon, 457 U.S. at 159; Redditt, 718 F.2d at 1387. More importantly, Flores as a high level manager, does not have claims which are typical of the lower level employees listed in the proposed class. Plaintiff has failed to meet his burden to satisfy the requirement of typicality pursuant to Fed. Rule Civ. Proc. 23(a)(3)

## 4. **Adequacy of Representation**

The fourth requirement for class certification is that the representative party or agent will fairly and adequately protect the interests of the class. Fed. Rule Civ. Proc. 23(a)(4). Since Plaintiff has failed to meet the requirements of commonality and typicality, it logically follows that Plaintiff has also failed to meet the requirement that he is an adequate representative of the class. The analysis of the elements of commonality and typicality tends to merge with the analysis of the element of adequacy of representation. Falcon, 457 U.S. at 157 n.13.; Kelley, 196 F.R.D. at 476.

As has been made plain in the earlier discussions of the elements of commonality and typicality, Plaintiff's claim and interests have not been established to be coextensive of the entire class. A sharing of interests among the class members and the agent is necessary for the agent's representation to be adequate. See Redditt, 718 F.2d at 1387; Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 263 (S.D.Cal. 1988), citing In re Northern District of California, Dalkon Shield IUD Products Liability Litigation, 693 F.2d 847, 855 (9th Cir. 1982), cert. denied, 459 U.S. 1171 (1983). In fact, as a former member of management charged with making recommendations and decisions regarding several employees on the list, Flores has a conflict of interest. See, e.g., Morgan v. United Parcel Service, 169 F.R.D. 349 (E.D. Mo. 1996)(explaining that a class consisting of managers and subordinates was not appropriate, as the managers would be representing management at the same time they were challenging management's actions). Where grievances may be so individualized and personalized as in this matter, it is likely that the class members will ultimately expend their energies on their own claims and defenses at the expense of the class. Burka v. New York City Transit

Authority, 110 F.R.D. at 601-602; Johnson v. Bond, 94 F.R.D. at 131.   Flores' allegations, as evidenced by his administrative record are individualized concerning his reassignment as a GS 14 Port Director from Assistant Commissioner Charles Winwood and the oversight provided by his former supervisor, Maria Reba. There is no evidence that these two individuals had direct and subjective involvement regarding the other putative members' allegations.

Additionally, in his administrative cases, Flores signed several documents that he believed he was discriminated against based on sex and age.  If Flores perceives these to be a basis of discrimination against him personally, he would not likely be adequately representing the females and different age groups on the list of 107 people.

Most importantly, Flores' interests conflict with those 101 "members" who are in bargaining unit, as he was a manager who may be responsible for certain acts alleged by these subordinate employee members.    Therefore, Plaintiff has failed to establish that he is an adequate class representative pursuant to Fed. Rule Civ. Proc. 23(a)(4).

Since all four requirements of Rule 23(a) must be met before the Court examines whether the Plaintiffs meet Rule 23(b), it is not necessary to go through an extensive analysis of this

Page 22

subsection. However, it does not appear that Plaintiffs will be able to satisfy these requirements in Rule 23(b).

## CONCLUSION

While Plaintiff correctly argues that 42 U.S.C. 1981 does not have an exhaustion requirement, this type of constitutional claim (including any <u>Bivens</u>' claim) is not a viable cause of action that can be asserted against the Federal Government by its employees.  Second, Flores' individual exhaustion is insufficient to exhaust on behalf of the 107 individuals, as he does not have representational capacity.  His claims are distinct from the 107 individuals and F.R.C.P. Rule 23(a) requisites for a class action have not been met.  Therefore, the claims of the putative class action (107 employees) should be dismissed, leaving Flores' individual claims within the jurisdiction of this Honorable Court.

WHEREFORE, Defendant respectfully requests that its Motion to Dismiss the Amended Complaint be granted.

<div style="margin-left:40%">

Respectfully submitted,

GREGORY A. SERRES
United States Attorney

By: _____ , AUSA

VERNON L. LEWIS
Assistant United States Attorney
Attorney in Charge
Texas Bar Number: 12308800
Federal ID Number: 15882
910 Travis, Suite 1500
P. O. Box 61129
Houston, Texas 77208
Phone: (713) 567-9505
Fax: (713) 718-3303

</div>

OF COUNSEL:

Ms. Caroline Blessey
Office of the Associate Chief Counsel
US Customs Service
2323 South Sheperd Drive, Suite 1246
Houston, Texas 77019

## CERTIFICATE OF SERVICE

I, Vernon L. Lewis, do hereby certify that a true and correct copy of the foregoing pleading was sent via facsimile and certified mail, return receipt requested, on September 14, 2001, to the following:

Mr. Denis A. Downey
1185 F.M. 802, Suite 3
Brownsville, Texas 78526-1538
Fax: (956) 544-0562

_____
VERNON L. LEWIS
ASSISTANT UNITED STATES ATTORNEY

Page 24

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **JORGE FLORES, ET AL** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CASE NO.   01-CV-00057** |
| v. | § | |
| | § | |
| **U.S. CUSTOMS SERVICE,** | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## ORDER GRANTING DEFENDANT'S
## MOTION TO DISMISS THE AMENDED COMPLAINT

Upon consideration of Defendant's Motion to Dismiss the Amended Complaint, the pleadings, and the applicable law, the Court finds that the Motions are meritorious and should be granted. It is therefore

**ORDERED** that Defendant's Motion to Dismiss the Amended Complaint is **GRANTED**.

Signed in Brownsville, Texas on the _____ day of _____, 2001.

_____

UNITED STATES DISTRICT JUDGE