*18*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
S         District of Texas

**NOV 1 5 2001**

Mic           y
Clerk of Court

| | | |
|---|---|---|
| **JORGE FLORES, ET AL** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CASE NO.   01-CV-00057** |
| **v.** | § | |
| | § | |
| **U.S. CUSTOMS SERVICE,** | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## DEFENDANT'S MOTION FOR SUMMARY
## JUDGMENT AND MEMORANDUM IN SUPPORT

The Defendant, the Secretary of the Department of the Treasury, by and through the undersigned Assistant United States Attorney, respectfully moves this Court to grant Defendant's Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c). The basis for this Motion is there are no issues of material fact to be decided.

## I. BACKGROUND

Mr. Jorge Flores filed three administrative employment discrimination cases with the Department of the Treasury. The investigative files ("IF") have previously been provided to the Court in the Defendant's Motion to Dismiss the Amended Complaint, as Exhibit 2 to that Motion. Mr. Flores has exhausted his administrative remedies, on two of these Treasury Department ("T.D.") cases, numbers 99-2268 and 98-2284, as he was engaged in the administrative process at least 180 days. See 29 C.F.R. 1614.407. Mr. Flores opted out of the administrative process on March 26, 2001 for these two cases, so he had 90 days from that date

to file in federal court. <u>See</u> 29 <u>C.F.R.</u> 1614.407. With regard to Mr. Flores' third individual administrative case, 99-2009, the case was dismissed by the EEOC on February 15, 2000, and he had 90 days to file suit. As part of this dismissal, Mr. Flores received a notice concerning his appeal rights explaining that he had 90 days to file in United States District Court. (Defendant's Exhibit 1). The statute of limitations on case number 99-2009 has run. Mr. Flores has also previously filed administrative actions claiming whistleblower protection under 5 <u>U.S.C.</u> 2301 et seq. These cases have been dismissed by the Office of Special Counsel ("OSC"), the Merit Systems Protection Board ("MSPB") and by the Federal Circuit Court of Appeals, docket number 01-3231 on October 24, 2001. (Defendant's Exhibits 2 and 3.)

The following issues were exhausted in the administrative employment discrimination case, Treasury Department (T.D.) Case No. 98-2284:

> Whether [Complainant has been] subjected to a continuing pattern of discrimination and a hostile working environment based on [his] age (52; D.O.B. 06-06-46), national origin (Hispanic), sex (male) and/or reprisal for prior and/or reprisal for prior EEO complaint activity when:

(1)     On December 4, 1997, the South Texas CMC Director impounded the canine records of the Port of Brownsville without first consulting with or notifying [him] as the Director, Port of Brownsville;

(2)     On December 4, 1997, the CMC Director initiated a Headquarters' Management Review of the Canine Program in the Port of Brownsville without first consulting with or informing [Complainant] of the reason;

(3)     On December 9, 1997, the CMC Director requested in an e-mail message that [Complainant] justify [his] recommendation for the selection of a Supervisory Customs Inspector in the Port of Brownsville and in part stated, "We need to be able to articulate why we selected one and not the others . . .It is an awful way to do business, but unfortunately we have been forced to it by those that abuse the system and cry discrimination every time they don't like a decision management makes";

(4)     On April 1, 1998, the CMC Director postponed until further notice the filling of a Supervisory Canine Officer position in the Port of Brownsville without first consulting with or informing [Complainant];

(5)    On April 6, 1998, the CMC Director detailed a Supervisory Canine Officer from the Port of Hidalgo to the Port of Brownsville, without first consulting with or informing [Complainant]; and

(6)    Between December 1997 and May 1998, the Assistant Commissioner, Office Field Operations, failed to respond to [Complainant's] repeated requests to intervene in the CMC Director's actions. (Investigative File (IF) 98-2284, Ex. 2, p. 235-236).

The following issue was exhausted in administrative case, T.D. Case No. 99-2368:

Whether [Complainant was] subjected to a continued pattern of harassment because of [his] age: 53 (06-06-46), national origin (Hispanic), sex (male), and/or reprisal for [his] prior EEO complaint activity, when on May 3, 1999, [he] received a directed reassignment to Norfolk, Virginia.
(IF 99-2368, Ex. 3, p. 103).

## A.    Facts Regarding T.D. No. 98-2284

The administrative Investigative File shows that Plaintiff was a GS-14 Customs Port Director, assigned to Norfolk, Virginia at the time of the complaint. From February 1996 to September 1999, his supervisor was the Director, Customs Management Center, (SES level) Maria Reba and at the time he was the Port Director of Brownsville, Texas. (IF, 98-2284, Ex. 18, p. 329, Ex. 6, p. 277; Ex. 16, p. 325). During this period, Ms. Reba supervised ten Port Directors. (IF, 98-2284, p. 4 and IF, Ex. 16, p. 325). Ms. Reba's supervisor was Assistant Commissioner Robert Trotter at that time. (IF, 98-2284, Ex. 7, p. 283).

As Assistant Commissioner Trotter explained in his sworn testimony to the Office of Special Counsel, Plaintiff's conduct and insubordination problems began to be noticed by upper management after Plaintiff's previous supervisor, Audrey Adams, left around 1994 and gradually escalated through 1998. (Defendant's Exhibit 4). According to Mr. Trotter, the Plaintiff worked with Ms. Adams for approximately 13 years and they were part of a "South Texas Group." Mr. Trotter explained that Ms. Adams acted like a "mother bird" to her subordinates, and that when she left the "nest", Plaintiff was unable to "step up" and "fly."

3

(Defendant's Exhibit 4, p. 40-42). Subsequent to Ms. Adams' departure, Plaintiff would not take direction from Ms. Adams' acting successors. As Mr. Trotter stated, Plaintiff also had problems with another acting successor, Linda Wilcox, in 1994 or 1995. (IF, 98-2284, Ex. 9, p. 289). When Plaintiff was counseled about his conduct with Ms. Wilcox by Mr. Trotter's deputy, John McGowen, in 1994 or 1995, Mr. Trotter explained this is the period when Plaintiff got "hard feelings." (IF, 98-2284, Ex. 9, p. 289; Defendant's Exhibit 4, p. 11-12). This preceded Ms. Reba's arrival of February 1996 and Plaintiff's EEO activity.

In fact, soon after Ms. Reba's arrival in February 1996, Plaintiff's performance deficiencies became evident to her in early April 1996. (Defendant's Exhibit 5, p. 21-35). At this time, despite the Customs Service's primary mission to catch narcotics' smugglers, Plaintiff's Port released approximately 3,080 pounds of cocaine into the country. (Defendant's Exhibit 5, p. 21-35; Exhibit 4, p. 9-11). As a result, Mr. Trotter determined, on or about May 11, 1996, that some type of employment action needed to be taken against Plaintiff, such as a reassignment or downgrade. (Defendant's Exhibit 4, p.18-21). However, because of political connections Plaintiff had in the Department of the Treasury, the local Congressional delegation, and the trade, this action got stalled in May 1996. (Defendant's Exhibit 4, p. 18-21). Conveniently, while the action against Plaintiff was being stalled, in late September 1996, Plaintiff made his alleged "whistleblower" disclosure to Mr. Trotter, the FBI and IG about his supervisor, Ms. Reba. At this time, Mr. Trotter was "chilled." Mr. Trotter did take any action because he surmised that Plaintiff made up this disclosure to shield himself, and Mr. Trotter was concerned about being accused of retaliating against an alleged whistleblower.[1]

---

[1] In fact, Mr. Trotter's sworn statements together with the decision in the first MSPB case show Flores' alleged disclosure was a **convenient** disclosure rather than a **protected** disclosure.

4

(Defendant's Exhibit 4, p. 19-21). Gradually, however, Plaintiff's enforcement performance declined, and his insubordination escalated. (Defendant's Exhibit 4, p. 26-34). Any action by Mr. Trotter was held in abeyance until August 1998 when his performance and conduct reached a point that Mr. Trotter asked Agency Counsel to see if the Agency could reach a global settlement to resolve both the mis-management concerns with the administrative cases. (Defendant's Exhibit 4, p. 19-34). As Mr. Trotter's declaration indicates, it was common to try to do a global settlement, which can involve a lump sum of cash in exchange for a retirement, when a high level manager has performance problems, conduct issues, and pending EEO/MSPB cases. (IF, 98-2384, Ex. 7, p. 283-284).

The Agency Counsels assigned to Plaintiff's cases made settlement offers to Plaintiff. Plaintiff made a counter-offer to the Agency that included a substantially larger cash payment. A reassignment was a term within a settlement offer and it was his option to accept or decline. (IF, 98-2384, Ex. 10, p. 290-294, Ex. 11, p. 295-296, IF 99-2369, Ex. 10, p. 155-156; Defendant's Exhibits 1, 2, and 3). The settlement proposal was to encompass all of Plaintiff's administrative cases, as well as the deficiencies in his performance (narcotic enforcement deficiencies) and in his conduct (insubordination).[2]    (IF, 98-2384, Ex. 7, p. 283-284; Defendant's Exhibit 4, p. 29-30 and 11)  The reassignment was part of the settlement because his professional relations with Ms. Reba were very strained and presented a problem. (IF, 98-2384, Ex. 10, p. 290-294, and Ex. 7, p. 283-284; Defendant's Exhibit 4, p. 9-34). Further, there was evidence that there were enforcement deficiencies and security breaches at the Brownsville

---

[2] The Complainant filed No. 99-2009 as an EEO complaint regarding settlement discussions, as he did not get what he wanted in settlement. This same matter was dismissed by the Agency and the EEOC because settlement discussions do not constitute an employment action. (Defendant's Exhibit 1).

border crossing.[3]  (Defendant's Exhibits 4, p. 9-19).  The settlement negotiations subsequently ceased, as the parties could not reach an agreement.

Just prior to the settlement offer, between December 1997 and May 1998, as mentioned previously, Plaintiff complained to Assistant Commissioner Trotter, concerning alleged wrongdoing by Plaintiff's supervisor, Ms. Reba.  Mr. Trotter, himself, referred these allegations to the Inspector General.  Sometime thereafter, Mr. Trotter had a conversation with Plaintiff.

Mr. Flores informed Mr. Trotter that he too had referred these allegations outside of the Agency to the FBI.  Mr. Trotter explained that since the allegations referred to an outside agency, he could no longer be involved.  (IF, No. 98-2284, Ex. 7, p. 283).  Mr. Trotter understood that there was a later determination by IG that none of the allegations had merit. (IF, No. 98-2284, Ex. 7, p. 283).

Subsequently, Mr. Trotter offered to send a mediator to Laredo and Brownsville to address the concerns.  However, Plaintiff refused.  Mr. Trotter had sent a mediator back in 1994 when Mr. Flores complained about his previous boss, Linda Wilcox. (IF, No. 98-2284, Ex. 7, p. 283).

Mr. Trotter left the position of Assistant Commissioner, Office of Field Operations in early 1999.  (IF, No. 98-2284, Ex. 6, p. 119).  He was replaced by Charles Winwood in February 1999.  (IF, No. 98-2368, Ex. 5, p. 115).  When Mr. Winwood assumed his position he began a major reorganization in the Office of Field Operations.  Approximately 25 reassignments were made at the same time as Mr. Flores.  Each reassignment was made in order to improve on past deficiencies in several Ports and work locations. (IF, No. 98-2368, Ex. 5, p.

---

[3] Both the strained relationship and the security breaches began in April 1996 with the cocaine incident, well before his EEO activity.

115-116). Plaintiff's reassignment was based on the fact that the Brownsville Port had drug enforcement deficiencies, but he had the necessary people skills to address the communication problems the Port of Norfolk had with the public. (Defendant's Exhibit 6, p. 10-27, 35-48).

Mr. Winwood was new to the position of Assistant Commissioner, Office of Field Operations, and was not implicated in any way in prior EEO actions. The Commissioner of Customs was also new to that position.   The evidence in the OSC case indicates that Commissioner Raymond Kelly desired to change Customs and that he directed staff members, including Mr. Winwood, to reorganize and improve the Agency structure. (Defendant's Exhibit 6, p. 10-27, 35-48).   As part of this mandate, the evidence shows that Mr. Winwood made a number of changes, to include moving, at a minimum 25 managers, including at least six Port Directors, nationwide. (IF, No. 98-2368, Ex. 5, p. 115 and Ex. 11, p. 168-169, and Defendant's Exhibit 6, p. 10-27, 35-48). Mr. Winwood's statements, which explain the basis for each move, explain that he focused on the weaknesses of each Port and the strengths of each Director. (Defendant's Exhibit 6, p. 24-26). Mr. Winwood perceived that Plaintiff was very strong with community and public relations and determined that Norfolk had a weakness in that area, because Norfolk had experienced frequent friction between the Customs Service and the external communities.   (Defendant's Exhibit 6, p. 10-27, 35-48).   On the other hand, Mr. Winwood perceived that Brownsville had a problem with enforcement issues and selected a Port Director that he believed had strengths in that area.[4] (IF, No. 98-2368, Ex. 5, p. 116; Defendant's Exhibits 6, p. 10-27, 35-48). The evidence shows that each move was based on legitimate and defensible reasons.   Therefore, the fact that Mr. Winwood had no apparent

---

[4] The prior management attempted to address these deficiencies in the enforcement area with the prior settlement attempts in Agency case number 99-2009. (Defendant's Exhibit 1).

motive to discriminate, and in light of the evidence that Plaintiff's reassignment was part of a significant reorganization of Field Operations for Customs, which was directed by the incoming Commissioner, there is no evidence of discrimination.

**B.**     <u>**Facts Regarding T.D. No. 98-2284**</u>

In late 1997, Nat Aycox, the Director, Canine Program Team, in Customs Headquarters was responsible for sending managers, Mr. Norman Nestlerode and Mr. Jeffrey Gabel to do a management review at the Brownsville Port. (IF, No. 98-2284, Ex. 1, p. 94-120). There had been previous issues raised concerning the lost cocaine shipment and claims by SCEO Brian Collentine who claimed the CEO's did not receive equal treatment with the Inspectors. (IF, No. 98-2284, Ex. 1, p. 94-95, 99 and Ex. 6, p. 280). In preparation for the Headquarters' review, the Director, Field Operations in Laredo, Plaintiff's Supervisor, asked Supervisory Canine Enforcement Officer Perry (Skip) Mahen to look at the canine records in Brownsville. Plaintiff claims this record review was in some way discriminatory. However, Ms. Reba wanted to make sure the records were all in order to make sure the upcoming review was easy to conduct. (IF, No. 98-2284, Ex. 6, p. 280). SCEO Mahan took the records back to his office, reviewed them, found nothing missing and had them returned. (IF, No. 98-2284, Ex. 6, p. 280).

Plaintiff also asserts that Ms. Reba somehow discriminated against him by asking Mr. Ernie Tijerina, a Chief Inspector, for a detailed justification of his recommendation for Supervisory Selection, GS-12. In her declaration, Ms. Reba explained that she follows the same procedure for all Ports. As a practice, she asks the Port Directors or Chief Inspectors for a recommendation and then she makes a decision based on their recommendation. In this case, Chief Inspector Tijerina gave the recommendation on behalf of the Port Director. Ms. Reba felt

8

it did not explain enough in detail why the Proposed Selectee was the best. (IF, No. 98-2284, Ex. 6, p. 278-279). As a result, she sent it back asking for a better explanation saying we need a better reason. She thought that Mr. Tijerina was treating this as a pro forma request and did not realize how critical it was that the Agency have a good reason. Ms. Reba further explained how, when a selection is made, there will be challenges by those who were not selected and she wanted to be prepared. Ms. Reba stated that she sent the Plaintiff a copy of her message to Mr. Tijerina since Mr. Flores was Mr. Tijerina's boss. (IF, No. 98-2284, Ex. 6, p. 278-279).

In April 1998, Director Reba cancelled the vacancy announcement for a Canine Supervisor and instead sent Supervisory Canine Enforcement Officer (SCEO) James Wilder there on detail. She did this because the management review conducted by Headquarters had just been finished, and there were a series of recommendations on mismanagement and drug enforcement deficiencies that had to be addressed. She determined that it was not fair to expect a brand new supervisor to not only learn a new job but also to address deficiencies that had been out there for some time. Additionally, the Canine Supervisors already in Brownsville were there when the situation developed. She needed an outside manager to come in and evaluate the situation. Ms. Reba thought it made more management sense to bring in a seasoned manager, with experience from the training academy to come in, address the deficiencies and solve some of the problems. (IF, No. 98-2284, Ex. 6, p. 279). Once that was accomplished, Ms. Reba felt she could then select a supervisor to maintain what had been accomplished rather than perpetuate past mismanagement. SCEO Wilder has extensive national experience and has a strong personality. She believed that he would not be intimidated while trying to correct past mismanagement. (IF, No. 98-2284, Ex. 6, p. 279).

.

9

## II.  LEGAL ARGUMENT

**A.**    *A **Prima Facie** Case Has Not Been Established by Plaintiff*.

In any proceeding involving a charge of discrimination, it is the burden of the Plaintiff to establish there is some substance to the allegation of discrimination.  In order to meet this burden, the Plaintiff must establish a prima facie case of discrimination.  A prima facie case requires that the Plaintiff meet his burden by showing that (1) he is a member of a protected class; (2) the Agency took some adverse employment action; and (3) that in taking that action, the Agency treated Plaintiff differently than similarly situated employees outside of the protected class.    See McDonnell Douglas v. Green, 411 U.S. 792 (1973) and Furnco Construction Co. v. Waters, 438 U.S. 567 (1978).  In order for two or more employees to be considered similarly situated, all relevant aspects of the employees work situation should be identical or nearly identical. See Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 (8th Cir. 1985); Murray v. Thistledown Racing Club, 770 F.2d 63 (6th Cir. 1985).

Plaintiff has failed to establish a prima facie case of discrimination based on age, national origin, reprisal and gender.  Plaintiff is a member of protected classes (he was a 52 year old, Hispanic, male with prior EEO involvement).  However, he has failed to show he was treated differently based on these protected classes.

Instead, the record shows that any unfavorable treatment he could have possibly suffered was based on his own insubordination, his need to have his way, and his deficiencies in drug enforcement.[5]  Clearly, the record shows he did not like answering to his supervisor and his

---

[5] Plaintiff's need to have his way is the source of this case and all of his other cases. Whenever he cannot get his way, he blames the person who did not give him his way. Not only is this exemplified by the statements of Mr. Trotter, Ms. Wilcox and Ms. Reba, and in various email messages, but Complainant decided to make allegations about the Agency attorneys and even the OSC investigator because he did not get his way in settlement or with OSC. (Defendant's Exhibits, 1, 2 and 3; IF 99-2368, Ex. 8, p. 155-156).

conduct "borders on insubordination." (IF, 98-2284, Ex. 7, p. 284). As Mr. Trotter succinctly states, "[h]is boss is Ms. Reba, but he has not accepted that fact, and has done everything within his will to disrupt a subordinate boss relationship." (IF, 98-2284, Ex. 7, p. 284). Though it is obvious that the issues in No. 98-2284 do not materially affect the terms and conditions of his employment, they do, however, epitomize his insubordinate attitude. More specifically, these issues reflect Plaintiff's inability to accept his supervisor, as many of these issues are based on Plaintiff's assertion that his supervisor did "not consult with [him]" before making a decision. Thus, there is no evidence of a prima facie case of discrimination in Case No. 98-2284. The only prima facie case, which is established in Case No. 98-2284, is one of insubordination by Plaintiff.

Similarly, in Case No. 99-2368, Plaintiff does not show that he was treated differently than those outside his classes. There were approximately 25 directed reassignments. Most of these (21) were not Hispanic, and most of these (24) had not been involved in the EEO process. Those who were reassigned included women, employees less than 40 years old and some younger than Plaintiff. Thus, Plaintiff has failed to show a prima facie case in Case No. 99-2368.

Moreover, in order to overcome a motion for summary judgment on a Title VII discrimination or retaliation claim, Plaintiff must establish a prima facie case. Smith v. Summers, No. EP-99-CA-72-H Slip Op. at 5 (W.D. TX, Nov. 17, 1999) (unpublished, copy of decision attached as Defendant's Exhibit 7) (citing Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 (5th Cir. 1999)). In response to such a motion, the Plaintiff must show a prima facie case which requires: (1) Plaintiff is a member of a protected class; (2) he was subjected to

11

or tended to be subject to an adverse employment action; and (3) that others similarly situated were not subjected to the same treatment. Smith v. Summers, No. EP-99-CA-72-H Slip Op. at 5 (W.D. TX Nov. 17, 1999); see Shackelford, 190 F.3d at 404; Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997); Dupont-Lauren v. Schneider (USA), Inc. et al., 994 F. Supp. 802, 813 (S.D. Tex. 1998). In a retaliation claim, the prima facie case requires a showing that (1) the plaintiff engaged in activity protected by Title VII; (2) an ultimate adverse employment action occurred; and (3) there was a causal connection between participation in the activity and the adverse employment action. See Dollis v. Rubin, 77 F. 3d 777, 778-782 (5th Cir. 1995); Mattern v. Eastman Kodak Co., 104 F.3d 702, 707-08 (5th Cir. 1997).

The "common thread" in both reprisal and non-reprisal discrimination claims under Title VII is the "adverse employment action." Smith v. Summers, No. EP-99-CA-72-H, Slip Op. at 6 (W.D. TX, Nov. 17, 1999); see Shackelford, 190 F.3d at 404. While the Fifth Circuit in Mattern recognized a distinction between the type of harm covered by anti-retaliation provision of 42 U.S.C. 2000e-3 and type of harm covered by 42 U.S.C. 2000e-2, which concerns the other bases of discrimination, the Fifth Circuit in Shackelford gave more clarity to this distinction. The Court explained that while acts under section e-3 reguired a tangible adverse effect, the acts in section e-2 still need to tend to adversely effect the employee. The Court, thus found that the denial of training was not an adverse employment action in this race discrimination claim brought under section e-2. Shackelford, 190 F.3d at 405. Similarly, the Southern District of Texas determined that the Plaintiff's allegations of non-reprisal discriminatory treatment in the employer's assignment of stent sites and the apportionment of senior sales representatives to her work region did not involve adverse employment actions for

which the anti-discrimination provision of Title VII provides relief. <u>Dupont-Lauren</u>, 994 F.

Supp. at 813.

The anti-discrimination provision in section e-2 of Title VII prohibits adverse

employment actions based on an employee's protected status. <u>Dupont-Lauren</u>, 994 F. Supp. at

813; see 42 <u>U.S.C.</u> § 2000e-2. An "adverse employment action" requires proof that the

defendant's behavior or the defendant's decision effected a "materially adverse change in the

terms and conditions of (a plaintiff's) employment". <u>Dupont-Lauren</u>, 994 F.Supp. at 813; see

<u>Shackelford</u>, 190 F.3d at 405.[6] This change must be more than just an inconvenience or an

alteration of job responsibilities, but instead, it should be a disruptive event, such as

termination, demotion, loss of benefits or salary, decrease in responsibility, or suspension. See

<u>Crady</u>, 993 F.2d at 136.; <u>Smith v. Summers</u>, No. EP-99-CA-72-H, Slip Op. at 6 (W.D.TX Nov.

17, 1999); see also <u>Boriski v. City of College Station</u>, 65 F. Supp. 2d 493 (S.D.Tex. 1999).

Employment actions are not adverse where pay, benefits, and level of responsibility remain the

same. See <u>Watts v. Kroger Co.</u>, 170 F.3d 505, 512 (5th Cir. 1999). Moreover, adverse employ-

ment actions under section e-2 provision include "discharges, demotions, refusals to hire,

refusals to promote, and reprimands." <u>Dupont-Lauren</u>, 994 F. Supp. at 819 (citing <u>Kocsis v.</u>

<u>Multi-Care Management, Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996) (reassignment to different

---

[6]  See also <u>Dupont-Lauren</u>, 994 F. Supp. at 819 (citing the following: <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993
F.2d 132, 136 (7th Cir. 1993) (There was no adverse action where job transfer merely caused personal
inconvenience or altered job responsibilities; see <u>Harlston v. McDonnell Douglas Corp.</u>, 37 F.3d 379, 382 (8th Cir.
1994) (A reassignment to a different position without any reduction in title, salary, or benefits was not adverse
employment action although new position involved different duties and was more stressful); <u>Flaherty v. Gas
Research Inst.</u>, 31 F.3d 451, 457 (7th Cir. 1994) (A semantic change in title and "bruised ego" did not constitute
adverse employment action where pay, benefits, and level of responsibility remained the same); <u>Spring v.
Sheboygan Area Sch. Dist.</u>, 865 F.2d 883, 885 (7th Cir. 1989) (A transfer to a dual principalship over two schools
with higher pay was not an adverse employment action); <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir.), <u>cert</u> <u>denied</u>,
454 U.S. 892, 70 L. Ed. 2d 206, 102 S.Ct. 388 (1981) (A process used in selecting board members that evaluated
plaintiff's qualifications for promotion did not involve an adverse employment action)).

division not adverse employment action); <u>Yates v. Avco Corp.</u>, 819 F.2d 630, 638 (6th. Cir.

1987); and <u>Lulac Councils 4433 & 4436 v. City of Galveston</u>, 979 F. Supp. 514, 518 (S.D. Tex.

1997)).  See, also, <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997) in which the

court found a lateral transfer was insufficient to constitute an adverse employment action for

race discrimination and <u>Darnell v. Campbell County Fiscal Court</u>, 731 F. Supp. 1309, 1313

(E.D. Ky. 1990) <u>aff'd</u> 924 F.2d 1057 (6th Cir. 1991) in which the court found a lateral transfer

insufficient to constitute an adverse employment action for sex and age discrimination.  With

regard to the definition of an "adverse action," the Seventh Circuit has explained:

> A material adverse change in the terms and conditions of employment must be
> more disruptive than a mere inconvenience or an alteration of job responsibilities.
> A materially adverse change might be indicated by a termination of employment,
> a demotion evidenced by a decrease in wage or salary, a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or
> other indices that might be unique to a particular situation.  See <u>Dupont-Lauren</u>,
> 994 F. Supp. at 819 (citing <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 132,
> 136 (7th Cir. 1993)).

In this case, there was no material adverse employment action.  In Case No. 98-2284,

Plaintiff claims his boss (Ms. Reba) had records reviewed from the Port, initiated a review of

the canine program, postponed filling a supervisory vacancy at the Brownsville Port, and

detailed a Supervisory Canine Officer to Brownsville, without consulting or informing Plaintiff

first. (IF 98-2284, Ex. 2, p. 235-236)(emphasis added).  Additionally, he complains about a

message that was addressed to his subordinate Chief Inspector by Ms. Reba, so the subordinate

would explain the recommendations that the subordinate had made to her.  Plaintiff further

complains about his requests to    Mr. Trotter to assist him, even though Mr. Trotter referred his

allegations for investigation and offered to send a mediator to address management's and

Plaintiff's concerns.  Additionally, in Case No. 99-2368, Plaintiff received a lateral transfer to

14

be the Port Director in Norfolk. Plaintiff was 1 of 25 people to be reassigned laterally at that time. Plaintiff would have to have a large ego to think that an Assistant Commissioner would move 24 other individuals just to harm Plaintiff based on his EEO classes or activity.

None of Plaintiff's allegations constitute adverse employment actions. He suffered no loss in title, salary and benefits. For example, the courts have found that a verbal threat of being fired or demoted does not constitute an adverse employment action, since it has no concrete effect on the person's employment until the employer acts upon it. Smith v. Summers, No. EP-99-CA-72-H, Slip Op. at 6 (W.D. TX Nov. 17, 1999 (citing, e.g., Mattern, 104 F.3d at 708).

Similarly, there are no adverse employment actions in this case under the reprisal provision, section e-3. A Title VII retaliation claim has three elements:(1) employee engaged in activity protected by Title VII; (2) employer took adverse employment action against employee; and (3) causal connection exists between protected activity and adverse employment action. Mattern v. Eastman Kodak Co, 104 F.3d 702 (5th Cir. 1997); 42 U.S.C. 2000e-3(a).

Ultimate employment decisions which the Title VII reprisal provision was designed to address include acts such as hiring, granting leave, discharging, promoting and compensating. Title VII's anti-retaliation provision refers to ultimate employment decisions, and not an "interlocutory or mediate" decision which can lead to an ultimate decision. Mattern, 104 F.3d at 708; Dollis v. Rubin 77 F.3d 777, 78-82 (5th Cir. 1995). In Mattern, the Court following its previous decision in Dollis v. Rubin, determined that none of the plaintiff's complaints constituted an ultimate employment decision. Among the complaints that the court dismissed for failing to meet this threshold requirement were the following: hostility from co-workers,

15

having tools stolen, Mattern's anxiety - related illness, a visit to Mattern's home, a verbal threat of being fired, a reprimand, a missed pay increase and being placed on a final warning notice. None of these constituted adverse employment actions because of their "lack of consequence".

Similarly, in <u>Dollis</u>, the Fifth Circuit determined the following acts did not constitute adverse employment actions: (1) she was not considered for a promotion; (2) she was not allowed to attend a conference; (3) her work was criticized, and (4) that she was given false information regarding certain aspects of her employment, including access to travel funds and methods for filing EEO complaints.

In this case, none of Plaintiff's allegations rise to the level of ultimate employment decisions. At best, his allegations (i.e., his supervisor did not consult him regarding a record review, a management review of the Port, a vacancy postponement for a subordinate's position, and a supervisory detail, along with a message meant for his subordinate to justify the subordinate's recommendation, an alleged failure of Assistant Commissioner Trotter to respond the way Complainant wanted, and a lateral transfer), are only intermediary actions and are not ultimate employment decisions. Therefore, these actions are not actionable on the basis of alleged retaliation under Title VII.

Moreover, even though Plaintiff attempts to claim harassment based on his national origin, sex, age, and reprisal, there is no showing of a prima facie case. As discussed above, the allegations in these cases are not related to national origin, age, sex or reprisal. More importantly, the allegations are not "sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment or create an abusive working environment." See <u>Harris v. Forklift Systems, Inc.</u>, 114 S.Ct. 367, 370-371 (1993). Thus, there is no prima facie case of harassment

16

based on a hostile work environment in these cases.  As a result, Plaintiff has failed to establish

a prima facie case of a hostile work environment.

**B.      The Defendant Has Articulated Legitimate Non-Discriminatory Reasons.**

Even if it could be concluded that Plaintiff has established a prima facie case, the

Agency can carry its burden of production by articulating "one or more legitimate

nondiscriminatory reasons for its actions." McDonnell Douglas, 411 U.S. at 802.  The Agency

has articulated legitimate nondiscriminatory reasons.  With regard to the directed reassignment

in May 1999, Mr. Winwood explains that he began a major reorganization in the Office of Field

Operations when he assumed his duties in February 1999.  Approximately 25 reassignments

were made at the same time as Mr. Flores' reassignment.  Each reassignment was made in order

to improve on past deficiencies in several Ports and work locations.  Plaintiff's reassignment

was based on the fact that the Brownsville Port had enforcement deficiencies, but he had the

necessary people skills to address the communication problems the Port of Norfolk had with the

public. (IF, No. 98-2368, Ex. 5, p. 116; Defendant's Exhibit 6).  Mr. Winwood's statements,

which explain the basis for each move, show that he focused on the weaknesses of each Port

and the strengths of each Director.  (IF, No. 98-2368, Ex. 5, p. 116; Defendant's Exhibit 6).  Mr.

Winwood perceived that Plaintiff was very strong with community and public relations and

determined that Norfolk had a weakness in that area, because Norfolk had experienced frequent

friction between the Customs Service and the external communities.  (Defendant's Exhibit 6).

On the other hand, Mr. Winwood perceived that Brownsville had a problem with enforcement

issues and selected a Port Director that he believed had strengths in that area.[7]  (IF, No. 98-

---

[7] The prior management attempted to address these deficiencies in the enforcement area with the prior settlement
attempts in 99-2009.

17

2368, Ex. 5, p. 116; Defendant's Exhibit 6).  The evidence shows that each move was based on legitimate business reasons.   Consequently, the fact that Mr. Winwood had no apparent motive to discriminate, and in light of the evidence that Plaintiff's reassignment was part of a significant reorganization of Field Operations for Customs, which was directed by the incoming Commissioner, there is no evidence of discrimination.

With regard to the issues in TD No. 98-2284, Ms. Reba explained that in preparation for the Headquarters' review, she asked Supervisory Canine Enforcement Officer Mahan to look at the canine records in Brownsville.  She wanted to make sure the records were all in order to make sure the upcoming review was easy to conduct because of the past mismanagement at the Port and its effect on drug enforcement.  (IF, No. 98-2284, Ex. 6, p. 279-280).

The Plaintiff was not notified that SCEO Mahan was going to review the records because he was out of the office at the time.  The acting Port Director was notified by SCEO Mahan that he was going to review the records.  SCEO Mahan is stationed in Hidalgo, Texas so it was more efficient to take records with him rather than to spend the day looking at them in Brownsville and then return them to his post of duty.  SCEO Mahan took the records back to his office, reviewed them, found nothing missing and had them returned.  (IF, No. 98-2284, Ex. 6, p. 280).

Mr. Aycox of Customs Headquarters was in charge of the Canine review of Brownsville.  It was Headquarters' decision to conduct the review.  Ms. Reba was not involved in this decision.   Headquarters notified the Plaintiff of its intention to conduct the review.  When the review had to be postponed again Headquarters notified him of the postponement.

When the new date was selected, he was again notified of the new date. (IF, No. 98-2284, Ex. 6, p. 279-280).

Plaintiff asserts that Ms. Reba in some way discriminated against him by asking Mr. Tijerina, a Chief Inspector, for a detailed justification of his recommendation for Supervisory Selection, GS-12. Ms. Reba explained that she follows the same procedure for all Ports. As a practice, she asks Port management for a recommendation and then she makes a decision based on their recommendation. In this case, Mr. Tijerina gave the recommendation on behalf of the Port Director. Ms. Reba felt it did not explain enough in detail why the Proposed Selectee was the best. As a result, she sent it back asking for a better explanation saying we need a better reason. She thought that Mr. Tijerina was treating this as a pro forma request and did not realize how critical it was that the Agency have a good reason. Ms. Reba further explained how, when a selection is made, there were going to be challenges by those who were not selected and she wanted to be prepared. Ms. Reba explained that she sent the Plaintiff a copy of her message to Mr. Tijerina since he was Mr. Tijerina's boss. (IF, No. 98-2284, Ex. 6, p. 278-279).

In April 1998, Director Reba cancelled the vacancy announcement for a Canine Supervisor and instead sent SCEO Wilder there on detail. She did this because the management review conducted by Headquarters had just been finished, and there were a series of recommendations regarding mismanagement and deficient enforcement that had to be addressed. She determined that it was not fair to expect a brand new supervisor to not only learn a new job but also to address deficiencies that had been out there for some time. Additionally, the Canine Supervisors already in Brownsville were there when the situation

developed. She needed an outside manager to come in and evaluate the situation. Ms. Reba thought it made more management sense to bring in a seasoned manager, with experience from the training academy to come in, address the deficiencies and solve some of the problems. Once that was accomplished Ms. Reba could then select a supervisor to maintain what had been accomplished rather than perpetuate past mismanagement. SCEO Wilder has extensive national experience and has a strong personality. She felt he would not be intimidated while trying to correct past mismanagement. (IF, No. 98-2284, Ex. 6, p. 279).

### C.   There is No Evidence of Pretext.

Once the Agency articulates legitimate nondiscriminatory reasons for the employment decision in question, the presumption of discrimination created by the prima facie case "drops from the case." St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2751-2754 (1993). The Plaintiff must then prove by preponderance of the evidence that the legitimate reasons proffered by the Agency were not its true reasons, but were a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). But the reasons are not proven as pretext for discrimination "unless it is shown both that the reason was false and that discrimination was the real reason." St. Mary's, 113 S.Ct. at 2751-2754. As a result, even if the Agency's asserted legitimate reasons for its actions are rejected, the Plaintiff is not entitled to a judgment in his favor because the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff" remains with the Plaintiff. St. Mary's, 113 S.Ct. at 2747-8 (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981)); Reeves v. Sanders Plumbing Production, Inc., 120 S.Ct. 2097 (2000).

In other words, once the Agency produces legitimate, non-discriminatory reasons, the Plaintiff must then prove by preponderance of the evidence that the legitimate reasons proffered by the Agency were not its true reasons, but were a pretext for discrimination. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2751-2754 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Soon after the above-cited Supreme Court decision in Hicks was rendered, different interpretations among the District and Circuit Courts arose in determining the amount of evidence needed to prove pretext under Hicks. One view which has been termed the "pretext plus" rule was held by the Fifth, Second, Fourth and First Circuits for a several years until recently. Under that rule, these Circuit Courts determined that merely rebutting the employer's reason is not enough unless the employer has some additional evidence of discrimination. See, e.g., Reeves v. Sanderson Plumbing Co., 197 F.3d 688 (5th Cir. 1999).[8] Under the alternative view held by the Third, Eleventh, Eighth and Sixth Circuits, the McDonald Douglas inference regarding a prima facie case plus rebuttal of the employer's explanation always permits a reasonable inference of discrimination. See, e.g., Kline v. TWA, 128 F.3d 337 (6th Cir. 1997).[9] The split in the Circuits was resolved recently by the Supreme Court in Reeves v. Sanderson Plumbing Co., 120 S.Ct 2097, 2106-2108 (2000).

In Reeves, the Supreme Court set forth a standard for pretext falling in the center of the newly established Circuit Court spectrum on pretext. The Court set the standard somewhere between the "pretext plus" standard and the alternative standard. In Reeves, the Supreme Court

---

[8] The Supreme Court subsequently overruled the Fifth Circuit in Reeves v. Sanderson Plumbing Co., 120 S.Ct 2097 (2000).

[9] The Supreme Court modified this case in Reeves.

prove pretext under <u>Reeves</u>.[10]   For example, in <u>Rubinstein v. Administrators of the Tulane</u>

<u>Educational Fund</u>, 218 F.3d 392 (5th Cir. 2000), the Court granted the employer's summary

judgment on the plaintiff's religion and national origin claims and affirmed the jury's verdict on

the retaliation claim, but it was insufficient to prove pretext under Title VII.   In affirming the

summary judgment, the Court admitted "Rubinstein demonstrated some pretext" on the

discrimination claims.   <u>Rubinstein</u>, 218 F.3d. at 400. The Court explained the following with

regard to <u>Reeves</u>:

> [D]iscrimination suits still require evidence of discrimination. On this record Rubinstein
> has failed to meet his burden of producing evidence of discrimination to survive
> summary judgment, and his evidence to rebut the non-discriminatory reasons offered by
> Tulane is not so pervasive as to support an inference that the real reason was
> discrimination. <u>Rubinstein</u>, 218 F.3d. at 400.

In particular, the <u>Rubinstein</u> case involved an associate professor at Tulane, who filed

suit against Tulane, alleging that he was denied raises and promotions based on his national

origin.   In his ten-year tenure, Rubinstein was noted as "an outstanding researcher" and as a

"satisfactory" teacher. <u>Rubinstein</u>, 218 F.3d. at 396.   Rubinstein contended that he did not

receive raises over a period of two years because of Tulane's discriminatory animus.   He relied

upon the speculation of his co-worker that his failure to receive job raises was probably related

to his status as a Russian Jew.   He also relied upon remarks by members of the Mechanical

Engineering faculty that he was a "Russian Yankee" and a "Commie" as well as anti-Semitic

---

[10]  Other Circuit Courts since <u>Reeves</u> have also defined the sufficiency of the evidence for pretext.  See e.g.,
<u>Schnabel v. Abrahamson</u>, 232 F.3d 83, 91 (2nd Cir. 2000) finding even if the society's reasons for terminating the
employee were pretextual, the Court still found age was not a determinative factor in the termination.  See <u>Rowe v.
Marley Co.</u>, 233 F.3d 825 (4th Cir. 2000) finding insufficient evidence of the pretext where the employee claimed
the employer's explanation of its method of selecting employees for layoff was to attack minor inconsistencies in
accounts given by managers involved in the process.  See also <u>Chapman v. AI Transport</u> 229 F.3d 1012 (11th Cir.
2000) and <u>Megivenoff v. Banco Bilboa Bizcaya</u>, 233 F.3d 73 (1st Cir. 2000).

remarks about placing a propeller on a "yarmulke" and about "Jewish frugality." Rubinstein, 218 F.3d. at 396.

The District Court granted summary judgment in favor of Tulane, finding that Rubinstein could not demonstrate that discrimination was the basis for the alleged employment decisions. The District Court also, however, found some evidence of pretext, specifically with regard to Rubenstein's purported lack of qualifications for a raise. Rubinstein, 218 F.3d. at 400.

Analyzing the District Court's grant of summary judgment under Reeves, the Fifth Circuit determined that Rubinstein failed to produce sufficient evidence of discrimination. The remarks about being a "Russian Yankee" and a "Russian Jew" were considered stray remarks because they were neither related to the employment decision at issue nor proximate in time to his failure to receive raises or promotions. Rubinstein, 218 F.3d. at 400. The Fifth Circuit determined again that the evidence to rebut the employer's legitimate non-discriminatory reasons was not so pervasive to support a finding of discrimination. Rubinstein, 218 F.3d at 400; see also Mato v. Baldauf, No. 00-50522, Slip Op. (5th Cir. Oct. 9, 2001) and Rios v. Rossotti, 252 F.3d, 375, 380 (5th Cir. 2001). Moreover, in Vadie v. Mississippi State University, 218 F.3d 365 (5th Cir. 2000), the Fifth Circuit reversed the District Court's denial of a Rule 50 motion against the plaintiff's national origin claim and affirmed the verdict for the plaintiff on the retaliation claim. Plaintiff claimed discrimination on the basis of his Iranian national origin and retaliation. When his department was eliminated, the university adopted a policy of allowing professors from that department to seek positions in other departments. The Chemical Engineering Faculty strongly resisted his appointment. In one case, the qualifications for a position he sought were suddenly changed to require a Ph.D. in a particular field that he

24

reaffirmed the <u>Burdine/Hicks</u> rule that the "ultimate burden" to prove discrimination is on the Plaintiff. <u>Reeves</u>, 120 S.Ct. at 2106. The Court rejected the Fifth Circuit's prior "pretext plus" rulings, but did not go so far as to adopt the alternative view of the Sixth Circuit. <u>Reeves</u>, 120 S.Ct. at 2108-2109.

In rejecting a strict pretext plus theory, the Supreme Court determined that, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." <u>Reeves</u>, 120 S.Ct. at 2108. In other words, the Supreme Court recognized that it is possible to infer discrimination from the falsity of the employer's reason, but it is not a mandatory or automatic inference in all cases. <u>Reeves</u>, 120 S.Ct. at 2108-2109. In reaching a middle ground between positions taken by the Circuit Courts, the Supreme Court made a significant qualification regarding this inference. It recognized that there are also cases in which the prima facie case plus rebuttal of the employer's explanation is not enough to support an inference of discrimination. As the Court explained,

> Certainly there will be instances where although the plaintiff has established a prima facie case and set forth sufficient evidence to reject defendant's explanation, no rational fact finder could conclude that the action was discriminatory. <u>Reeves</u>, 120 S.Ct. at 2109.

For example, evidence might reveal "some other non-discriminatory reason for the employment decision" or that the Plaintiff's evidence that the employer's reason was untrue might be "weak" and might be countered by "evidence of that no discrimination had occurred." <u>Reeves</u>, 120 S.Ct. 2109. Similarly, the Fifth Circuit has recently issued several decisions interpreting the Supreme Court's latest distinction with regard to the sufficiency of the evidence needed to

22

lacked. By the time of trial, this qualification had been dropped again. At one point, the court came close to suggesting a "pretext plus" rule even in the face of <u>Reeves</u>, but clarified that it is following something short of a pretext plus rule. The Court assumed, for the sake of argument, that the plaintiff proved pretext, and then it stated as follows:

    .o h                                                              ɔɒa
    ɔ1ɾ                                                               was

reaffirmed the <u>Burdine</u>/<u>Hicks</u> rule that the "ultimate burden" to prove discrimination is on the Plaintiff. <u>Reeves</u>, 120 S.Ct. at 2106. The Court rejected the Fifth Circuit's prior "pretext plus" rulings, but did not go so far as to adopt the alternative view of the Sixth Circuit. <u>Reeves</u>, 120 S.Ct. at 2108-2109.

    In rejecting a strict pretext plus theory, the Supreme Court determined that, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." <u>Reeves</u>, 120 S.Ct. at 2108. In other words, the Supreme Court recognized that it is possible to infer discrimination from the falsity of the employer's reason, but it is not a mandatory or automatic inference in all cases. <u>Reeves</u>, 120 S.Ct. at 2108-2109. In reaching a middle ground between positions taken by the Circuit Courts, the Supreme Court made a significant qualification regarding this inference. It recognized that there are also cases in which the prima facie case plus rebuttal of the employer's explanation is not enough to support an inference of discrimination. As the Court explained,

> Certainly there will be instances where although the plaintiff has established a prima facie case and set forth sufficient evidence to reject defendant's explanation, no rational fact finder could conclude that the action was discriminatory. <u>Reeves</u>, 120 S.Ct. at 2109.

For example, evidence might reveal "some other non-discriminatory reason for the employment decision" or that the Plaintiff's evidence that the employer's reason was untrue might be "weak" and might be countered by "evidence of that no discrimination had occurred." <u>Reeves</u>, 120 S.Ct. 2109. Similarly, the Fifth Circuit has recently issued several decisions interpreting the

positions at issue, while the members of the faculty did not. The Court ultimately held that Vadie's evidence only proved that the "decision-makers had some unidentifiable reason for not wanting to hire [him]." Vadie, 218 F.3d at 373. The evidence had no probative value with respect to the ultimate question before the jury of whether there was discrimination based on either his race or national origin. The Fifth Circuit explained that its decision to reverse the jury award was mandated by the fact that Vadie's case fell within the exception noted in Reeves where judgment for the employer is appropriate when the plaintiff has created only a "weak" issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. Vadie, 218 F.3d at 373, n. 23.

Furthermore, in Crawford v. Formosa Plastics Corp., Louisiana, 234 F.3d 899 (5th Cir. 2000), the Fifth Circuit affirmed the lower court's summary judgment for the employer on the basis of the plaintiff's failure to produce sufficient evidence of pretext. In Crawford, the Fifth Circuit explained that a "mere scintilla of evidence of pretext does not create an issue of material fact." Crawford, 234 F.3d at 902-903 (citing Wyvill v. United Companies Life Insurance Co., 212 F.3d 296, 301 (5th Cir. 2000)). The Court further stated that it is possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination. Crawford, 234 F.3d at 903 (citing Travis v. Board of Regents of the University of Texas System, 122 F.3d 259 (5th Cir. 1997)). The Fifth Circuit also explained that "if the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason." Crawford, 234 F.3d at 902-903 (citing Walton v. Bisco Industries, Inc., 119 F.3d 368,

372 (5th Cir. 1997)).  Consequently, the Court concluded that the determination must be made on a case by case basis, depending on the nature, extent and quality of the evidence, as to whether a jury could reasonable infer discrimination.

As applied to the facts in <u>Crawford</u>, the Fifth Circuit determined, where there is no direct evidence of discrimination, the plaintiff needs to present sufficient evidence that the employer's proffered reason is false.  Here, "[Crawford's] evidence to rebut the non-discriminatory reasons offered by [the employer] is not so persuasive so as to support an inference that the real reason was discrimination."  <u>Crawford</u>, 234 F.3d at 903-904 (citing <u>Rubinstein</u>, 218 F.3d at 400); see also <u>Rios v. Rosotti</u>, 252 F.3d 275 280 (5th Cir. 2001); <u>Mato v. Baldauf</u>, Slip Op. No. 00-50522 (5th Cir. Oct. 9, 2001).

Similarly, in the instant case, there is insufficient evidence to support a finding of pretext.  While Plaintiff makes allegations regarding various witnesses in this case, none of these are supported by credible evidence.  His complaint is merely argumentative and not supported by evidence or facts in this case.

More importantly, Plaintiff has failed to set forth "sufficient evidence" to discredit all of the legitimate reasons that management has articulated.  Even if Plaintiff was able to show any particular reason was pretextual, "where the Agency cites two or more ostensibly legitimate reasons for its actions, complainant cannot prevail unless he proves that all of those reasons are pretext." <u>Sims v. Cleland</u>, 613 F.2d 790 (6th Cir. 1987)).  Furthermore, in <u>Logue v. International Rehabilitation Associates, Inc.</u>, 837 F.2d 150, 153 (3rd Cir. 1988), the Third Circuit held that where an employer articulates more than one reason for its challenged action,

the falseness or incorrectness of one reason does not impeach the credibility of the remaining reasons.

Similarly, in this case, Plaintiff has produced insufficient evidence to prove any and all of the Agency's reasons are pretext for discrimination. As a result, Plaintiff has failed meet his "ultimate burden of persuading the trier of fact that the [Agency] intentionally discriminated against [him]." Reeves, 120 S.Ct. at 2106 (citing Burdine, 450 U.S. at 253).

More specifically, there is no dispute that the record contains no evidence of intentional discrimination under St. Mary's and Reeves. It is obvious that the Plaintiff did not want to be supervised by Ms. Reba, and that he would not listen to his prior boss, Ms. Wilcox. Plaintiff's insubordination and his lack of drug enforcement were the real source of any actions. (Defendant's Exhibits 4,5, and 6; IF 98-2284, Ex. 6, p. 277-283; Ex. 7, p. 283-284). The only type of pretext in this case that Plaintiff's pretextual use of this forum, as well as the other administrative forums which have already dismissed his claims, to avoid being supervised. In fact, a supervisor may correct and direct employees under his or her supervision. See Deines v. Texas Department of Protective and Regulatory Services, 164 F.3d 277, 281 (5th Cir. 1999). Furthermore, in this forum, the role of the Court is not to second-guess the Agency's business decisions. Instead, the role of the Court is to evaluate the explanation of the Agency's actions and determine whether discrimination motivated the action. See Deines, 164 F.3d at 281 (in which the Fifth Circuit acknowledges that the "anti-discrimination laws are not vehicles of second guessing of business decisions"). Just because an action may be unfair or illogical, does not necessarily mean it is discrimination. "Title VII is not violated by the exercise of erroneous or illogical business judgment." Sanchez v. Phillip Morris, Inc., 922 F.2d 244, 247 (10th Cir.

28

1993); see also Burdine, 450 U.S. at 259.  In this case, there is no evidence in the record indicating discrimination was a motive, a factor or a reason.

**WHEREFORE**, Defendant respectfully requests that this Court enter an Order granting its Motion for Summary Judgment and awarding any and all such further relief this Court deems necessary and just.

Respectfully submitted,

GREGORY A. SERRES
United States Attorney

By:  _____

VERNON L. LEWIS
Assistant United States Attorney
Attorney in Charge
Federal Bar No.15882
Texas Bar Number: 12308800
910 Travis, Suite 1500
P. O. Box 61129
Houston, Texas 77208
Phone: (713) 567-9605
Fax: (713) 718-3303

OF COUNSEL:

Ms. Caroline Blessey
Office of the Associate Chief Counsel
US Customs Service
2323 South Sheperd Drive, Suite 1246
Houston, Texas 77019

## CERTIFICATE OF SERVICE

I, Vernon L. Lewis, do hereby certify that a true and correct copy of the

foregoing pleading was sent via overnight delivery, on the ___14th___ day of November,

2001, to the following:

Mr. Denis A. Downey
1185 F.M. 802, Suite 3
Brownsville, Texas 78526-1538
Fax: (956) 544-0562

_____
VERNON L. LEWIS
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **JORGE FLORES, ET AL** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CASE NO.   01-CV-00057** |
| **v.** | § | |
| | § | |
| **U.S. CUSTOMS SERVICE,** | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Upon consideration of Defendant's Motion for Summary Judgment, the pleadings, and the applicable law, the Court finds that the Motions are meritorious and should be granted. It is therefore **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

Signed in Brownsville, Texas on the _____ day of _____, 2001.

_____

UNITED STATES DISTRICT JUDGE

31

## Affidavit of James N. De Stefano

STATE OF TEXAS                    *
                                  *
COUNTY OF HARRIS                  *


I, James N. De Stefano, do hereby make the following statement to the best of my knowledge, without waiving any attorney-client/work product privileges with Customs, and pursuant to the authorization received from the Office of Chief Counsel, U.S. Customs Service:

I am the Associate Chief Counsel, SES level, assigned to Houston, Texas, a field office of the Chief Counsel, U.S. Customs Service.  I am the first line supervisor of Caroline M. Blessey, an attorney on my staff.  I assigned to Ms. Blessey cases concerning Jorge Flores, including: a Merit Systems Protection Board Case  (MSPB) case, allegations of discrimination filed with the Agency and the EEOC, and personnel cases regarding alleged mismanagement and insubordination at the Port of Brownsville.

The following documents submitted with Defendant's Motion for Summary Judgment are documents maintained in the regular course of business by the Agency, as they are submissions which were filed by the Agency as exhibits in Mr. Flores' administrative MSPB and EEOC cases:

1. Defendant's Exhibit 1 – Decision of the EEOC, <u>Jorge Flores v. Treasury</u>, dated February 15, 2000 in Agency Case <u>Number 99-2009</u>;

2. Defendant's Exhibit 2 – Federal Circuit Court of Appeals Decision, dated October 24, 2001, <u>Jorge Flores v. Treasury</u>, Dkt. number 01-3231;


3. Defendant's Exhibit 3 - Merit Systems Protection Board Decision;

4. Defendant's Exhibit 4 - The sworn and transcribed (from tape) testimony of Robert Trotter, taken by Investigator Grace Rojas from the Office of Special Counsel;

1

5. Defendant's Exhibit 5 - The sworn and transcribed (from tape) testimony of Maria Reba, taken by Investigator Grace Rojas from the Office of Special Counsel from the Office of Special Counsel;

6. Defendant's Exhibit 6 - The sworn and transcribed (from tape) testimony of Charles Winwood, taken by Investigator Grace Rojas from the Office of Special Counsel an investigator from the Office of Special Counsel; and

7. Defendant's Exhibit 7 - The decision in Smith v. Summers, No. EP-99-CA-72-H, Slip Op. at 6 (W.D. TX, Nov. 17, 1999);


I declare that the forgoing is true and correct, under penalty of perjury, to the best of my knowledge.

GLORIA R. GLORIA
MY COMMISSION EXPIRES
February 24, 2005

_____
James N. De Stefano
Associate Chief Counsel
U.S. Customs Service
Houston, Texas


SUBSCRIBED AND SWORN BEFORE ME on __8th__ day of _November_, 2001.

_____
Notary

2



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 19848
Washington, D.C. 20036

Jorge L. Flores,  )
    Complainant,  )
               )
        v.  )      Appeal No. 01992633
               )      Agency No. 99-2009
Lawrence H. Summers,  )
Secretary,  )
Department of the Treasury,  )
    Agency.  )
_____  )

## DECISION

The Commission finds that the agency's January 14, 1999 decision dismissing the complaint is proper pursuant to the provisions of 64 Fed. Reg. 37,644, 37,656 (1999) (to be codified and hereinafter referred to as 29 C.F.R. §1614.107(a)(1)).[1]

The record shows that Complainant alleged that he had been discriminated-against and harassed on the bases of age, national origin, sex, and reprisal when on August 25, 1998, he was threatened with the option of a directed reassignment to Washington, D.C. or retiring on discontinued service.

The agency dismissed the complaint on the basis of failure to state a claim after finding that Complainant had failed to show that he had been aggrieved.

On appeal, Complainant contends that he was aggrieved when he was "subsequently presented with a copy of a printout showing [his] current potential retirement earnings if [he] refused to accept forced reassignment and if [he] opted to retire under a 'discontinued service retirement'". In response to Complainant's appeal, the agency argues that Complainant has not been reassigned.

EEOC Regulations provide that an agency shall dismiss a complaint that fails to state a claim. In the instant case, the record reflects that the statements purportedly directed toward Complainant on August 25, 1998, were made within the context of a settlement discussion. The Commission has previously held that settlement negotiations, including any statements and proposals made

---

[1] On November 9, 1999, revised regulations governing the EEOC's federal sector complaint process went into effect. These regulations apply to all Federal sector EEO complaints pending at any stage in the administrative process. Consequently, the Commission will apply the revised regulations found at 64 Fed. Reg. 37,644 (1999), where applicable, in deciding the present appeal. The regulations, as amended, may also be found at the Commission's website at WWW.EEOC.GOV.

DEFENDANT'S EXHIBIT
1

therein, are to be treated as confidential and privileged in order to facilitate candid interchange to settle disputes formally. *Montague v. Department of the Army*, EEOC Request No. 05920321 (May 7, 1992). In that case, the Commission also held that it would not allow complainants to base new complaints on such negotiations. *Id.*

Accordingly, the final agency decision is hereby AFFIRMED.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M1199)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, MUST BE FILED WITH THE OFFICE OF FEDERAL OPERATIONS (OFO) WITHIN THIRTY (30) CALENDAR DAYS of receipt of this decision or WITHIN TWENTY (20) CALENDAR DAYS OF RECEIPT OF ANOTHER PARTY'S TIMELY REQUEST FOR RECONSIDERATION. *See* 64 Fed. Reg. 37,644, 37,659 (1999) (to be codified and hereinafter referred to as 29 C.F.R. § 1614.405). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 64 Fed. Reg. 37,644, 37,661 (1999) (to be codified and hereinafter referred to as 29 C.F.R. § 1614.604). The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S1199)

You have the right to file a civil action in an appropriate United States District Court WITHIN NINETY (90) CALENDAR DAYS from the date that you receive this decision.    If you file a

3                    01992633
                     99-2009

civil action, YOU MUST NAME AS THE DEFENDANT IN THE COMPLAINT THE
PERSON WHO IS THE OFFICIAL AGENCY HEAD OR DEPARTMENT HEAD,
IDENTIFYING THAT PERSON BY HIS OR HER FULL NAME AND OFFICIAL TITLE.
Failure to do so may result in the dismissal of your case in court. "Agency" or "department"
means the national organization, and not the local office, facility or department in which you
work. If you file a request to reconsider and also file a civil action, filing a civil action will
terminate the administrative processing of your complaint.

<u>RIGHT TO REQUEST COUNSEL</u> (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an
attorney, you may request that the Court appoint an attorney to represent you and that the Court
permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973,
as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole
discretion of the Court. Filing a request for an attorney does not extend your time in which to
file a civil action. Both the request and the civil action must be filed within the time limits as
stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

FEB 1 5 2000
_____                    _____
DATE                               Carlton M. Hadden, Acting Director
                                   Office of Federal Operations


<u>CERTIFICATE OF MAILING</u>

For timeliness purposes, the Commission will presume that this decision was received within
five (5) calendar days after it was mailed. I certify that this decision was mailed to
complainant, complainant's representative (if applicable), and the agency on:

FEB 1 5 2000
_____        _____
DATE                   EQUAL EMPLOYMENT ASSISTANT

ASSOC. ~~~~~ ~~~~~~

2001 AUG ~ ~

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# WASHINGTON REGIONAL OFFICE

JORGE L. FLORES,

        Appellant,

    v.

DEPARTMENT OF THE TREASURY,

    Agency.

DOCKET NUMBER
DC-1221-01-0474-W-1

DATE: August 29, 2001

Jorge L. Flores, Brownsville, Texas, pro se.

Caroline M. Blessey, Esquire, Houston, Texas, for the agency.

**BEFORE**
William C. Jenkins
Administrative Judge

## INITIAL DECISION

### INTRODUCTION

On April 17, 2001, appellant filed an Individual Right of Action (IRA) appeal under 5 U.S.C. § 1221(a) alleging that the agency had retaliated against him for his protected whistleblowing disclosures. For the following reasons appellant's appeal is DISMISSED for a lack of jurisdiction.

### ANALYSIS AND FINDINGS

Background

Appellant, at the time a GS-14 Port Director in Norfolk, Virginia, filed a complaint with the Office of Special Counsel (OSC) on August 26, 2000, in

DEFENDANT'S
EXHIBIT
2

which he alleged that he was reassigned from Brownsville, Texas, to Norfolk, Virginia, in September 1999 in reprisal for a protected whistleblowing disclosure he made to the agency's Inspector General (IG) in September 1996. (Appeal File (AF) Tab 1). This disclosure, which was provided to OSC as an attachment to the complaint, concerned Customs Management Center Director Maria Reba and a contract with CODE-3 Environmental Services (CODE-3). Appellant also asserted that his promotion to GS-15 was affected by this disclosure. In a March 8, 2001, letter advising appellant that it was closing its file on his complaint and that he could request corrective action with the Board, OSC referred to his "disclosure" that occurred two and one-half years before his reassignment. *Id.* In the instant IRA appeal appellant states that he is appealing OSC's decision but also specifically identifies the following three "protected disclosures": (1) a May 27, 1997, letter to Robert Trotter, Assistant Commissioner of Field Operations; (2) an April 27, 1998, letter to Senator Phil Gramm; and (3) a January 16, 1999, letter to Raymond Kelly, Commissioner of the U.S. Customs Service.

In a previous IRA appeal that he filed with the Board in December 1997 appellant alleged that he had received negative comments on his performance appraisal for the period of April 1 through September 30, 1996, in reprisal for his disclosures to the IG and the Assistant Commissioner for Field Operations about Ms. Reba and the CODE-3 contract. (Ag. File, Tab 4nn). In a December 11, 1998, initial decision appellant's appeal was dismissed for a lack of jurisdiction based on a finding that appellant's disclosure did not constitute protected whistleblowing covered by 5 U.S.C. § 2302(b)(8). *Flores v. Department of the Treasury,* MSPB Docket No. DA-12212-98-0149-W-1. (Ag. File, Tab 4dd) That decision became a final decision on July 19, 1999, when the Board denied appellant's petition for review. (Ag. File, Tab 4m). *Flores v. Department of the Treasury,* 83 M.S.P.R. 381 (1999) (Table). In a second IRA appeal filed on May 5, 2000, appellant claimed that the agency retaliated against him by reassigning him to Norfolk in September 1999 and by blocking an upgrade of his position in

Brownsville. He alleged that these actions were based on his disclosures to agency officials and others that Ms. Reba had improperly entered into a contract with CODE-3. (Ag. File, Tab 4g). In a September 15, 2000, initial decision this appeal was also dismissed for a lack of jurisdiction based on a determination that the Board had already found that appellant's disclosures were not protected under 5 U.S.C. § 2302(b)(8) and that he was collaterally estopped from relitigating this issue. *Flores v. Department of the Treasury,* MSPB Docket No. DA-1221-00-0431-W-1; (Ag. File, Tab 4e). This decision became the final decision of the Board on April 3, 2001, when appellant's petition for review was again denied. (Ag. File, Tab 4d); *Flores v. Department of the Treasury,* 88 M.S.P.R. 304 (2001) (Table).

<u>Appellant is estopped from relitigating the Board's determination that he did not engage in protected whistleblowing</u>

Collateral estoppel, or issue preclusion, may be applied when (1) an issue is identical to that involved in the prior action, (2) the issue was actually litigated in the prior action, (3) the determination on the issue in the prior action was necessary to the resulting judgment, and (4) the party precluded was fully represented in the prior action. *See Kroeger v. U.S. Postal Service,* 865 F.2d 235, 239 (Fed.Cir.1988); *Kennedy v. National Aeronautics & Space Administration,* 84 M.S.P.R. 103, 106 (1999); *Peartree v. U.S. Postal Service,* 66 M.S.P.R. 332, 338 (1995). Here the record establishes that two of the disclosures appellant identifies in the instant appeal, his 1996 letter to the IG concerning Ms. Reba and the CODE-3 contract and his May 27, 1997, letter to Mr. Trotter, Assistant Commissioner of Field Operations, which attached the 1996 letter about Ms. Reba, were also raised in his prior two IRA appeals to the Board and in each case were found not to constitute protected whistleblowing. (Ag. File, Tabs 4d, 4g – Attachs. 39 and 41, 4dd, and 4nn). The other two disclosures that appellant cites, his April 27, 1998, letter to Senator Gramm and his January 16, 1999, letter to

Commissioner Kelly, were likewise specifically identified as disclosures in his second IRA appeal and were also found by the Board not to constitute protected whistleblowing. (Ag. file, Tabs 4d and 4g – Attachs. 26 and 35). I find that all of the elements of collateral estoppel are therefore satisfied and that appellant cannot in this appeal relitigate the issue of whether the disclosures he has again raised are protected under 5 U.S.C. § 2302(b)(8).

The U.S. Court of Appeals for the Federal Circuit and the Board have held that for the Board to have jurisdiction over an IRA appeal the appellant must make nonfrivolous allegations that he engaged in whistleblowing activity by making a protected disclosure under 5 U.S.C. 2302(b)(8). *See Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1371-72 (Fed.Cir.2001); *Geyer v. Department of Justice*, 63 M.S.P.R. 13, 16-17 (1994). Because the Board has already found that he did not engage in protected whistleblowing by making the disclosures he has identified and because he cannot now relitigate that issue, I find that appellant has failed to raise nonfrivolous allegations that he made protected disclosures and thus has not established Board jurisdiction over his IRA appeal.[1]

## DECISION

The appeal is DISMISSED.

FOR THE BOARD:

William C. Jenkins
Administrative Judge

---

[1] Appellant's motions to compel are DENIED because the information requested has no relevance to the dispositive jurisdictional issue in this case. Because the appeal has been dismissed for a lack of jurisdiction, the parties' respective motions for sanctions are also DENIED.

## NOTICE TO APPELLANT

This initial decision will become final on ___OCT - 3 2001___, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if this initial decision is received by you more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be postmarked, faxed, or hand-delivered no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you fail to provide a statement with your petition that you have either mailed, faxed, or hand-delivered a copy of your petition to the agency, your petition will be rejected and returned to you.

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be <u>received</u> by the court no later than 60 calendar days after the date this initial decision becomes final.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

# CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent by regular mail this day to each of the following:

### Appellant

Jorge L. Flores
2700 FM 802, #1021
Brownsville, TX 78526

### Agency's Representative

Caroline M. Blessey
U.S. Customs Service
Office of the Associate Chief Counsel
2323 South Shepherd Drive, Suite 1246
Houston, TX 77019

### Other

Kenneth L. Bates
U.S. Office of Personnel Management
Employee Relations Division
1900 E Street, NW, Room 7412
Washington, DC 20415

August 29, 2001
(Date)

Eric W. Hawthorne
Paralegal Specialist

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 44 of 318

NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record. The
disposition will appear in tables published periodically.

# United States Court of Appeals for the Federal Circuit

## 01-3231

JORGE L. FLORES,

Petitioner,

v.

DEPARTMENT OF THE TREASURY,

Respondent.

---

DECIDED: October 24, 2001

---

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA,
Circuit Judge.

PER CURIAM.

Jorge L. Flores seeks review of the final decision of the Merit Systems
Protection Board dismissing his individual right of action ("IRA") appeal under the
Whistleblower Protection Act ("WPA") for lack of jurisdiction. Flores v. Dep't of
the Treasury, No. DA1221000431-W-1 (MSPB Sept. 15, 2000). Because we
agree that Flores was collaterally estopped from relitigating his earlier-dismissed
IRA appeal, and made no protected disclosures in the present action, we affirm.


DEFENDANT'S
EXHIBIT
3

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 45 of 318

## DISCUSSION

The scope of our review in an appeal from a decision of the board is limited. We must affirm the board's decision unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1994).

To establish the board's jurisdiction over an IRA appeal under the WPA, the appellant must show by the preponderance of the evidence that (1) he made a "protected disclosure" by disclosing information that he reasonably believed evidenced a violation of law, rule or regulation, gross mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety; (2) based on the protected disclosure, the agency took or failed to take, or threatened to take or fail to take a "personnel action" against him, as defined by 5 U.S.C. § 2302(a)(2); and (3) he raised the same whistleblowing issue before the Office of Special Counsel ("OSC") and the proceedings before the OSC have been exhausted. See 5 U.S.C. § 2302(b)(8); Willis v. Dep't of Agric., 141 F.3d 1139, 1142 (Fed. Cir. 1998); Serrao v. Merit Sys. Prot. Bd., 95 F.3d 1569, 1573-74 (Fed. Cir. 1996).

Flores previously filed an appeal with the board identifying as a "protected disclosure" his statements concerning the alleged impropriety of the U.S. Customs Service's contract with a company named Code 3 Environmental Services, Inc. The administrative judge found that Flores' disclosures

01-3231                                       2

Case 1:01-cv-00057  Document 18  Filed in TXSD on 11/15/2001  Page 46 of 318

concerning the Code-3 contract were not protected disclosures under 5 U.S.C. §

2302(b)(8) because Flores did not have a reasonable belief that the agency's

actions evidenced any of the enumerated categories of wrongdoing. <u>Flores v.</u>

<u>Dep't of the Treasury</u>, No. DA1221980149-W-1 (MSPB Dec. 11, 1998).  He

therefore dismissed Flores' appeal for lack of jurisdiction.  The board denied

Flores's subsequent petition for review, and no further appeal was taken.

In the present appeal, Flores identifies as further protected disclosures the

following four letters: his January 16, 1999 and May 13, 1999 letters to United

States Customs Commissioner Raymond Kelley, his August 3, 1999 letter to

Treasury Undersecretary James Johnson, and his August 12, 1999 letter to

President William J. Clinton.  He argues that the board erred in failing to treat

these disclosures as protected.

The board in the present action reviewed Flores' letters, and determined

that they are allegations of retaliation stemming from the same protected

disclosure that Flores identified in his earlier appeal: the Code-3 contract.  They

detail Flores' complaints of further retaliation stemming from the same initial

disclosure, and seek assistance in responding to the alleged retaliation.

Collateral estoppel bars a litigant from relitigating the same issue decided

in a previous case where (1) the issue is identical to that involved in the prior

action, (2) the issue was actually litigated in the prior action, (3) the

determination on the issue was necessary to the resulting judgment in the earlier

action, and (4) the interests of the precluded party were fully represented in the

Case 1:01-cv-00057  Document 18  Filed in TXSD on 11/15/2001  Page 47 of 318

prior action.  Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1569 (Fed. Cir. 1983).

Because the board previously has held that Flores' disclosures concerning the Code 3 contract were not "protected disclosures" under 5 U.S.C. § 2302(b)(8), it correctly determined that Flores is collaterally estopped from relitigating these assertions in the present action.  First, the issue in the present action – whether Flores is being retaliated against for a "protected disclosure" of the Code-3 violations – is identical to that involved in the prior action.  Second, the issue of whether Flores' disclosures were protected was actually determined in the prior action.  Third, the determination on this issue was the heart of the resulting dismissal in the earlier action.  Finally, Flores' interests were fully represented in the prior action.  Flores was a party to the earlier action, engaged in discovery and submitted motions, responses and papers to the board in support of his case.  While Flores may not have been represented by counsel in the prior proceedings, his pro se status does not prevent the application of collateral estoppel.  See Moss v. Dep't of the Air Force, 82 M.S.P.R. 309, 314 (1999).

Flores also argues that the board improperly ignored his allegation that Customs Attorney Caroline Blessey threatened him with reassignment to Washington D.C. or forced early retirement.   He complains that her alleged threats were a prohibited personnel practice under the WPA.   However, as the OSC investigation determined, Ms. Blessey merely was acting as an attorney for the agency, was making an offer to reach a global settlement of all of Flores'

01-3231                                4

Case 1:01-cv-00057  Document 18  Filed in TXSD on 11/15/2001  Page 48 of 318

outstanding complaints, and had no authority to direct Flores' reassignment. Moreover, Flores alleges that her retaliatory threats were premised upon his Code-3 disclosures, which the board has already determined are not protected under the WPA. To the extent that Flores is arguing that this alleged retaliation was based on his filing of an appeal to the board, or his complaints to the EEOC, the board properly found that these activities are not protected under 5 U.S.C. § 2302(b)(8) as "whistleblowing."

Finally, Flores was not improperly denied a hearing before the board because an appellant has no statutory right to a hearing on the threshold issue of jurisdiction.  Wilson v. Merit Sys. Prot. Bd., 807 F.2d 1577, 1582 (Fed. Cir. 1986).

## QUESTIONS AND ANSWERS
## ABOUT
## PETITIONS FOR REHEARING
## AND
## SUGGESTIONS FOR HEARING
## OR REHEARING IN BANC
## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

Q.    *When is a petition for rehearing appropriate?*

A.    Petitions for rehearing are rarely considered meritorious. Consequently, it is easiest to first answer when a petition for rehearing is not appropriate. A petition for rehearing should not be used to reargue matters already briefed and orally argued. If you failed to persuade the court then, you do not get a second chance. This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36, as a disposition of this nature is used only when the appellant has utterly failed to raise any issues in the appeal that require an opinion to be written in support of the court's judgment of affirmance.

Thus, as a usual prerequisite, the court must have filed an opinion in support of its judgment for a petition for rehearing to be appropriate. In addition, counsel seeking rehearing by the panel must be able to identify in the court's opinion a material error of fact or law the correction of which would require a different judgment on appeal.

Q.    *When is a suggestion for for rehearing in banc appropriate?*

A.    In-banc decisions are extraordinary occurrences. Consequently, to answer this question, one must first understand the respective roles of a three-judge merits panel of the court and the court in banc. The responsibility of a merits panel is to decide individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate responsibility of the court in banc is to set forth the law of the circuit which merits panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have en-

tered a precedential opinion in support of its judgment for a suggestion for rehearing in banc to be appropriate. In addition, the party seeking rehearing in banc must show that either the merits panel has failed to follow identifiable decisions of the Supreme Court of the United States or precedential opinions of the circuit or the merits panel has followed circuit precedent which the party seeks to have overruled by the court in banc.

Q.    *How frequently are petitions for rehearing granted by merits panels or suggestions for rehearing in banc accepted by the court in banc?*

A.    The data about petitions for rehearing since 1982 show that merits panels granted some relief in only 3 percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision. In-banc suggestions were accepted less frequently, only 16 of more than 1100 times.

Historically, the court itself initiated in-banc review in more than half (21 of 37) of the very few appeals decided in banc since 1982. This sua sponte, in banc review is a by-product of the court's practice of circulating every precedential panel decision to all of the judges before it is published. No count is kept of sua sponte, in banc polls that fail to carry, but one of the reasons that virtually all of the more than 1100 suggestions made by the parties since 1982 have been declined is that the court itself has already impliedly "cleared" the precedential opinions before they are filed by merits panels.

Q.    *Is it necessary to have filed either a petition for rehearing or a suggestion for rehearing in banc before filing a petition for certiorari in the Supreme Court of the United States?*

A.    No. All that is needed is a final judgment in the court of appeals.

‾    As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit. Almost 1000 petitions for certiorari have been filed in that period.

OCT-24-2001  17:05          US DEPT OF JUSTICE-CLB                    202 514 8640      P.09

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMATION SHEET

## FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File.** You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999

# ORIGINAL

INTERVIEW OF

ROBERT S. TROTTER

TAKEN ON JULY 28, 1999

DEFENDANT'S
EXHIBIT
4

1          MS. ROJAS:  ...Robert Trotter, Grace Rojas,

2    Caroline Blessey.  We are taping the interview today.

3    And what we're discussing is an allegation of reprisal

4    for having been a whistle-blower.  The complaint was

5    filed in our office, with our office on buyout listed by

6    Jorge Flores and port director in Brownsville.

7          And so that's basically what the topic we'll be

8    discussing today is.  I will administer an oath to you.

9    Because as I explained before we started, we do consider

10   you a subject.  May or may not turn out to be one, but

11   at this time we'll just go ahead with that.

12         So would you raise your right hand, please.  Do

13   you solemnly swear to tell the truth, the whole truth,

14   and nothing but the truth, so help you God?

15              MR. TROTTER:  I do.

16              MS. ROJAS:  Okay.

17

18                      *  *  *

19

20   QUESTIONS BY MS. ROJAS:

21       Q.   What is your full name, Mr. Trotter?

22       A.   Robert S. Trotter.

23       Q.   And what is your title?

24       A.   Assistant Commissioner, Office of Strategic

25   Trade.

1    Q.   I should have asked you before we started.   Do

2    you have a card?

3    A.   I gave you one.

4    Q.   Oh.  Thank you.  You sure did.  Okay.  How long

5    have you been in this position?

6    A.   February of '99.

7    Q.   And what is your rank, Federal --

8    A.   ES-4

9    Q.   SES-4?

10    A.   Uh-huh.

11    Q.   Okay.  What were you before this position?

12    A.   I was the Assistant Commissioner, Office of

13    Field Operations.

14    Q.   Do you know who Jorge Flores is?

15    A.   I do.

16    Q.   When did you first meet him?

17    A.   1991.

18    Q.   And what was your working relationship with him

19    then?

20    A.   I was at that time the regional commissioner in

21    Houston, Texas.  Jorge Flores was the port director in

22    Brownsville, Texas.

23    Q.   He already was the port director in '91?

24    A.   That's correct.  When I first met Jorge, he was

25    the port director in Brownsville, Texas.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.   Okay.

2    A.   And I supervised the district of Laredo, which

3 reported to -- Brownsville reported to Laredo.

4    Q.   Okay.  Were you his first-line supervisor?

5    A.   No.

6    Q.   Who was that?

7    A.   At that time, it was the district director of

8 U.S. Customs.  At that time, it was -- when I first met

9 him it was Joe Costellano, was the district director at

10 that time.

11   Q.   And when did that change?

12   A.   In 1993 another district director by the name

13 of Audrey Adams.  And we went into a new configuration.

14 The Customs Service was reorganized.  And in September

15 of '95, actually October 1st of '95, the regions were

16 done away with, so I no longer supervised that same

17 location.

18   Q.   Okay.  So when did Maria Reba come into the

19 picture?

20   A.   Reba reported on board 2-25-96.

21   Q.   So then did she take over from Audrey Adams?

22   A.   Right.  We were in a different configuration at

23 the time.  As I said, there were no longer regional

24 commissioners.  So I was actually Maria's -- I would

25 have been her peer.  I was in Houston at the time, the

1    East Texas CMC.  And I was there another year or so

2    before moving on to headquarters to the assistant

3    commissioner OFO's job.

4        Q.   Okay.  So what is the -- in February you mean?

5    February '99?

6        A.   No, no.  I came to headquarters in June of '97.

7        Q.   Okay.  And, so then Maria Reba took over Audrey

8    Adams --

9        A.   Correct.  Correct.

10       Q.   Except that she wasn't called a district

11   director.

12       A.   That's correct.  At the time it was called the

13   Customs Management Center Director, CMC.

14       Q.   And that's what it still is called; is that

15   right?

16       A.   It's called -- actually, there's a CMC, but

17   their title has changed.  They're now -- let me get the

18   right title.  They're called Director of Field

19   Operations.

20       Q.   When I asked you if you were his first-line

21   supervisor, it was these others, Audrey and then Maria.

22   So Maria would be his first-line supervisor --

23       A.   That's correct.  Yes.  Today.

24       Q.   -- today and before you left, February '99.

25       A.   Right.  Correct.

1      Q.   What were her -- as being a supervisor, his --

2   the port director's supervisor, what were some of the

3   duties that she had?

4      A.   Well, the CMC director is responsible for the

5   entire scope of operations of the South Texas CMC.

6   It's, I would imagine, a little over 1,000 employees.

7   Maybe 1,050 employees.  And I think nine ports of entry.

8   And she's responsible for the enforcement of Customs

9   laws and regulations for the collections of duties, the

10   assessment of penalties, for the management of

11   personnel.

12          And generally, she is the field officer that's

13   responsible for that geographic area for the Customs

14   Service and the Office of Field Operations.  We're

15   divided up.  We have different offices.  Our two main

16   offices are the Office of Field Operations and then the

17   other is the Office of Investigations.

18      Q.   Okay.  So in the management of personnel, she

19   was the one responsible for providing his yearly

20   evaluation?

21      A.   Correct.

22      Q.   Performance evaluation.  What about as far as

23   issuing him directives to do certain things?  Is she

24   responsible for that?

25      A.   That's correct.  Yeah.

1     Q.   Did she have the authority for those things?

2     A.   We had in the reorganization that I spoke about

3   in September of '95, we had tried a different style of

4   management where we were delayering and flattening the

5   organization.  We had, as I said, done away with the

6   position of regional commissioner.  We had done away

7   with the position of district director.  And we had

8   established the position of Customs Management Center

9   director.

10        The Customs Management Center director, in the

11   beginning of the reorganization, we laid out guidelines

12   of who was responsible and how work was to be done.  And

13   the responsibility for doing the work was always at the

14   CMC level.  It was always the CMC director's

15   responsibility.  However, the job of getting the work

16   done, the operational day-to-day work was done at the

17   ports of entry.  And that's how we tried to make a

18   differentiation.  We used terms like empowering the port

19   director to perform operational duties.

20        The work -- one of our theories was, the work

21   gets done at the port, not at the CMC.  And where

22   districts actually had done work, districts were always,

23   generally speaking, co-located in the major ports.  So

24   the district director at that time would have been like

25   a port director now of a major port, plus having the

1    duties of all the other, responsibilities of all the
2    other ports underneath him.
3           So what we tried to do with the reorganization
4    was to redefine the scope of work that was being done.
5    But we never, ever said that the port director's boss
6    wasn't the CMC director.  I mean, we always made that
7    clear, they were the ones who still did the appraisal.
8    They were the ones who assigned training, who granted
9    leave, who set the course, actually, for the CMC.  And
10   so it was a period of time where we tried a different
11   way to manage.
12          Along the southern border, which we have four
13   CMCs along the southern border:  the Southern California
14   CMC, which is in San Diego; the Arizona CMC, which is in
15   Nogales; the West Texas New Mexico CMC, which is in
16   El Paso; and then finally the South Texas CMC, which is
17   in Laredo.  They were always treated differently because
18   that part of the world is where we really have the most
19   activity as far as arrests, as far as seizures, as far
20   as areas of attention along the border.
21          So we always dealt very closely in headquarters
22   with the CMC directors.  And we expected them to, you
23   know, be responsible for what the ports did or didn't
24   do.  It was the policy of the organization at that time,
25   once again, that the operational work was done at the

1   port level.

2       Q.   Okay.  So as far as the arrests and seizure and

3   activities that occurred at the, specifically at the

4   Brownsville port, was that different than was the --

5   were the seizures different than what was happening at

6   other ports?

7       A.   Well, I think over the course of time, we found

8   that the Brownsville port of entry was not performing up

9   to the standards that we would have liked to have seen

10  in comparable ports in Texas or Arizona and New Mexico

11  or California.

12          And there was an incident in, if I have my

13  dates here correctly, in May of '96, where there was a

14  load of narcotics.  We had had a lookout going for quite

15  a while on reefer trucks, refrigerated trucks crossing

16  the border.  And we had very good information developed

17  by the Office of Investigations that these trucks were

18  moving back and forth across the border carrying

19  generally cocaine northbound and currency southbound.

20  And it just so happened that the informant was in the

21  area of Brownsville, in the city, with an agent.  And he

22  saw a reefer truck get through.  And he said, that's one

23  of the trucks I've told you to look out for.

24          They finally traced the truck down and they got

25  it back to the port.  It had I think 3,080 pounds of

1    cocaine in it, which the inspector had missed.  And when

2    we started quizzing a little more of what actually went

3    awry there after we had done so much work to alert these

4    people that these trucks were coming through -- we had

5    information put on our enforcement system called Tex

6    that the inspectors are supposed to query when these

7    trucks came through or when any truck comes through or

8    passenger vehicle comes through.  And we found out that

9    the policies and procedures had not been followed.

10          And that caused a (inaudible) concern in

11   Washington.  Not so much that we missed the load.  Those

12   things do happen.  But yet, when we started to check up

13   on it, it seemed like the truth was not coming out for

14   Brownsville.  It seemed like there was a situation where

15   the facts didn't line up with some of the stories that

16   we had been told about how this truck got through.  And

17   that very much concerned me.  And so we started taking a

18   more closely -- closer look at what was going on in

19   Brownsville and their enforcement efforts.

20          And I think that's one of the pivotable times

21   after Reba got to the job that her and Flores first

22   clashed on who's responsible for what and who's in

23   charge and who will do what and when.  And I must tell

24   you, that I always sided with the CMC director because I

25   thought that it was correct, her efforts in the

1  enforcement arena.  She was working throughout the South

2  Texas to tighten up enforcement.  And I thought that she

3  did have a good package that she had put together to

4  raise our enforcement efforts.  And so --

5      Q.    So did you see improvement in the Brownsville

6  seizures?

7      A.    I don't know that there an immediate

8  improvement or much of any improvement in the cargo

9  arena.  I think that cargo was always a concern of ours

10  from Brownsville.  Subsequently to that, we were able to

11  send in some teams to look at what was actually going on

12  in Brownsville.  And I would get reports back that it

13  didn't look like the effort was being put in at

14  Brownsville that was in other locations.  That when

15  Brownsville was talked to about this, the statement

16  pretty much was, we run our port, you know, don't worry

17  about us.

18      Q.    When you say Brownsville said "we run our

19  ports," are you saying Jorge Flores said that?

20      A.    Right.  And his subordinate managers.  That

21  there was a schism that was developed there that --

22  actually, the schism between Brownsville and Laredo

23  predated that, quite honestly, by even a few years.  The

24  first encounter I had with Flores was in 1993 where

25  there was an incident involving Internal Affairs where

1  Jorge felt that Internal Affairs was perhaps persecuting
2  him for some mistakes that were made with some personnel
3  issues and had sent a fact finder down to look at the
4  situation, wanted to get to the bottom of it.  Flores
5  had his story.  There was an acting district director at
6  the time, Linda Wakash, she had her story.

7        And when I got the report back, I ended up
8  sending down the assistant regional commissioner in --
9  let me get my dates here correctly -- January of '95, I
10  sent down the assistant regional commissioner to talk
11  with Wilcox and Flores.

12     Q.   And who was that?

13     A.   John McGowen.  John McGowen ended up counseling
14  both Flores and Wilcox.  And he said that Wilcox took
15  the counseling and said, okay, I'll work to get along
16  with Jorge.  And Jorge was very upset.  I think it was
17  that point in time that Jorge, I guess if you will, the
18  hard feelings started being developed with the Laredo
19  district.  And I think they continued after Ms. Adams
20  left and they intensified actually when Ms. --

21     Q.   Are you saying he had hard feelings towards
22  whoever was the district --

23     A.   I think he had hard feelings towards the
24  district in trying to supervise, yeah.  Trying to exact
25  behavior modifications or compliance with rules and

1   regulations and policies.  Up until that time, I think

2   Jorge was considered a model employee, a good employee.

3   He -- I thought he did a good job in Brownsville of

4   patrolling a rather hostile environment.  He replaced a

5   fellow who was charged with smuggling.  I think his name

6   was Nacius, the port director before Jorge.

7         And Jorge was selected, a lot to do with his

8   community relationship.  He had been a teacher in the

9   public school system there.  Jorge knew a lot of people

10   in Brownsville.  And he could assure them that the port

11   was going to be maintained and that the people of

12   Brownsville would have a fair hearing when it came to

13   Customs.

14         I think what happened along the way, the

15   Customs Service started changing pretty dramatically.

16   And as we became more and more enforcement oriented and

17   we had operations -- the first big enforcement operation

18   that I can remember we were involved with was Operation

19   Hard Line.  We really started intensifying cargo

20   examinations.  We had been told at our intelligence

21   briefings that the cocaine smugglers for the most part

22   were beating us in cargo.  And so we tried to raise up

23   the efforts in our cargo operations.  What that then

24   started doing --

25       Q.   Who would be the one who would tell you the

1  cocaine smugglers are beating you, you know, winning the
2  war or whatever?
3      A.    Well, you know, we get pretty consistent
4  intelligence briefings.  We have pretty consistent --
5  there are informants involved.  I mean, this fellow on
6  the reefer trucks was an informant.  He was the guy who
7  was modifying these trailers, you knows.  They had
8  bought I think 18 of these trailers.  It was a great bit
9  of intelligence.  I mean, quite often we don't get that
10 good of an intelligence, you know, where they'll tell us
11 what the trailer number is, where it's stowed away in
12 that trailer and so on, but...
13     Q.    Is that the informants there working with
14 Customs agents?
15     A.    Right.  Correct.
16     Q.    Not inspectors --
17     A.    No.  Right.  Agents.
18     Q.    -- but agents they're called.
19     A.    Yeah.  That's when I told you, there's
20 basically two different organizations.
21     Q.    I see.
22     A.    And we also were very concerned about the
23 safety of our officers.  In Operation Hard Line, we
24 hardened the ports actually.  Have you ever seen a
25 Customs port of entry?  Have you ever been to one?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.   No, I haven't.

2    A.   Well, basically, you have the cars that drive

3  up to what we call primary.  And there you have an

4  immigration officer, a Customs officer.  We split the

5  duties out there.  And then they make their

6  determination if the car goes to secondary or if it goes

7  on down the road.  And at that point in time, we have

8  what we call port runners.  And these port runners would

9  run the port.  They would sit out in front of the port

10  and just gun their engines and then drive right through.

11       And it became very -- a very hostile

12  environment for our people to work in and it was

13  life-threatening.  We had not -- in Brownsville, we

14  didn't lose any lives; but in other ports, we had lost

15  lives of these people who were running the ports.  So we

16  knew that the smugglers were changing their smuggling

17  practices.  They were getting much more aggressive on

18  the southern border.  And so we had to heighten our

19  intensity.

20       And in that same period, we put additional

21  inspectors on the land border, additional K-9

22  enforcement officers, and we were building new

23  facilities all along.  So we were really stepping up the

24  intensity of the drug war on the southern border.  And

25  certainly Brownsville was in the heart of it.

1    I'm going to show you a map here and you're

2    welcome to have this, but it will give you some idea of

3    where Brownsville sits along the waterway and some of

4    the ports around Brownsville, and just give you some

5    idea the Customs Management Center in Laredo, which they

6    call up river.  You can see it goes up to Amistad Dam,

7    and then down river to Brownsville.  And you're

8    certainly welcome to that.  But it gives you some idea

9    of how many ports are there, how many border crossings.

10    And the bad guys were infiltrating the border

11    throughout that area.  And what we had asked all the

12    port directors to do was intensify their efforts

13    because, you know, we knew that the smugglers, the whole

14    cocaine smuggling routes had shifted from south Florida

15    to the southern border.

16    Q.    What time frame, then, are we talking about?

17    A.    That would have been from about '92, 3, up

18    until the present.  I think we still feel that way.  We

19    still feel that the southern tier -- what we refer to as

20    the southern tier starts in Puerto Rico and runs all the

21    way to California.  But the southern border are those

22    hard border states that the map shows you there.  And we

23    certainly feel that most of the narcotics that are

24    getting into this country now, most of the cocaine and

25    marijuana are coming up through the southern tier, which

1  would be certainly including Florida, but the shift away

2  from Florida as the primary entrance point to the Texas,

3  Arizona, New Mexico, California border occurred in about

4  the '92/'93 time frame and continues to this day.

5      Q.   So if their seizures were not up to what you

6  wanted them to be and the informants were involved with

7  the agents in telling you that you were not winning the

8  war and Reba was in charge or supervising the ports, was

9  Reba reprimanded or disciplined?

10     A.   Well, I don't think Reba's seizures across the

11  CMC were down at all.  I think her seizures are up and

12  continue to be up.  I think that there was one port that

13  probably was having the most difficulty and that was

14  Brownsville.  Actually, we did transfer people who did

15  not take this seriously.  They were not in that part of

16  Texas.  They were in West Texas.  We transferred people

17  out.  We installed new people to try to heighten their

18  awareness.

19     Q.   When you say "we," that's you when you were --

20     A.   Yeah.  When I was the regional commissioner.

21  That's correct.

22     Q.   You moved someone from El Paso --

23     A.   El Paso.  Right.  Yeah.

24     Q.   -- out because the seizures were not --

25     A.   Well, the seizures were not there and they were

1  not responding to make things better.  Once again, some

2  managers choose not to listen.  That's not always

3  seizures.  There's other things that are involved when

4  you look at a manager, but certainly enforcement is what

5  we do.  I mean --

6      Q.  So when was that change in El Paso happen?

7      A.  That was in the early '90s.  '91, '92.  In the

8  early '90s.  They had had a series of very large loads

9  of narcotics that got through there.  Once again, in

10  trucks.  They went to Silmar, California.  And the

11  feedback was that the port was very loose, that we had

12  to tighten up.  And the district director and assistant

13  district director at that time, they felt that they knew

14  best on how to run the ports.

15      Q.  Okay.  So since Reba's -- she was not

16  reprimanded or disciplined because overall her seizures

17  were okay.  You just started having problems with

18  Brownsville.

19      A.  Yes.

20      Q.  What direction did you give Reba about

21  disciplining, you know, I would think that, Brownsville,

22  Jorge Flores would get some disciplinary?

23      A.  I told her to move him.

24      Q.  To move him?

25      A.  Yeah.  In '96 I told her to move him, yeah.  In

1    May of '96, I wrote her a note and said, move him.    If

2    he's not responding, if he's not replying, if he thinks

3    that you're not there to run the CMC, then you have to

4    move him, you know.    And that was my instructions to her

5    to move him.    And I worked with her to move him in May

6    of '96.

7        Q.    He's still there.

8        A.    That's right.

9        Q.    What happened?

10       A.    Because in --

11       Q.    I have copies of your documents if you want to

12   refer to it.

13       A.    Okay.    In September 28th of '96, in May of '96,

14   I told Reba to go ahead and move him.    I worked it

15   through the system here to move him.    We ran into some

16   impediments for moving him.    First of all, he had a very

17   strong relationship with the trade community there.

18   Very strong political relationship, which he has to this

19   day and he uses that routinely.    Too, he had a

20   relationship with an individual at treasury that was in

21   a very powerful position at treasury.

22           And he had positioned himself by a subsequent

23   action with declaring himself a whistle-blower to me in

24   September of '96.    And at that time, I decided that his

25   reference to being a whistle-blower is a message to me,

1  and in fact, I talked to him about it.  He sent me the
2  package that he had turned in on the whistle-blower.  It
3  was basically surrounding an allegation about a
4  hazardous material, company code three and a contract
5  with Laredo CMC.  South Texas CMC.
6      He pretty much insulated himself from being
7  moved by those, one, the political community controls to
8  the connection at treasury; and then, subsequently, by
9  filing the whistle-blower notice with me.  What I then
10  thought should happen was that the whistle-blower
11  charges, the allegations about code three to the FBI and
12  to the inspector general should run its course.
13      And I got back to Reba.  I did not tell her
14  why.  I never mentioned to her about the referral and
15  the whistle-blower claim.  I got back to her and said
16  that we had to cool our actions on moving Jorge.  He had
17  to stay and that we had to work around that.  My
18  thoughts all along were that I would let this thing run
19  its course, and hopefully during this time period,
20  things would get better between the two of them and we
21  could go ahead and live through this.
22      And this kind of happens with lots of things
23  that we do.  The government, as you well know, any
24  action takes quite a while.  Any personnel action.  And
25  especially when outside agencies are brought into it.

1   The second part of it, I didn't know that Jorge wasn't

2   telling me the truth about Maria Reba.  I mean, I didn't

3   know that she had not been involved.  So first thing I

4   couldn't tell her that he had filed because I didn't

5   know her involvement.

6           And secondly, she took my word for it that we

7   weren't going to do anything to Jorge.  So it rest with

8   me that there was no action, no subsequent action taken

9   for I guess about two years after that with Flores.

10      Q.   Okay.  As far as the allegation, I really don't

11  need to know or want to know about what her come back

12  is, you know, whether she was or wasn't involved.  I

13  just need to know about your knowledge of the

14  allegations, what actions you took on it and who else

15  you told about it.  So you did not tell Reba you said.

16      A.   I did not.

17      Q.   What about others?  Did you tell --

18      A.   Well, I told Al Tenent, who worked for me in

19  field ops.  He was my chief of the administration.  And

20  Al was the person who was following up on this for me.

21  I reoccurringly asked Al what the status of the case was

22  because it kept running and running and running.  And Al

23  would check occasionally to see if Internal Affairs had

24  heard anything back from the FBI or from OIG on their

25  investigation.  And I told Tenent and myself probably

1   down line I may -- and I don't know how much down line

2   it was -- I may have spoken to Diane Tudson about it.  I

3   may have spoken to her.  But it was a very close circle

4   of people that I spoke to about the whistle-blower

5   situation.

6       Q.   What about, since you did not tell Reba, what

7   about Winwood?

8       A.   I never mentioned it to Winwood.  See, he would

9   have no reason to know.  Reba since she was a target,

10  you know, I couldn't tell her.

11      Q.   And then you told her to just wait, I guess.

12      A.   Uh-huh.  Well, and we tried other interventions

13  along the way.  In April of '97, there were continuing

14  complaints coming out of that part of the country,

15  specifically from congressmen.  I think it was

16  Congressman Ortiz for the most part that had been set in

17  motion by allegations that Brownsville should be a

18  service port.

19      Q.   Tell me what a service port is.  I don't know

20  what that is.

21      A.   Yeah.  Okay.  A service port is basically what

22  we would consider a full service port.  It offers up all

23  of the kind of amenities of the large ports.  Basically,

24  we have probably, I guess close to 50 service ports now.

25  Those are ports that have import specialists.  They have

1  FPMF officers.  They have the full gamut of Customs

2  activities.  Prior to the request to becoming a service

3  port, there was a request to become a CMC itself to

4  establish Brownsville as our Customs Management Center.

5  And we had gone through that for the reasons that

6  Customs Management was not going to add one more Customs

7  Management Center, and why we thought that the --

8            (END OF SIDE A; BEGINNING OF SIDE B).

9            -- the congressmen that we felt that there --

10  there did not need to be a Customs Management Center in

11  Brownsville.  On the heels of that, there then came a

12  request to become a service port.  We said at

13  interventions --

14      Q.    So what is it, that the Brownsville port

15  presently does not have the service port --

16      A.    I think for the most part, it's the import

17  specialist side of it.  They do have an entry section,

18  if I remember correctly, and they have some FPMF work.

19  But they do not have the import specialist.

20      Q.    And FPMF, what's that?

21      A.    The fines, penalties and forfeitures.  So we

22  sent a group down from headquarters here.  It was led by

23  Denise Crawford to go down and interview the people in

24  that area.  We were bringing a new bridge on-line at the

25  time.  It was called Los Indios.  And there was

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1     questions about staffing there.  There was questions

2     about overtime.

3         Q.    And when was that?

4         A.    Pardon me?

5         Q.    When was the Los Indios --

6         A.    This was April of '97.

7         Q.    Okay.

8         A.    There were questions about overtime.  There

9     were questions about budget.  A service port, another

10    thing they don't have is they don't have their own

11    budget.  The CMC administers the budget.  So those are

12    two big things that a service port -- even the largest

13    service port, for the most part, the CMC administers the

14    budget.

15        Q.    So Brownsville administers their budget or not?

16        A.    No.  No, no.  They do not.  They're not a

17    service port and they don't administer their budget.

18    But I would say many service ports do not administer

19    their budget as well.  It's something that generally is

20    retained by the Customs Management Center.

21        Q.    What does that mean, does not administer their

22    own budget?  Because I've heard something that, you

23    know, he did not budget his -- I mean, he did not use

24    his budget properly.

25        A.    Well, what they're given, they're -- administer

1   in the bigger sense that you're given a -- CMC decides

2   that Laredo probably has a budget of I'd say $30

3   million.  And what happens out of that budget, it's

4   divided up many different ways from the CMC and it's

5   sent out to the ports.  And salaries and expenses are

6   certainly the biggest part of that.  And what's happened

7   then, these port directors are given a dollar amount

8   that they have to manage within.

9       Q.   I see.

10     A.   And if they don't manage within that amount,

11   then they have to go back to the CMC and ask for more

12   money.  And the big thing out in the ports for the most

13   time is managing the overtime.  That's Customs

14   inspectors are assigned a lot of overtime and K-9

15   enforcement officers.  And one of the large ports

16   administering a field budget is managing your overtime.

17   And if you don't manage your overtime properly and you

18   don't manage your salary and expenses properly, you get

19   into problems that you can't staff.  You can't staff

20   during the hours of service.  Which creates all sorts of

21   problems for everyone concerned.

22       And the question that came in, was Brownsville

23   being treated fairly in the budget process.  And I

24   instructed the CMC at the time to bring the people in

25   from Brownsville and show them the budget, show them

1   their share of the budget.  And show them, you know, how

2   much money they were getting.

3       Q.   So the question -- are we back to Solomon

4   Ortiz, the question about was Brownsville getting their

5   share or where did that come from?

6       A.   What we were talking about was the

7   intervention --

8       Q.   Oh.  Yes.  Thank you.

9       A.   -- and the issues that Ms. Crawford went down

10   to look at.  It was staffing at Los Indios bridge, it

11   was the budget issues, and it was the overtime issues.

12   And those are things that she went down and did a lot of

13   interviews inside the Customs Services, as well as

14   externally.  Worked closely with the trade.  Worked with

15   Ortiz' staff and came up with some answers.  What I was

16   trying to do, as I said in this period of time that I

17   knew Flores was going to be there because I knew it was

18   going to take some time, I wanted to see if we couldn't

19   turn that around.

20          I mean, to tell you personally -- and I don't

21   know if you met Jorge Flores.  He's a very likable guy.

22   I have no bone to pick with Jorge Flores at all.  I

23   never have.  I like the man.  I respect the man.

24   However, if you don't do your job, if you're not

25   responsible to your superiors, I've got problems with

1   that.  No matter if I like you personally or not, I've

2   got problems with it.  And I do support the system.  I

3   mean, I must maintain the structure, the reporting

4   structure of the organization.

5          So I really thought that perhaps, as I said in

6   this time period between when the allegations were made

7   and now we're, you know, six months later into it, that

8   we might be able to get through this, that we might be

9   able to get through the situation, that I in fact had

10  asked a few other teams to go down and take a look at

11  what was going on down there.  I asked for a review of

12  the K-9 enforcement operation.  And I spoke to a fellow

13  that worked for me in OFO by the name of Mike Lovejoy

14  and he knew Jorge.

15         And I said, you know, go down and take a look

16  at that.  See if we're getting our money's worth with

17  our K-9s.  See what kind of work these guys are doing in

18  cargo.  Lovejoy is in charge of anti-smuggling in OFO.

19  **And what happened was, he went down.  He said, sure.**

20  **I'll be glad to go.  I know Flores.  I can talk to**

21  **Flores.  And he goes down and he finds out that they're**

22  **not performing up to standards.  They're not doing what**

23  we've asked them to do with the trailers.  They're not

24  doing what we asked them to do with cargo.  They're not

25  doing what we asked them to do with the K-9s.

1           And so Mike sits down and talks to Jorge.
2     Well, instead of taking this as constructive criticism
3     or trying to do something about it, Jorge flares up and
4     says, well, you're just out to get me.  You're just like
5     the rest of them.  You're just coming here to get me.
6     And by this point in time, he had convinced himself that
7     everybody was out to get him.  And so anybody that we
8     would send in there ran into the same type of situation,
9     you know.  There was no trust between Jorge and Laredo
10    at the time.

11          And then headquarters started to get more and
12    more involved.  And whenever we would send folks in
13    there, the same situation would come.  Jorge would, you
14    know, attack the messenger.  So we went through that.
15    We continued to go through that.  Things really didn't
16    get any better.  They continued quite honestly to
17    deteriorate.

18          On 5-22 of '98, Jorge then wrote a letter to
19    Graham and Ortiz talking about the problems of
20    mismanagement in the South Texas CMC, talking about the
21    allegations of -- Code 3 allegations.  And stating that
22    I had become the problem, as well as Reba.  And that it
23    was in a -- that whole part of South Texas, it was in a
24    terrible situation because of Reba's management and my
25    involvement, my letting her get involved in the port

1   activities.

2          Jorge had missed a big point here.  I had

3   decided long ago that the CMC directors were going to be

4   involved in port activities, as I specifically said

5   about that southern border.  And so things -- I didn't

6   see that we turning a corner on what was really going to

7   take place down there.  So I thought once again, I would

8   go ahead and offer up an alternative.  We had rode

9   through this.  I thought if I would be able to repair

10  this disconnect -- I found out I couldn't do that.

11         So I did what normally I would do in a

12  situation like this where we have a rather high level

13  field manager involved in a dispute either with their

14  boss or with the community, is you go in and see if you

15  can't work a deal to take care of the situation.  And

16  there were several open allegations I think.  Jorge had

17  I think filed some EEO -- he had made some EEO

18  allegations as well.  He had made some allegations about

19  missing an opportunity for a management training

20  program.

21         So I asked counsel and LER to put a team

22  together to go down to Brownsville and talk to Jorge.

23  And this is another instance of my intervention with

24  Jorge to once again resolve this.  I think Jorge was

25  asking for a rather high dollar amount for a settlement.

1   He was asking for a promotion to a GS-15.  And this is

2   typically how these things go.  And ⊥ asked Carol

3   Blessey and Diane Tudson to go down in August of '98 to

4   settle these open cases.  And what we offered Jorge was

5   a directed reassignment and money.

6           Now, a directed reassignment is a tool that's

7   used by management for several reasons.  But one of

8   those reasons is to settle disputes that seemingly can't

9   be settled another way.  A lot of people when they'll

10  get into situations like this, they'll ask for a

11  reassignment because they know that they can't stay in

12  the area.  Other people will never want to be reassigned

13  because that's where they want to be.  They want other

14  folks reassigned.

15          Jorge wanted Wilcox reassigned.  He wanted Reba

16  reassigned.  He wanted everybody that he had to report

17  to.  He wanted me reassigned.  And that's just not how

18  the system works, you know.  The 14's don't get to

19  reassign the 15's, and the 15's don't get to reassign

20  the SES's.  It works the other way.  So I asked Blessey

21  and Tudson to go down and talk to Jorge about this and

22  sit down and open up a dialogue with him about what do

23  you really want, Jorge.  What's it really going to take

24  to make this go away.

25          Here we have this directed reassignment.  Jorge

1    is fairly close to being able to retire.  He had lived

2    in the community I think most all of his life.  You

3    know, many people see this directed reassignment as an

4    opportunity to go out early to start something new, to

5    try a different career.  Some take the directed

6    reassignment and go off and do a fine job somewhere

7    else.  Sometimes it's just what the doctor ordered to

8    kind of change the equation to, you know, start anew.

9        And I had used this several times over the

10   course of my management career to affect change and to

11   try to give people a shot at making things right.  Not

12   only was I willing to do the directed reassignment,

13   there was a job here at headquarters.  I was willing to

14   go ahead and throw some dollars in there for --

15       Q.   And what was the job in headquarters?

16       A.   It was a -- it would be one of our GS-14

17   program officers here at headquarters.  We had tried

18   this once with Jorge before back, many, many years ago.

19   Even to get him out of there temporarily, kind of a

20   cooling off period, back -- I would say this was in

21   about the '96 time frame, '97 time frame.  We had a job

22   teaching at the board patrol academy.  The board patrol

23   was bringing on a couple 3,000 new employees in.

24       The board patrol had come to us and said, hey,

25   we would like to have an experienced Spanish speaker who

1   could come and talk to our people about the southern

2   border.  And we thought for a number of reasons it would

3   have been a good opportunity for Jorge to go do this.

4   At the time, it would have given us some breathing room

5   between Reba and Flores.  You know, sometimes just a

6   cooling off helps in these situations.

7           Flores came back and said he had a sick child,

8   there was no way that he could go.  So we backed away

9   from it.  When you talked about why did it take so long,

10  that was another intervention that we tried.  It slipped

11  my memory until this time around.  That intervention

12  failed because Jorge came back to us and said he had a

13  sick child and he just couldn't possibly go.  I think

14  this was an adult child and I don't know the whole, all

15  the story.

16          So at that point in time, here we are now 9 --

17  8-25-98 with Blessey and Tudson going down there.  On

18  9-17, Jorge files an EEO complaint against myself and I

19  **guess all the rest about going down and making them this**

20  offer.  So here we have a situation that we went down in

21  good faith to make the offer.  What I think ended it was

22  the dollar amount.  Jorge was I believe asking for a

23  million dollars.

24          And I was dealing with Jim Destephano at the

25  time on this.  I was not dealing -- it was just

1   Destephano and I.  When you talk about money, generally
2   you talk to the associate field counsel, and that's Jim
3   Destephano in Houston.  And Jim and I were talking about
4   how much money we would offer up to Jorge, you know, to
5   kind of close this deal.  Because quite often, money is
6   generally the lubricant that settles many of these
7   cases.  And we went back and forth about a dollar
8   amount.  We would never go to a million dollars.  I
9   mean, we've never gone that high that I know of on any
10  settlement.

11          And we didn't see that we had done anything
12  wrong.  What we were seeing that we were doing was
13  taking care of a problem by offering the directed
14  reassignment, giving Jorge the option to retire early
15  and plus take some money with him because he had
16  invested some money I'm sure in lawyers and so on and so
17  forth.

18          At that time, then, on 10-23-98, I was informed
19  that the MSPB had determined that the Code 3 case was
20  over and that there was no findings against Reba.  So I
21  decided to once again, since I had made a bona fide
22  offer to Jorge, to help alleviate this problem to
23  recommend his directed reassignment.

24          Now, during that period of time, we had a new
25  commissioner come on board by the name of Ray Kelly.

1   And Kelley was going to make some moves himself.  And I

2   went to him and I said, you know, this guy is ready.

3   We've gone through a protracted time period with him.

4   I've tried these interventions and it hasn't worked.

5   Things aren't getting any better.  I would like to move

6   him.

7          What Kelly told me to do was to hold off, that

8   he was going to consider a reorganization in OFO.  At

9   that point in time, I didn't know that he meant me.  But

10  he did mean me because I was reorganized out of OFO in

11  February of '99.  And that's where Winwood came into the

12  picture.  I was transferred out.  Chuck was transferred

13  in.  We swapped jobs.  Chuck had this job before I left,

14  before I got it.  And what happened then, I was of

15  course out of the picture.  The offer was no longer on

16  the table.  There was actually nothing going to happen

17  from my perspective because I was no longer in the chain

18  of command.

19          I spoke to one fellow in the transition, and

20  that was Deputy Assistant Commissioner, Bob McNamara,

21  who was acting at the time.  And he said, how is it

22  going out there with the CMC directors and the port

23  directors.

24      Q.   When is this?

25      A.   This would have been in February of '99.  And I

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    said, the way I see it, there are three problems, three

2    problem areas.  He said, what are they.  I told him.

3    And I never went into the detail of why they were

4    problem areas.  His answer was, who's not getting along.

5    And I told him that.  And that was the last conversation

6    I had with OFO on the subject.

7        Q.   When you said three problem areas,

8    Brownsville --

9        A.   Detroit and Houston.

10       Q.   Okay.

11       A.   Brownsville, I must say, was the worst of the

12   three.  That's I think from '93 to -- actually, my first

13   encounter with Jorge was '93, '94 when we started with

14   the allegations about IA, till I left OFO in '99, you

15   know, five and a half years.  That's kind of a recap of

16   my relationship with Jorge.

17            Once again, I must tell you, that they were

18   warned.  I went to Jorge when we had a change of

19   district directors down there the first time when

20   Costellano left.  And I said, Jorge, who do you think

21   would be a good district director.  And Jorge was kind

22   of somewhat -- you know, he could have been in a

23   reachable group for that job, although he was only a 14.

24   And he said Audrey Adams, who was the assistant district

25   director, would be a fine district director.

So, I mean, that was some kind of relationship that I had in the beginning with Jorge.  And I don't want you to think that, you know, I was always on Brownsville's case.  Brownsville did some, along the way, they had received a Hammer reward for their participation with the other federal agencies and for customer service down there.  I went down for that recognition.

I will tell you that when I went to the recognition, Jorge was very proud.  And he introduced me to the ex-mayor of Brownsville, who came up to me and immediately started attacking Maria Reba.  I don't think he got that out of the newspapers, but he immediately attacked Maria about the poor job she was doing and how she was treating Jorge and that I should get rid of her. I took that for what it was worth.  But that was the kind of poison that was in the atmosphere down there.

I don't think Jorge ever really gave Maria a chance.  I don't think he ever really supported her. Even if, let's just say he didn't like her as a person, but as the person in authority.  I don't think Jorge ever respected that and I think that this actions displayed it.  And it made it very difficult for her.

Over the course of time, I talked to Maria Reba about many, many, many different things.  Truly, South

1   Texas is one of the most difficult places to run.  And I

2   did have several conversations with her about

3   operational issues down in South Texas.

4        I was familiar with that area because I had

5   spent six years in Texas.  So I felt qualified to make

6   some of these decisions and qualified to make some of

7   these recommendations.  And I thought that overall I

8   always tried to keep the best interest of the

9   organization at heart.  I tried to keep our enforcement

10  posture as strong as I possibly could, and yet, be fair.

11  I wanted to be fair.  And that's why I offered up over

12  the course of these six years different solutions to a

13  problem that continues probably to this day.

14       Q.   Well, as far as the review teams and the

15  results, I guess they were somewhat unfavorable results.

16  What --

17       A.   I don't think -- you know, and I wouldn't even

18  mind it if the results were unfavorable.  Whenever you

19  send a review team in, there's unfavorable results.  I

20  mean, that's just what review teams do.

21       Q.   Sure.  Right.

22       A.   What I was upset about was the reception of

23  that by Jorge, you know, and by his people.  That it's

24  almost like they immediately turned it and put it,

25  you're only here to pick on me.  Not you're here to

1   improve my K-9 program and improve my cargo program or

2   improve whatever. You're only here -- you've been sent

3   by them to pick on me because now you're part of whoever

4   they are to get at me, you know. And so, I guess that's

5   what I reoccurringly saw happen.

6          That's a bad situation, you know. I mean, it's

7   a bad situation when a manager will not listen to

8   outside, you know, input. And especially when it's

9   coming from your superiors. You know, it's different if

10  your peers might say something to you and you can shrug

11  that off or even your subordinates. But when your

12  superiors say something to you --

13      Q. That's what I'm confused about. It seems that

14  there would be a way to overrule what he wants and go

15  ahead and implement a strong enforcement program,

16  whatever that is, you know, K-9 program or whatever.

17  Wouldn't it have been --

18      A. Well, I don't know how you would do that when

19  he's the top manager. I mean, you can't be there

20  24 hours a day, seven days a week. And Maria did end up

21  sending people in to do that very same thing. I think

22  she sent in a K-9 manager from Laredo to do that very

23  same thing. And he was immediately under attack the

24  minute he walked in the door by Jorge and his people.

25  No, there were many things tried.

1    I mean, I'm not -- you have to remember what

2    level I was at.  And I have, you know, over 13,000

3    people working for you, you know, spread out over 20

4    CMCs and, you know, six different time zones, so you

5    don't get into that part of the nitty-gritty.  I mean,

6    you really leave that more to subordinate managers.  But

7    those instances that would be brought to my attention,

8    that's what they were about.  Hey, we tried that.  We

9    put this guy in here and he was rejected.  He was run

10   out of town.  You know, he was threatened, you know.

11   That's -- that's bad behavior.  It's conduct.  It's

12   performance.

13       I mean, it's many, many things that -- and once

14   again, I go back to -- it was not, if you will see the

15   first time I mentioned to move Jorge was in May of '96.

16   It was before he ever said he was a whistle-blower, you

17   know.  So it wasn't done because he was a whistle-

18   blower.  It was done because of instances that -- and I

19   **talked personally to Jorge about those instances before**

20   '96 occurred.  And I knew that -- I mean, I've been

21   around long enough.  I've been in the Customs Service

22   28 years and been a manager for, you know, since 19

23   what, '76 here, so that's 23 years I been a manager.  So

24   I have a feel somewhat for people and if they're going

25   to -- situations are going to get better with them.

1        And what I saw was this situation continuing to

2   deteriorate and unwind.  And I must tell you that in

3   that window of opportunity when we should have done

4   something, we didn't, before the whistle-blower case was

5   brought to my attention.  Because they were political --

6   they weren't political.  They were decisions that were

7   made in our internal environment.  And, you know, we all

8   have a boss.  I went to my boss.  I asked him to help

9   me.  He tried.  There were other people that said, no,

10  not now.  And so, that's how it is.  That's how it is

11  with lots of things, you know.  The BBAC.  And really,

12  you know, you would have to get in line too.

13       Q.   So what was his relationship before Reba with

14  Adams?

15       A.   It was good.  It was very good.

16       Q.   He had a good relationship.

17       A.   Oh, yeah.  Yeah.

18       Q.   I wonder what the difference was.

19       A.   **Two different people.  Entirely two different**

20  people.  Audrey had been in that organization 13 years.

21  She grew up with those people.  They were very -- it was

22  a group that was very close together.  The boss --

23       Q.   You mean the Brownsville people?  South Texas?

24       A.   The whole group.  The whole group.

25       Q.   Yeah.  The South Texas group.

1    A.    Of the ten ports.

2    Q.    Right.   And Audrey had a very warm relationship

3    with all of them.   It was just Audrey's style.   That's

4    how she manages.   She -- Audrey groomed those people.

5    In fact, when Audrey left there, I went to her

6    retirement party -- her going away party in Laredo.   She

7    went to Los Angeles.   And she had told me -- she had

8    been gone about a year.   I was on the reorganization

9    team.   She was on the transition team.   So we were gone

10   about a year.

11        And she told me, she said, you know, I really

12   feel bad leaving some of these poor directors because

13   what we're going to give them to do, many of them aren't

14   equipped to do it.   And I think that she was talking

15   about Jorge in a lot of respects.   Because in the past,

16   the District was all powerful.   It did just about

17   everything.   If there were a mistake made at the port,

18   the District fixed it.   If the port got in trouble with

19   money, the District fixed it.   The District was in

20   between the port and the region.

21        Well, now, what happened in the new

22   environment, there was no more District.   And that's

23   what Audrey felt.   And here's what I told her.   I said,

24   Audrey, you're like a mother bird.   You're leaving the

25   nest now and some of them are going to fly and some of

1   them aren't.  And a lot of them did fly.  A lot of the

2   port directors stepped up to it.  They did what we asked

3   them to do.  And these types of interventions that I

4   mentioned about Brownsville were needed.  Jorge did not

5   step up.  And there were others.  I'm not saying Jorge

6   was the only one who didn't step up.  But there were

7   others who just didn't step up.

8          That warm relationship -- when Reba came in,

9   she didn't have 13 years of experience with Jorge.  She

10  came from a different environment.  As I said, she's a

11  different person.  Not that, you know, one is bad and

12  one is not, they're just different people.  I think

13  Maria is in a way a little more demanding than Audrey in

14  some instances.  And I think she's less maybe warm and

15  fuzzy than Audrey is.  But, you know, we're all

16  different a little bit.

17         I have to tell you, I'm proud of the job that

18  Maria has done down there with the community.  She has

19  tackled some of the toughest problems that we have in

20  this organization.  Some of the very toughest under some

21  of the very harshest conditions and she's done a good

22  job for us.  I think she's an outstanding manager.  Now,

23  all that said, when you have a run-in with an employee,

24  that certainly weighs heavily in her favor when you make

25  a decision about a subordinate.

1    Q.    That pretty much sums it up as far as the

2    questions I have.  Is there anything you would like to

3    add or any questions you would like to ask me?

4    A.    Well, you know, I think -- you know, and then

5    when you talk to Jorge, and I'm sure you will, I mean,

6    from my perspective, and you don't need to tell him

7    this, I still like and respect Jorge.  I've never

8    disliked him.  I've never disrespected him.  I don't

9    think I've ever showed him any disrespect because that's

10   **a very important thing for all of us.  And I certainly**

11   haven't tried to be disrespectful in any of this, you

12   know.  He's a grown man.  He has his rights.  He has his

13   personal kind of esteem.  And I never meant to trample

14   on it.  Never meant to.

15        I wished that through these interventions, we

16   could have changed the situation.  I really do.  I mean,

17   Jorge isn't the only person I've ever dealt with in this

18   arena.  I mean, you deal with lots and lots and lots of

19   **different people.  Sometimes you're successful and**

20   sometimes you're not.  And I was not successful.  So

21   that's it.

22        Q.    All right.  I will turn off the tape.

23                    (END OF INTERVIEW)

24

25

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COPY

INTERVIEW OF

MARIA P. REBA

TAKEN ON JULY 27, 1999

CONTINENTAL COURT REPORTERS, INC. (713)522-5080



DEFENDANT'S
EXHIBIT
5

1        TONY (VIA TELEPHONE):  Hello.

2        MS. ROJAS:  Hi, Tony.

3        TONY:  Okay.

4        MS. ROJAS:  Okay.  Well, thanks for changing

5   your plans.

6        TONY:  No problem.

7        MS. ROJAS:  If we hear from Leslie, then we'll

8   let you know.  We left our phone number here on her

9   answering machine.

10       TONY:  Okay.

11       MS. ROJAS:  Okay.  Can you hear us all right?

12       TONY:  Yeah.  I'm going to try to put you on

13  the speaker phone too, so.

14       MS. ROJAS:  All right.  That's fine.

15       TONY:  Hold on a second.

16       (Brief pause.)

17       TONY:  Okay.  Can you hear me?

18       MS. ROJAS:  Yes.  We can hear you.

19       TONY:  Okay.

20       MS. ROJAS:  Okay.  So present today is Caroline

21  **Blessey, Maria Reba and myself.  And I have informed**

22  **Maria Reba that she is considered a subject of the**

23  investigation and that I'm going to administer an oath.

24       Would you raise your right hand?  Do you

25  solemnly swear to tell the truth, the whole truth, and

1    nothing but the truth, so help you God?

2                    MS. REBA:  I do.

3                    MS. ROJAS:  Okay.  And we do have the tape

4    recorder running.

5

6                         *  *  *

7

8    QUESTIONS BY MS. ROJAS:

9         Q.   All right.  So, Maria, what is your full name?

10        A.   My name is Maria P. Reba.

11        Q.   Okay.  And what is your title?

12        A.   Director of Field Operations, South Texas.

13        Q.   And what is your G.S. rank or --

14        A.   I'm an SES.

15        Q.   SES what?

16        A.   Three.

17        Q.   Okay.  How long have you been in this position?

18        A.   Since February 25th, 1996.

19        Q.   Okay.  And you came from what?  What were you

20   doing before this?

21        A.   I was in headquarters.  I was in the Office of

22   International Affairs.  I was a division director.

23        Q.   Okay.  In headquarters in Washington?

24        A.   Right.

25        Q.   And how long have you worked for Customs?

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1          A.    Since May '65.

2          Q.    Wow.   That's quite a career.

3          A.    It's been fun.

4          Q.    Been fun.   Okay.   So you -- what is your

5     business address?

6          A.    P. O. Box 3130, Laredo, Texas 78044.

7          Q.    Okay.   And then your phone number there?

8          A.    (956) 718-4177.

9                MS. ROJAS:   Okay.   The phone is ringing,

10    but it might be Leslie, but we'll let the secretary get

11    it, Tony.

12                TONY:   Okay.

13         Q.    Okay.   So let's see.   Do you know who Jorge

14    Flores is?

15         A.    Yes.

16         Q.    Okay.   What relationship do you have with him?

17    What is he as far as work relationship?

18         A.    He's the port director in Brownsville and he's

19    my direct report.

20         Q.    You are his first-line supervisor.

21         A.    Right.

22         Q.    Okay.   And so you became the Director of Field

23    Operations in '96.   Was he already at the port in

24    Brownsville, port director there already?

25         A.    Yes.   He was there already.

1    Q.   Okay.  Who else do you supervise?

2    A.   I have 10 ports that I supervise, plus the

3 staff of the management center where I am.

4    Q.   Okay.

5              (Phone ringing.)

6              MS. REBA:  It just rings.  It just rings.

7              MS. ROJAS:  Do you think we're supposed to

8 get that?

9              MS. REBA:  They will tell us.  They will

10 come in.

11             MS. ROJAS:  Do you think she will get it?

12             MS. REBA:  Yeah.

13             MS. ROJAS:  You're sure?

14             MS. REBA:  It's been ringing all morning.

15             MS. ROJAS:  Oh, okay.  I just don't want

16 it to be Leslie trying to get us.

17   Q.   All right.  So let's see.  You do manage other

18 port directors in your region?  Is that what that's

19 called?

20   A.   It's a Customs Management Center.  We call it

21 CMC for short.

22   Q.   Okay.  So -- I think that you, before we get

23 started too far, I think you said you had something

24 prepared, a letter prepared for me regarding

25 whistle-blowing.  As you know, I'm investigating a

1    reprisal allegation for having been a whistle-blower.

2    And so, are you aware of whistle-blowing allegations

3    that Jorge Flores might have made?

4        A.    I know now.

5        Q.    Today?

6        A.    Yeah.

7        Q.    You didn't know before today?

8        A.    Oh, no.  No.  I mean, I know now.  I didn't

9    know for the longest time.

10       Q.    Uh-huh.  When was it that you first became

11   aware that he had made allegations of procurement

12   violations?

13       A.    In January '98.

14       Q.    How is it that you came to know that?

15       A.    I got a fax from Tom Dowler, our attorney at

16   regional counsel, sending me a copy of something he had

17   filed.  I think it was the MSPV, when he filed the MSPV

18   application.

19       Q.    "He," Jorge Flores.

20       A.    Mr. Flores.  Mr. Flores.  Either when he filed

21   it or when we got the decision from -- I don't remember,

22   but I remember that Mr. Dowler sent me a copy of the

23   document.  And in it, it was the allegation of

24   whistle-blower.  That's the first I heard of it.

25       Q.    Did it say that, a whistle-blower, or was it an

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   allegation of the violation of the regulations,

2   procurement regulation?

3      A.   I really don't remember.  I know that it

4   mentioned some allegations.  I don't really remember --

5   don't remember the wording.

6      Q.   Okay.  So it was January '98 that you received

7   a fax from the attorney, from the Customs attorney, with

8   information about allegations.  And you're not sure

9   whether it's the whistle-blowing or not.

10     A.   No.

11     Q.   But it had some allegation.

12     A.   Right.

13     Q.   Okay.  And it mentioned, then, procurement

14  violations?  Allegations.

15     A.   Something like that, yeah.

16     Q.   Okay.  What action did you take based on the

17  receipt of that fax?

18     A.   None.

19     Q.   Did you discuss it with someone, the

20  allegations?

21     A.   I may have discussed it with the attorney, but

22  I don't remember.  I think he was just sending it to me

23  for my information, so I don't think I had to take any

24  action.

25     Q.   Okay.  How did you feel about receiving that

1    information?

2         A.    I was very surprised.  It just never occurred

3    to me that anyone would consider that that was a

4    procurement violation.  Or that I had done it.  Because

5    it was in place when I came into the job.

6         Q.    The contract with that company --

7         A.    That company was already working --

8         Q.    -- Code 3 company.  It was already working

9    before you came into play?

10               MS. BLESSEY:  Well, we had agreed not to

11    go into the substance of this.

12         Q.    Okay.  But anyway --

13         A.    I was surprised.

14         Q.    You were surprised.

15         A.    I was surprised.

16         Q.    Okay.  Did you feel any resentment or anger or

17    bad feelings about it?

18         A.    In my job, a lot of people say a lot of things

19    about me.  So it's just part of the job.  If I was going

20    to get mad at everybody who said bad things about me, I

21    would be always mad.

22         Q.    All right.  So let's see.  I think that's

23    enough as far as your knowledge in the timing.  And you

24    say you didn't take any action.  You were surprised.

25    You didn't have any ill feelings, mad feelings at that

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   time. Okay. What about his OEC complaint recently,

2   more recently, the one I'm investigating. When was the

3   first time that you became aware of this?

4       A.   Oh. I guess when I was told that you were

5   coming to interview me.

6       Q.   Were you aware that there was an IG

7   investigation, an OIG Customs or treasury, whoever?

8       A.   No.

9       Q.   You're not aware of an IG investigation?

10      A.   I've now, since --

11      Q.   Since --

12      A.   In fact, I think I found out when Carol told me

13  that we can't discuss Code 3 because it's an IG

14  investigation. I think that's when I found out.

15      Q.   Okay. And so when was that? Just recently

16  or --

17              MS. BLESSEY: I'm going to object to the

18  content of our conversation on attorney-client

19  privilege.

20      Q.   Well, just the time. I don't want to know --

21  basically, you were informed that it was OIG

22  investigation. And when was that, that you became

23  aware, that somebody told you?

24      A.   Well, I heard about it a few days ago. I can't

25  say that I never knew that there was. I knew there was

1    a lot of things floating around.  But that it was IG who

2    was investigating, I don't think I was ever aware until

3    now.

4         Q.   Okay.  A few days ago, three days ago.

5         A.   Yeah.

6         Q.   More or less.

7         A.   Couple of days ago.  Couple of days ago.

8         Q.   Within the last week --

9         A.   Within the last week, yeah.

10        Q.   -- you became aware that he had filed, Flores

11   had filed with OIG.

12        A.   Yeah.

13        Q.   Okay.  And with another Federal agency?  Are

14   you aware whether he had filed with another Federal

15   agency, such as the F.B.I.?

16        A.   I really don't know.  I don't think anybody

17   ever told me he had filed with the F.B.I.

18        Q.   No?

19        A.   No.

20        Q.   Okay.  All right.  What is your feeling about

21   the IG investigation, OIG?  Same kind of questions about

22   such as when you first found out about the allegations

23   of the procurement violations.  How did you feel about

24   the OIG investigation?

25        A.   It was just one more.  It was just one more

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1  thing that Mr. Flores is trying to do to -- I don't

2  know.  I guess I feel that it's just another, another,

3  another try to -- what's the word I want -- to make

4  something out of something there's nothing there.

5  There's nothing there.  So here's another allegation

6  that I did something I didn't do.  So, you know, it

7  happens.  A lot of people do that.  When they don't like

8  the decisions I make, they answer back with allegations.

9  It's just part of the job.

10      Q.   Okay.

11      A.   I'm the target of a lot of those by a lot of

12  people.

13      Q.   All right.  So the personal action that I'm

14  investigating is the reassignment or his discussions

15  about retirement, discussions with him about retirement.

16  What is your knowledge about his reassignment?  What

17  input have you had?  What involvement have you had in

18  that?

19      A.   Well, I didn't discuss it with Mr. Winwood at

20  all.  Mr. Winwood is our new assistant commissioner and

21  he does things very differently from the previous

22  assistant commissioner.  We now have a much more

23  centralized organization in headquarters where they make

24  all the decisions.  So I didn't discuss it with him at

25  all.  He never asked me.  He never told me.  He never

1  said anything to me about transferring him.  I had had

2  some discussions with some of his staff about continuous

3  management problems in Brownsville.  But I never really

4  discussed anything with Mr. Winwood.  So I don't know if

5  that means I have anything to do with that decision or

6  not.

7      Q.   Okay.  So let me just check for a second.

8           MS. ROJAS:  Tony, are you there?

9           TONY:  Yes.

10          MS. ROJAS:  Okay.  Just hadn't heard

11 anything.

12          TONY:  Okay.  I'm still here.  I'm having

13 a little trouble hearing you, so if you could speak up a

14 little bit, it would help me.

15          MS. ROJAS:  All right.  The phone doesn't

16 have a long enough extension.

17          TONY:  Well, I can hear you now good.

18          MS. ROJAS:  Oh, okay.

19          MS. REBA:  I'll raise the volume.

20          MS. ROJAS:  Okay.  She raised the volume,

21 so that should help.

22          TONY:  Okay.  Thanks.

23          MS. REBA:  All right.  Thank you.

24     Q.   Well, let's see.  So we were saying that now

25 Winwood is the -- what is his title?

13

1     A.   Assistant commissioner.

2     Q.   And so when did he come into the picture?  When

3   did he become the assistant commissioner?

4     A.   Oh, several -- it's a few months ago.  I really

5   don't remember.  It's been four, five, three, four

6   months ago.  I really don't remember.  It's been some

7   months ago.  I'm not very good at remembering time

8   periods.

9     Q.   All right.  So a short time ago.  And so was

10  Trotter preceding him then?

11    A.   Right.  He was assistant commissioner before

12  Mr. Winwood, yes.

13    Q.   All right.  So back to Winwood.  He made the

14  decision, you're saying.  And you did not discuss the

15  decision with him --

16    A.   Right.

17    Q.   -- to reassign Flores.  However, you did

18  discuss something about Flores with him.

19    A.   Not with him.

20    Q.   No?

21    A.   With his staff.  I had continuous management

22  problems in Brownsville.  I had real concerns about

23  mismanagement and lack of enforcement in Brownsville.

24  And I discussed that with his staff.

25    Q.   Would it be -- what do you mean "his staff"?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      A.    His -- the way that he's set up is he's

2   assistant commissioner.  He has a deputy underneath him.

3   And then he has four -- I don't know what the real

4   titles are, like --

5      Q.    Chiefs or something?

6      A.    Associate commissioners.  I forget all the

7   titles.  But he has four -- yeah, it's like four chiefs

8   that are under him.

9      Q.    All right.

10      A.    And so when the reorganization happened and

11   Mr. Trotter left and Mr. Winwood came in, there were

12   people acting.  Like Mr. McNamara came in for a while.

13   Then he left.  And then somebody else came in.  And then

14   he left.  And then finally Mr. McNamara came for

15   permanent staff, permanently as his deputy.  So they

16   went through four people that I talked to as he set up

17   his organization.

18      Q.    And why at that time did you talk to the staff

19   with the director's office, or had you been talking to

20   the staff when Trotter was there or had you talked to

21   Trotter about it?

22      A.    For three and a half years, I have been talking

23   to headquarters about mismanagement in Brownsville and

24   problems I've had, constantly seeking their advice on

25   how can I get the port to work better and how can I get

1    this -- a much more efficient and a much more

2    enforcement minded management in the port because the

3    port director refuses to acknowledge my authority and

4    refuses to do the things I want him to do.

5          So for three and a half years, I've been

6    talking to headquarters about what can I do to improve

7    this, what can I do to get control of this port because

8    it is so totally mismanaged.  So this was just a

9    continuation.  When the new management came in, I had to

10   kind of start from the start and give them the -- kind

11   of bring them up to speed on what had happened for three

12   years with the others, the others that were there

13   before.

14        Q.   So who, for example, had you spoken with before?

15   When they interviewed Mr. Trotter, he would be aware of

16   all the concerns that you had.

17        A.   Yeah.  Mr. Trotter was a lot more accessible

18   than Mr. Winwood, so I did speak with Mr. Trotter

19   a lot --

20        Q.   All right.  Who else?

21        A.   -- about the problems.  Mr. Tenent was there.

22        Q.   Tenent?

23        A.   Tenent.  He's not there in headquarters

24   anymore, but he was Mr. Trotter's deputy.  I guess he

25   did what Mr. McNamara does now.

1    Q.   And he's still with the agency?

2    A.   Yes.

3    Q.   Okay.  And who else?

4    A.   Those were mainly the people I talked to.

5    Q.   Okay.  What is Tenent's first name?

6    A.   Al.

7    Q.   Al.  I might need to talk with him on it.

8    We'll see.  Okay.

9    A.   Oh, yeah.  I also -- not in Mr. Tenent's --

10   Mr. Trotter's office, but in the deputy commissioner's

11   office, Denise Crawford, I talked to her a lot.

12   Q.   Denise.  What is the last name?

13   A.   Crawford, C-R-A-U-F-O-R-D.

14   Q.   Okay.  And she's the --

15   A.   She's special assistant for the deputy

16   commissioner.

17   Q.   So these were the people that you spoke with

18   before Winwood came in.

19   A.   Uh-huh.

20   Q.   And then when he came in, these people were

21   out.  All of these people were no longer there.

22   A.   Yes.

23   Q.   And so you started about three or four months

24   ago speaking with Winwood and his assistant, which

25   was --

1      MS. BLESSEY:  I think this is being

2  mischaracterized.  She said she didn't talk to Winwood.

3      MS. REBA:  I didn't talk to Winwood.

4      Q.  Oh, I'm sorry.  Yeah.  I thought you did talk

5  to him.

6      A.  No.  Not Winwood.

7      Q.  Didn't you say you talked with him --

8      A.  I talked to his assistants.  Not with Winwood.

9  He's very hard to get through to.  He's much more

10  chain-of-command than Mr. Trotter was.

11     Q.  Okay.  So I was looking for the name of the

12  person that you did speak with in Winwood's staff.

13     A.  I spoke with Mr. McNamara.  It was mainly

14  McNamara who I spoke with, yeah.

15     Q.  Okay.  So, of course, you say you spoke -- you

16  did not speak with Winwood about his reassignment.  Have

17  you since?  Do you know why he decided?

18     A.  Mr. Winwood doesn't explain his doings.  The

19  only time I spoke with Winwood was when he called me to

20  tell me that he was reassigning Mr. Flores and that he

21  wanted one of my staff to go as a port director in

22  Brownsville.  That didn't work out.  Then he changed his

23  mind and said he was going to put somebody else there.

24  He never even told me that, so he hasn't spoken to me.

25  The only time he spoke to me was the one time when he

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   inquired about that person in my staff to go to

2   Brownsville.  That's all he said.

3          And he hasn't talked to me about it since.  He

4   doesn't explain and he doesn't -- he's very much

5   centralized.  And headquarters makes the decisions.

6   He's the boss, so that's what we do.

7      Q.  Okay.  So I will find out when I speak with him

8   what it is, what the reason was that he determined or

9   what he says is the reason that he determined to move

10  him.  But since we're here and you have talked about

11  this three and a half years of talking with staff about

12  the issues at Brownsville, we might as well go into that

13  and see what documentation and what problems you have

14  had and what you've done.  So where shall we start?

15     A.  Well, what I did was, I went to my class.  And

16  this is all in chronological order.

17     Q.  All right.

18          MS. BLESSEY:  You have an identical copy

19  right here.

20          MS. ROJAS:  Okay.

21     A.  I thought if I went chronological order, you

22  could see the process that I followed in trying to

23  bring -- in trying to work with Mr. Flores and see how,

24  as time went by, it got more and more difficult to work

25  with him.  And eventually, I came to the conclusion that

1    this, that I just could not work with him anymore

2    because he just refuses to acknowledge that I'm his

3    boss.

4        Q.   And this, you know, enlightenment that you

5    couldn't work with him anymore, seems like that would --

6    you would have had to have conveyed that for sure to --

7    if it wasn't Winwood, then it was McNamara?

8        A.   I did tell Mr. McNamara that I felt that we

9    could not get -- that this was beyond hope.  I did tell

10   Mr. McNamara that.

11       Q.   Okay.  And when did you tell him that?

12       A.   Well, we can go through it.  It's here in one

13   of these documents.  Here's something I sent him.  But

14   why don't we go in order so we can see, put it all in

15   perspective of how it happened.

16       Q.   All right.  Is this the one -- the latest?

17       A.   No.  This is the oldest.

18       Q.   Okay.

19       A.   We're starting from the back, to the beginning.

20       Q.   We're looking at a stack of papers.

21       A.   It's been a very difficult three and a half

22   years.  Very difficult.

23       Q.   Before we get too much into -- is this the only

24   port of the 10 that you supervise that you have had

25   similar problems with?

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1     A.   It is the only port I've had these kind of

2  problems.  In the other ports when I have a problem, I

3  tell them, look, I think that this is wrong, and they'll

4  say, okay, we'll fix it.  And it gets fixed.  Or they'll

5  say, no, we don't agree with you, and then we'll discuss

6  it, and then I say, well, I still want you to do it this

7  way, they'll go ahead and do it.  Nowhere else have I

8  faced this insubordination and this lack of respect that

9  I face there.

10     Q.   Okay.  So we will see this -- I know that we

11  haven't had a chance to look at it, but we will see this

12  reflected --

13     A.   You will see it.

14     Q.   -- in his (inaudible) appraisal?

15     A.   No.  Because all he gets in his appraisals --

16  our appraisal system is pass/fail.  So either pass or

17  fail.  What you will see in his appraisal is a pass, and

18  then they'll be comments from me saying, you have to

19  work on these issues.  And then there is an appraisal

20  of -- an attached document that lists weaknesses that he

21  needs to work on and improve.

22     Q.   So do we have his appraisals?

23     A.   They're in here.

24     Q.   Okay.  Starting from three and a half years

25  ago.  So starting from '96?

1    A.    Right.

2    Q.    Or '90- -- when you came?

3    A.    '96.  When I came.

4    Q.    So immediately you started having problems with

5    him since you came?

6    A.    I immediately started having problems with him.

7    I came in February 25th, and by April, he was already

8    accusing me of trying to get him and trying to destroy

9    him.

10    Q.    This was to your face?

11    A.    To my face.

12    Q.    He accused you of that?

13    A.    Yes.

14    Q.    Did you have witnesses of those comments?

15    A.    No.  No.  But I immediately notified my

16    supervisors about it and it's in here too.

17    Q.    Okay.  So -- okay.  Should we start from when

18    you came?

19    A.    Yeah.  Let's start from when I came.  What

20    originally happened was -- this is a summary that I did.

21    Because shortly after I came, I started having problems

22    with him.  And Mr. Trotter told me to go and speak with

23    Diane Tudson, who was the LER specialist, so that she

24    could help me work out with him.  He felt that maybe

25    what I needed to do was to put him in a process

1    improvement plan and try to work on his performance.

2    Because at the time I felt that what happened was, he

3    didn't know how to run the port and he just needed to

4    improve his performance.

5         So I put together this summary for Diane so

6    that she could help me in how I would draft the process

7    improvement plan.  So this is the summary that kind of

8    goes over some of the things that were happening.  The

9    first one was even before I came into the CMC.  There

10   was a position that he wanted filled in his port.  At

11   the time, headquarters said that position was not

12   warranted for a port, that it could only be done in

13   service ports and they turned it down.

14        At the same time, there was a storm -- we had a

15   tremendous storm, Marilyn, that destroyed the Virgin

16   Islands.  A woman called Susan Burdot was in the Virgin

17   Islands and she was very upset.  She lost everything.

18   She lost her house.  When the commissioner of Customs

19   **went down there and said, what can I do for you, she**

20   says, I have to get out of the island.  I just can't be

21   **in the island anymore.  I'm too afraid of hurricanes**

22   now.  So he offered her a job.

23        He said, what do you want.  She says, well, I

24   want to go to the Valley.  So this was before I came.

25   They worked a deal saying, okay, we told you you could

1  not have this position in Brownsville, but if you take

2  Susan Burdot, we'll let you have it.

3      Q.   If you take what?

4      A.   Susan Burdot.  Take this woman --

5      Q.   Oh, I see.

6      A.   -- she can fill that position.  So it was

7  around Christmas before vacation, and the person who was

8  working the deal, Bruce Kramer, never got a chance to

9  tell Mr. Flores.  Mr. Flores immediately became violent

10 and said, you know, you're doing things behind my back.

11 You're trying to set me up.  Why are you doing this.

12     Q.   So the commissioner, commissioner Kelly made

13 this promise to her?

14     A.   No.  This was commissioner Weiss.

15     Q.   Weiss.  Oh.

16            MS. ROJAS:  I don't know.  We're having

17 static a lot.

18            TONY:  I'm still here.

19            **MS. ROJAS:  Okay.**

20            MS. REBA:  You can hear us?  Is everything

21 **all right?**

22            **TONY:  I can hear you, but I really don't**

23 know what you're talking about, but that's okay.

24 Because I don't have the documents.  But that's

25 all right.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1          MS. ROJAS:  Sure.

2          MS. REBA:  Okay.

3          MS. ROJAS:  Well, I don't know -- Tony, I

4  don't know if this is all that, you know, that she was

5  concerned, Leslie was concerned about sitting in on.

6          MS. BLESSEY:  As long as we don't get into

7  the substance of Code 3.

8          MS. ROJAS:  Yeah.  We've gone on from the,

9  you know, the whistle-blowing and stuff.

10         TONY:  Can I ask a couple of questions

11  before I leave, though?

12         MS. ROJAS:  All right.

13         TONY:  Ms. Reba, can you hear me?

14         MS. REBA:  Yes.

15         TONY:  Okay.  When you were having

16  conversations with Mr. McNamara --

17         MS. REBA:  Uh-huh.

18         TONY:  -- did you ever suggest to

19  **Mr. McNamara that Mr. Flores should be reassigned?**

20         MS. REBA:  I said that he should not.

21  **That he needed to be where he could be closely**

22  supervised.

23         TONY:  Okay.

24         MS. REBA:  I did tell Mr. McNamara that.

25         TONY:  Did you ever suggest to

1   Mr. McNamara that he should be reassigned to Washington,

2   D.C.?

3              MS. REBA:  I just told him he should be

4   where he should be closely supervised.  I didn't know

5   where.  That was up to them.  But he could not be 400

6   miles away from his immediate supervisor.

7              TONY:  Okay.  And you're in Laredo.  Is

8   that where you work out of?

9              MS. REBA:  Right.

10             TONY:  Okay.

11             MS. REBA:  I'm four hours away from him.

12             TONY:  Right.  I understand.  How about

13  during the -- before Mr. Winwood's regime under

14  Mr. Trotter when you were having conversations either

15  with Mr. Trotter or some of his staff members, did you

16  ever suggest to them that Mr. Flores should be

17  reassigned?

18             MS. REBA:  We tried.  We're going to go

19  through this.  But at one point, Mr. Trotter and

20  Mr. Banks, the deputy commissioner, suggested that he be

21  reassigned.  And at that time, that was early when I was

22  there, I said, well, I still don't know.  I think we can

23  work with this man.  What can we do to make it better.

24  And that's when we suggested certain things that we were

25  going to do, that we're going to go through here now.

1    TONY:  Like performance improvement and
2  things like that?

3    MS. REBA:  Yeah.  Yeah.  Because at that
4  time, I still thought, well, it's just a matter of me
5  getting along with him or me, figure it out what makes
6  him kick and maybe we can make this marriage work.

7    TONY:  All right.  Do you remember the
8  first time you met Mr. Flores face-to-face?

9    MS. REBA:  Oh, shoot.  I think that was
10  before I got the job.  I came in to Laredo to give a
11  presentation.  Yeah.  When I was in headquarters, I went
12  to Laredo to give a presentation.  And all the board
13  directors were there.  And so, I know I met them all.  I
14  don't remember him, but --

15    TONY:  You don't remember anything from
16  that first meeting that stands out or anything like
17  that?

18    MS. REBA:  No.  No.  No, I don't.

19    TONY:  I don't have any other questions at
20  this point.  Unless you want me to stay on the line, I
21  will hang up.  But obviously, that's up to the three of
22  you or, you know, if you was going to ask questions
23  along these lines, I probably don't need to stay on the
24  line.  But if something comes up, just call me back and
25  I'll be here.

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 123 of 318

1          MS. ROJAS:  All right.  Thank you.

2          MS. REBA:  Thank you.

3          MS. ROJAS:  We're just going to proceed

4    along this line.

5          TONY:  All right.

6          MS. ROJAS:  Thanks.  Bye.

7      A.    And the reason I'm bringing this up is because

8    he did not want her there.  He said, you're reporting

9    this woman in here, and I don't want her here.

10     Q.    Oh, okay.  So you were telling me that it was

11   the previous -- previous to Kelly, had made -- **Weiss**.

12     A.    Weiss.  Right.

13     Q.    -- had made that kind of commitment to her.

14     A.    Made that deal.  Made that deal, yeah.

15     Q.    Deal.

16     A.    And so she came in.

17     Q.    And he didn't want her in Brownsville.

18     A.    He didn't want her.  Right.  And he called me

19   to -- I wasn't at the CMC yet, but I had already been

20   named and I was in the process of moving.  He called me

21   several times to complain.  I looked into it and I

22   explained to him what happened, that, you know, it was a

23   misunderstanding.  They just didn't tell him.  But that

24   it's either her or nothing because headquarters had

25   disapproved a position.  He called the deputy

1   commissioner.  He complained to the deputy commissioner

2   that there was this plot against him.

3          And then finally, he accepted her.  And then

4   what he did was, he put her -- he exiled her to an out

5   bridge out there and gave her no work to do for several

6   months, saying that she had to learn how the border

7   worked before she could do any work.  And then she

8   finally took a (inaudible) retirement because she

9   couldn't do it.  So she retired.  And at that time, we

10  took the position away because the position there was

11  only because the commissioner made that promise to her.

12         Immediately he started accusing me of, again,

13  doing things behind his back and not telling him things

14  and doing it on purpose to hurt him.  And I tried to

15  explain, look, you never would have had her if we didn't

16  have that deal with the commissioner.  And besides, you

17  never used her, so obviously, you don't have a need for

18  her.  But that was the first problem I had with him,

19  that immediately it was -- I had this, something I was

20  doing -- there was something behind all of this that I

21  was trying to hurt him.

22         And then on April 1st, so that was like a month

23  and a half after I came, a truck loaded with --

24         (END OF TAPE 1, SIDE A; BEGINNING OF SIDE B)

25         April 1st, '96, that was a month and a half

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

r I came to work, a truck loaded with coke, with

) pounds of coke, came through the port and they

ed it.  They didn't see the -- they didn't find the

.  It was released.

    An Office of Investigation agent, who was

.ng around town with an informant, saw the truck.

.he informant said, this truck is the one I've been

ng you about.  This is the kind of truck that we

-- that is information in the treasury enforcement

ter system, Tex.  It is information on this kind of

.  This is the kind of truck that's bringing the

.  So they brought it back.  They examined it

.  And sure enough, it had 2,000 pounds of coke.

nediately became a big deal.  2,000 pounds of coke,

n, it's a big deal on the border.

    Mr. Trotter sent down Mr. Lovejoy, the director

:i-smuggling, to take a look.  I came down to take

:.  Mr. Flores' first reaction was, that, oh, I had

.m up.  **The Office of Investigation had set up,**

:hey had planted the truck to hurt him.

    **He told this to Trotter and Lovejoy?**

    **He told that to me.**  He told that to Lovejoy.

hey had set him up and that they had planted it to

im.

        MS. BLESSEY:  I don't know if you

'ONTINENTAL COURT REPORTERS, INC. (713)522-5080

that.

easury,

rs, and

there and

and look

·rs.

stand what

from an

pecially,

ate is stop

)522-5080

1    the drugs from coming in.  Nothing else is second to

2    that.  That's where we get our resources.  That's where

3    we get our money.  That's where we get on the papers,

4    front page of the papers.  That's where the commissioner

5    gets called into Congress and gets reamed out is when we

6    don't do that.  We have to stop the drugs from coming

7    in.  So it's very important when we miss a truck.

8            And what happens is, when the cars or the

9    trucks come in, we have inspectors at booth that are

10   called primaries.  And you get a first shot at them.

11   When they come in, their inspector inputs the license

12   plate in that primary.  And if there is any information

13   in the computer system about any kind of -- anything

14   about that license plate, it pops up.  And then at that

15   point, the inspector decides whether they want to send

16   it to secondary for a more intensive exam or is going to

17   release it and let it go.

18       Q.   Okay.  So a while ago when you were telling me

19   about that you had it on -- that kind of truck was

20   already on the computer --

21       A.   It was in the computer.  And the license

22   plates, the informant had told us the license plates of

23   all the trucks that were in that group.

24       Q.   Oh.  Even the license plates.

25       A.   License plates were there.  What happened in

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   this truck was, that the inspector did not put the

2   license plate in.  So the inspector had no idea that

3   this was one of the trucks we were looking for.

4        Q.   He didn't input the license plate.  And why was

5   that?

6        A.   Part of the lack of enforcement posture in

7   Brownsville, which is a problem there, has been a

8   problem from the first day, and is still the problem

9   there.  They go through the motions.  They don't

10  really -- the port director has never emphasized the

11  importance of enforcement.  It's just like, he tells

12  everybody that, ones that listen, there are no drugs

13  coming in Brownsville because he is so tough, that he's

14  chased them away.  And so because there are no drugs

15  coming in Brownsville, they don't treat it seriously.

16  And so they go through the motions.

17       And sometimes they put the license plate in and

18  sometimes they don't.  When they feel like it.  So

19  that's what happened here.  They did know that this type

20  of trucks usually carries drugs.  So the inspector did

21  send it to secondary.  Not because the inspector knew

22  that it was one of those that had the license plate, but

23  because it was the type of truck.  So it went to

24  secondary.  But because they didn't know that it was one

25  of these trucks that we knew for sure had drugs, they

1    kind of went through the motions.  And they drilled it,

2    but it was like, yeah, let me drill.

3            And one of the things that the smugglers know,

4    they know us better than we know ourselves because they

5    watch us, they survey us, they have spotters.  They

6    know.  So they probably knew that the inspectors in

7    Brownsville always drilled four inches from the floor

8    and always drilled, you know, every three feet on the

9    ceiling.

10           So when this truck came through, the inspector

11   drilled four feet from the floor and every three feet

12   from the ceiling.  And the drugs were in between those

13   holes.  The dog, we had dogs that go on the trucks, and

14   the dog alerted that there was something there.  But

15   another problem in Brownsville is that the K-9s are

16   treated like second-class citizens.  They're not as

17   important as the inspectors, they're not treated with

18   the respect, and the inspectors did not believe the K-9

19   handler the dog had alert.  So they released the truck.

20   Mr. Lovejoy did a review of the process in the port

21   and --

22       Q.   So when was that?  Was that April?

23       A.   April '96.  He did a review of the posture of

24   the port and he found that, yeah, the procedures had

25   been followed, but kind of half asserted.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1     Q.  So you had just come as port director, so it

2  was his, Lovejoy's decision to do that, not your own

3  decision to do the review of the port?

4     A.  Oh, yeah.  That one was sent from headquarters

5  because they had missed the truck with 2,000 pounds.

6  You know, that's a big deal.  And so the deputy

7  commissioner was furious.  Mr. Trotter was -- no,

8  Mr. Trotter was not the assistant commissioner there.

9  Mr. Banks was the assistant commissioner then.  The

10  deputy commissioner was furious.  They were saying, you

11  know, we have to take action.  We have to discipline.

12  This is unheard of.  This should never have happened.  I

13  just got there.  I'm still trying to find my way around.

14     Q.  In February.

15     A.  In February.  I'm trying to find my way around.

16  So I'm trying to say, you know, hold off, hold off.

17  Let's just see what's going on before we take any

18  action.  Mr. Lovejoy reviewed and found there was no

19  intensive purpose, there was a lack of enforcement

20  posture.  Many times the inspectors went through the

21  motions without trying real hard.

22     Q.  So I have somewhere to find this?

23     A.  You have this.  Yeah.  They're in here.  Some

24  of these things are old, but they're in here.  Here's

25  his review.  You have it there to --

Q.    Oh.  This is Lovejoy's.

A.    That's Lovejoy, yeah.  That's there.

          MS. BLESSEY:  You may, since this is on
tape, you may want to identify the date and what it is
and what it's called.

Q.    Okay.  It is dated April 12th, '96 and it's
called a Memorandum to Assistant Commissioner, Office of
Field Operations from Director, Anti-Smuggling Division.
Subject:  Review of Brownsville Operation.  And it's
signed Michael Lovejoy.

A.    Oh.  It was 3,000 pounds of coke.  Not 2,000.
It's even worse.

Q.    Uh-huh.

A.    Okay.  So --

Q.    It is, yeah.  3,080 pounds of cocaine.

A.    And so he also found that the inspectors and
the K-9 officers do not work very well together and that
there was a problem and feeling that drugs were not a
problem in Brownsville.

Q.    That inspectors and the K-9 officers didn't --

A.    Didn't work well together.  And that there's a
prevalent feeling that the drugs are not a problem in
Brownsville.  So Mr. Flores was very defensive, you
know.  He said, you don't understand.  You are reading
things that are not there.  The truck was planted by OI.

1    My inspectors did all they should.  So we were there
2    facing, what do we do.  They wanted to discipline him.
3    I didn't want to do it yet.  I didn't know for sure what
4    to do.
5         Q.   Lovejoy wanted to discipline?
6         A.   No.  The deputy commissioner and the assistant
7    commissioner.
8         Q.   Banks?
9         A.   Banks and the deputy commissioner.  At that
10   time, Banks was the assistant commissioner and the
11   deputy commissioner was Lane.
12        Q.   L-A-N?
13        A.   L-A-N-E.  Yeah.  They wanted to discipline him.
14   I said, I just got here.  I'm not so sure.  Maybe, let
15   me take a better look at what's going on.  So they
16   agreed to do it so it wouldn't look like a disciplinary
17   measure.  We wanted to give him a face saving way out.
18   We decided to send him on a 60-day detail to the
19   training center and bring somebody in there to take a
20   good look for 60 days to see exactly what's happening in
21   that port and see if we really had a problem or not.  So
22   he kept coming up with reasons on why he couldn't do it.
23        Q.   Why he couldn't go for 60 days?
24        A.   Why he couldn't go for 60 days.  He was too
25   busy, he had too much to do, there was so much work on

1    the port.  The deputy commissioner at that time,

2    Mr. Banks, called him and pressured him on it.  And then

3    he told him that he couldn't go because his son had

4    something that looked like a strange type of cancer in

5    his leg, and that his daughter had gone through

6    something very similar, and he couldn't leave his wife

7    alone to deal with the problem.

8          Mr. Banks didn't quite believe that that was

9    really true, but we couldn't -- he didn't feel like he

10   wanted to call his bluff in case it was true.  We never

11   heard any more about that.  There were never any

12   indications his son was sick.  You know, usually when

13   somebody has a problem like that, you hear it.  People

14   ask for you to leave donations, some people ask to help

15   or prayers, but nothing.

16         What was interesting is, that his counterpart

17   in the port, the agent in charge, his son was going

18   through that and was having cancer of his leg and was

19   having operations.  So the story he told Mr. Banks was

20   exactly what was happening to the agent in charge son,

21   which made it so bizarre.  And yet, we got messages in

22   our computer system about helping out the son of the

23   agent and about donating and all of that.  So it was

24   obvious that something was happening with the agent's

25   son.  We never heard any more on Mr. Flores' son.  So

Case 1:01-cv-00057  Document 18  Filed in TXSD on 11/15/2001  Page 133 of 318

1  that was just a very, very strange occurrence.  So we

2  left it at that.

3      Q.  So he didn't go -- I guess we can turn that --

4  if there's a way to turn that off.

5      A.  Oh, it's off.  Oh, no, it's off.  It's just

6  that every time someone calls, it rings everywhere.

7      Q.  Okay.

8      A.  Then about a couple of weeks later, another

9  truck came through.  And the informant again was driving

10  through the town and saw it.  They brought it back.  It

11  was exactly the same type of truck --

12              OPERATOR:  Grace Rojas, you have a call on

13  line five.  Grace Rojas, line five.

14              MS. ROJAS:  It's probably Leslie.  Bring

15  that telephone in here, just --

16              OPERATOR:  Ruth, line one.  Ruth, line --

17              MS. ROJAS:  Hello.

18              UNIDENTIFIED SPEAKER:  Hey, what are you

19  doing?

20              MS. ROJAS:  I'm sorry.  I think we have

21  the wrong line.  Did you want Grace Rojas?

22              UNIDENTIFIED SPEAKER:  Hello.

23              MS. ROJAS:  Hello.

24              UNIDENTIFIED SPEAKER:  (Inaudible)

25              MS. ROJAS:  No, I'm sorry.

1              MS. REBA:  Her line.

2              MS. ROJAS:  Of course, this is all on

3    tape.

4              MS. BLESSEY:  Well, turn it back off.

5              (Tape off)

6         A.   So a couple weeks later, another truck came

7    through.  Exact same truck, the license plate was also

8    in tags.  This one went through, was not even examined.

9    This one wasn't even sent to secondary.  Just went right

10   through.

11        Q.   And the same informant saw it?

12        A.   Same information.

13        Q.   That's quite a coincidence, isn't it?

14        A.   It's a small town.  It's a small town and he

15   was traveling around looking for this kind of stuff.  So

16   the informant saw it, they sent it back.  And it was

17   empty.  It had the compartments, but by now it was

18   empty.  There was nothing in it anymore.  It had been

19   emptied already.

20             About a week later, I was in a meeting at the

21   Special Agent in Charge office.  And that is the head of

22   all the agents.  That's a SAC.

23        Q.   Special Agent in Charge.

24        A.   Yeah.

25        Q.   And that's still part of Customs?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    A.   Yeah.  He's my counterpart.

2    Q.   IA?

3    A.   OI.  OI.  You know, we're Field Operations and

4    the Office of Investigations.

5    Q.   I see.

6    A.   I have my counterpart.  He handles --

7              OPERATOR:  Ruth, line three.  Ruth, line

8    three.

9              MS. ROJAS:  You know, why don't we unplug

10   it from the wall?

11             MS. BLESSEY:  That's a great idea.

12             MS. REBA:  Yeah.  Just unplug it from

13   here.  There we go.  Thank you.

14   A.   So you have Office of Field Operations and you

15   have Office of Investigations.  The SAC covers the same

16   territory I cover.  And every port director has a

17   counterpart that covers the port.  So the port directors

18   counterparts are RACs.  My counterpart is a SAC.

19   Q.   Okay.  So what's a RAC?

20   A.   Resident Agent in Charge.

21   Q.   Okay.  And then the SAC is Special Agent in

22   Charge?

23   A.   Right.

24   Q.   And they're with OI?

25   A.   OI.

1    Q.    Okay.

2    A.    So we had a meeting at the SAC's office.    All

3 the ports were there, the port directors were there, and

4 we were planning an operation that we were going to do.

5 And the SAC told me, he pulled me over and he says, you

6 know there was another truck that came through.    I said,

7 no.    No, I didn't know.

8         He says, well, the RAC there told him.    He

9 says, but he knows that Flores doesn't want you to know.

10 And he thinks that you should know because headquarters

11 needs to be notified, so he told me to tell you.    So

12 when the meeting was over, I asked Mr. Flores to come

13 over, you know, I told him I wanted to talk to him.    And

14 I brought him over to an office by myself.

15   Q.    Now, this was about the one that was empty?

16   A.    The second one.    The second one, right.    And I

17 asked him, I said, you know, I have been traveling a lot

18 and I haven't been around, so you may not have an

19 occasion to talk to me, but is there anything you need

20 to tell me.    He said no, nothing to tell you.    I said,

21 are you sure.    He says, yeah, nothing to tell you.

22         And I said, well, how about the truck.    And he

23 said, what truck.    And I said, the truck that came

24 through last week.    He says, I don't know what you're

25 talking about.    And so I said, the truck that came

1   through, the truck that came through last week that the
2   informant brought back.  And then he blew up.

3          He started screaming and yelling at me, that I
4   was out to get him, that I was harassing him, that from
5   the very first day I came on-board, I was out to get
6   him, that I picked on all the little things, that I
7   never praised any good he did, but I only picked on the
8   bad things.  He said he did not tell me because he knew
9   I was going to use it against him, to leave him alone,
10  he was in power, to leave him alone and let him run his
11  port the way he wants.

12         So I told him I'm not going to do that.  I am
13  the CMC director.  I am responsible for all the ports
14  and I am not going to leave you alone.  I said, I am not
15  upset that the truck got through, but I am upset that
16  you didn't tell me.  And as a port director, you're
17  responsible for telling me what happens in your port.

18         And we had had that same discussion over and
19  over and over again.  Every time we have a situation,
20  it's the same thing.  Leave me alone, I'm in power, you
21  can't tell me what to do.  And I tell him I'm sorry.  I
22  am your supervisor.  You have to listen to what I'm
23  telling you.  All I want you to do is increase
24  enforcement of your port.  You do that and I'll leave
25  you alone.  But don't say leave me alone because I'm not

1   going to do that.  I am responsible for what you do.

2          And so, and then he immediately starts

3   threatening me.  If you don't leave me alone, you're

4   going to be sorry.  I'm going to take action.  You'll be

5   sorry you messed with me.  And then I tried to explain

6   to him why I'm doing what I'm doing.  I try to reason

7   with him.  But he just blows up and screams and yells.

8      Q.   It sounds so volatile.  I mean, you didn't have

9   people around to witness that?

10     A.   See, I don't like to do things in front of

11  people.  If I have to discipline my people, I want to do

12  it in closed doors.

13     Q.   Yeah.

14     A.   Because I don't want to embarrass them.

15     Q.   Right.  But after a while, wouldn't you --

16     A.   Well, after that, what I started doing halfway

17  through this, I started doing everything in writing so

18  that at least I had a record of the way he answered me.

19  **And you'll see later on the letter messages how he**

20  **answers me.**

21     **Q.   Okay.**

22     **A.   Because I found that I still didn't want to**

23  lower myself to his level and do it in front of

24  everybody, but I wanted to protect myself.  So I started

25  doing everything in writing with him because of that.

1    Q.    And it wouldn't be appropriate to have like a

2    labor management relations person with you when you

3    spoke with him?   Would that not work or is that not an

4    option?

5    A.    We could have done that, but at that time I

6    didn't have one.   I had a vacancy.   I just got Diane

7    about a couple months ago.

8    Q.    Oh, really?

9    A.    So I didn't have one at the time.   So, you

10   know, a lot of this I done long-distance.   And I was

11   working with her, but she was in Houston long-distance.

12   I really didn't have -- I had someone, but he wasn't

13   very good.   He had just got the job and then he left and

14   then somebody else came.   And he was on duty there and

15   he left.   And so most of the time I didn't have a labor

16   relations person.   So that was one of the first times he

17   blew up.   And that's probably the first time he

18   threatened that he was going to do things.   He never

19   said what he was going to do.   He says, you're just

20   going to be sorry.   You're going to be sorry.

21   Q.    When did that start, the threats?

22   A.    This was April, May -- May '96.

23   Q.    Oh, way back then.

24   A.    Then -- and you see on this package, on the

25   package with Mr. Lovejoy's report --

1    Q.   Uh-huh.

2    A.   You see the memos from Mr. Trotter and from

3    Mr. Banks saying you need to take action.  You can't let

4    him -- there's a message from Mr. Banks.  He said --

5              MS. BLESSEY:  Since this is on a tape

6    recorder, you may want to identify what you're talking

7    about.

8              MS. REBA:  Oh, I'm sorry.

9    Q.   That's all right.  Thank you.  It's the same

10   memo that we looked at before, April 12th.  And there is

11   a report page about page six.  And it's an e-mail

12   message?

13   A.   Yes.  It's dated May 17th from Samuel Banks,

14   Samuel H. Banks, where he says, I want to strongly

15   support you in your interaction with Jorge Flores.  I do

16   not believe that we can ignore the last event.  Although

17   I have my own ideas of what actions might be

18   appropriate -- he just wanted to get rid of him right

19   then and there.

20             And I said, let me try to work with him.  I am

21   willing to let you set your own course and get advise

22   from Trotter and others.  My only constraints on you are

23   Jorge must feel some heat for hiding the situation from

24   you.  And we cannot allow a hiatus in the (inaudible) or

25   enforcement will occur.

1        So, you know, even back then, already

2   headquarters was telling me, you need to do something

3   about this man.  This one, they're also from Mr. Trotter

4   dated May 16th, where he says, you know, you need to

5   discipline him.  You need to deal with him.  And that's

6   when he told me, go talk to Diane and have her talk to

7   you about --

8        Q.   Page five.

9        A.   Yes.  Mr. Trotter wanted me to look into

10  downgrading or transferring.

11       Q.   This was about the second incident?

12       A.   Yeah.

13       Q.   About the second truck already that were saying

14  this?

15       A.   Yeah.

16       Q.   Well, you came in February.  Had there been

17  problems before or are you even aware?  I mean, before

18  you came, were there problems with his supervisor

19  before?

20       A.   He -- one of these first ones here.  Here's

21  something I found when I was looking for some old files.

22  Right here.  It's a memo to the file, May 27th, '94.

23       Q.   Okay.  Do I have a copy of that?

24       A.   Yeah.  You should have a copy.  It's one of the

25  very first ones.

Q.   Oh, okay.

A.   This is the assistant district director, Bob
Paige.  He was assistant district director in Laredo.
And what's he talking about is how he was doing
something with the entry unit and Mr. Flores did not
like it.  And so he threatened him with a name
consequences.  So I'm not the first one.  He's had
problems before with other people.  I think whatever he
said was strong enough that Mr. Paige felt necessary to
**protect himself by writing that memo to the file.**

        **I think what happened with him is in the past,**
he immediately threatened, I'm going to do something.
I'm going to go to Congressman Ortiz.  You're going to
be sorry.  And people backed off.  I think I was the
first one who didn't back off.  And that's why we got
what we got because I didn't back off and I don't think
that he can handle well having a woman telling him what
to do.  I think he really has problems with women in
**authority.  And so, yes, he had problems in the past.  I**
**think they're worser with me because I didn't back off.**

Q.   **Okay.  So is Bob Paige still around with the**
**service?**

A.   He's retired.  He's retired since.

Q.   Immediately before you, his supervisor was Bob
Paige, as far as you know?

1    A.   Well, there was an intern -- you know, during

2    the reorganization, I wasn't around.  I mean, during the

3    reorganization of an intern where there was not a

4    director.  Bruce Kramer was acting director.  And he did

5    that for over a year before I came.  He had tremendous

6    problems with Mr. Flores.

7              MS. BLESSEY:  He's another person you were

8    going to speak with and we got to set up the time to do

9    it.

10             MS. REBA:  Okay.

11   A.   Before him, there were others that he had

12   problems with.  He had problems with a RAC in IA.  He

13   accused her of tapping his phone.

14   Q.   Okay.  So let's see.  I can look at a lot of

15   this.  I guess basically what you're saying is, you had

16   problems -- and when was it that you started getting

17   those messages in writing from him?

18   A.   (Inaudible.)

19   Q.   Yeah.  I will review all of these documents

20   submitted.

21   A.   Okay.

22             MS. BLESSEY:  I think there was certain

23   things she wanted to bring out.

24   Q.   Okay.  I don't want to take away from you.

25   What do you suggest -- you know, we have some time

1    constraints here.

2        A.    What we can do is maybe -- let me bring out

3    some things that I think are important and then I'll

4    show you some of those documents.  How is that?  That

5    are more important.  I mean, all of this -- all of this

6    here is instances --

7        Q.    It's all a summary of --

8        A.    It's a summary of things where he either did

9    not do what I asked him to do, or if he did it, he did

10   it in what I call malicious compliance in the worst

11   possible way.  For example, here you have busters.

12       Q.    What is a buster?

13       A.    Okay.  A buster is a tool that we use where you

14   find density of a wall.  And that's how we find it as a

15   hidden compartment in the truck because the buster

16   measures, you know.  If this is empty, there should be

17   just dense.  And if it's not, then something is wrong.

18   So the busters are a very good tool to be used.  What

19   was happening with the busters in many of our ports was

20   they're very -- they cost a lot of money.  So they had

21   them locked up.  And so the inspectors couldn't use them

22   because they didn't want to bother to go unlock them.

23   So they had them locked up.

24            Well, locked up doesn't do them any good

25   because then the inspectors don't use them.  So I sent a

1    message to all the ports saying -- the ports that had

2    that problem that were locking them up, you have to make

3    them more accessible.  Immediately the port director in

4    Eagle Pass answered back saying, this is what I did.

5    This is the changes I made.  And now they're accessible

6    and that's how we're doing.

7            So I sent Mr. Flores a message.  I said, you

8    had a similar problem, what did you do.  Nothing.  I

9    sent him a second message.  I asked you, what did you do

10   with your busters.  Nothing.  And then finally on the

11   third message, I said, you will tell me by this date

12   what did you do with your busters.  And then he

13   answered.

14            MS. BLESSEY:  Can you identify which ones

15   you're talking about to make it easier for her?

16            MS. REBA:  That one is here.  This is

17   here.  CC mail dated May 22nd.

18            MS. BLESSEY:  What year?

19            MS. REBA:  '96.  Subject:  Buster

20   availability.  And you have it in there.  This is my

21   previous e-mails.  The one I got from Eagle Pass saying

22   this is what we're doing, my first request to Jorge, my

23   second request to Jorge, and then my third request to

24   Jorge giving him a deadline.

25       Q.   Okay.  Anyway, what you're going to show me is

1    his response to you.

2        A.    No, no.  I just wanted you to see that it took

3    three requests.  When I sent the message, the other

4    ports immediately answered.  It took three additional

5    requests from me and a deadline before he answered.

6        Q.    I see.

7        A.    That's this one.

8        Q.    Okay.

9        A.    So either he ignores me when I ask for

10   something or he responds in the worst possible way. And

11   that is -- another example here is in Los Indios

12   package.  Let me find Los Indios.  Maybe I don't have a

13   package of Los Indios.

14       Q.    So then he says, what are your thoughts and

15   your suggestions on making them more readily available.

16       A.    This is Eagle Pass.  This is Eagle Pass.  Eagle

17   Pass is another port, another one of my ports.

18       Q.    All right.

19       A.    See, he had the same problem.  I sent the

20   message to both of them.  He immediately responded.

21   This is what -- he sent me a copy of what he was telling

22   his people.

23       Q.    All right.

24       A.    What are we going to do.  And so, I sent to

25   Jorge and I said, you had a similar problem.  What did

CONTINENTAL COURT REPORTERS, INC. (713) 522-5080

1  you do about it.

2      Q.    I see.

3      A.    And he ignored me.

4      Q.    You forwarded this information to him?

5      A.    Right.  And I said, you had a similar problem.

6  What did you do about it.  He ignored me.  Then I sent

7  it again.  What did you do with your busters.

8      Q.    All right.

9      A.    And he ignored me again.

10     Q.    And that's when you said by May 24th --

11     A.    You will tell me, yes.

12     Q.    So then he sent his response?

13     A.    Sent me his response.  Then he told me.  But I

14  have to do that all the time.  I had another issue on

15  Los Indios, but I thought I had a package but I don't on

16  Los Indios.  One of the problems that I had had and we

17  had dealing with Flores is the perceived perception that

18  he's very closely tied to Congressman Ortiz.  Every time

19  you tried to get him to do something, he threatens to go

20  to Congressman Ortiz.

21     Q.    That's Olimar Ortiz?

22     A.    Olimar Ortiz.  So Los Indios is the bridge that

23  Congressman Ortiz was very interested in.

24     Q.    And where is that?  Is that also in

25  Brownsville?

1    A.    It's in Brownsville.    Interested in it being

2    utilized.    So we were trying to look for ways in

3    utilizing Los Indios better.    One of the things that we

4    thought about Los Indios is it's a bridge that is way

5    out in the middle of nowhere.    And we have a lot of

6    hazardous materials crossing the downtown bridges.

7          So I thought, well, maybe we can get -- do

8    something to make Congressman Ortiz happy by sending

9    some trucks to Los Indios and protect the community by

10   getting rid of those hazardous materials from the

11   downtown bridges so they don't cross where the streets

12   are, where the schools are, where the communities are.

13   And so everybody wins.    But, you know, the truckers

14   never liked to be told what to do.

15         So I told Mr. Flores, why don't you work on

16   this and try to get the bridges -- get the community

17   buying into this.    Next thing I know, he put out a trade

18   bulletin saying, within 30 days, we're moving all the

19   hazardous materials to Los Indios.    Well, we have a

20   policy that we give the community 90 days.    We don't

21   spring it on them.    And that we talk to them ahead of

22   time.

23     (END OF TAPE 1, SIDE B; BEGINNING OF TAPE 2, SIDE A)

24     A.    It's a September 4, 1996 memo.

25     Q.    September 4, 1996.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      A.    1996.   From the cargo chief to Mr. Flores.

2  Title, Hazardous Materials, in quotation.

3      Q.    Okay.   And, now, what is -- this is the memo

4  that he wrote to the community or --

5      A.    No.   No, no, no.   This is just -- no.   I'll

6  explain to you what that memo is.

7      Q.    All right.

8      A.    So anyway, he did the trade bulletin.

9            MS. BLESSEY:   It's all chronological

10  order.

11      A.    September 4th.   September 4th.   So it should

12  be --

13      Q.    It should be early on.

14      A.    It should be earlier than that.

15      Q.    Oh.   Over here.   September 4th.   Here we are.

16  April, October.   Let me make sure it's in here.   I might

17  have moved mine around.   September 4th.   Here we go.

18  Okay.

19      A.    So he put out the message even though you need

20  to talk to them about it ahead of time and then you need

21  to give 90 days.   So when they all complained, it was

22  the CMC's fault.

23      Q.    The community complained?

24      A.    The community complained.   It was my fault.

25  This memo here is a memo where they met with the

1    community about it and where the port director announced

2    that the CMC was recommending reduce windows and also

3    mentioned the moving of a HAZMAT waste to Los Indios

4    bridge.  It was not that the port was thinking of

5    doing -- it was not that Customs thought it was the best

6    thing to do.  It was not that it was best that a

7    community -- no.  The CMC.  It's always the CMC.  He's

8    never responsible.  He's never accountable.  It is never

9    his doing.  It's always somebody else.

10        And so instead of being something that was good

11   that could have been done quickly, it became a big

12   problem because he did it without consulting.  And then

13   it was much easier then to go back and mend fences with

14   the community and do it the right way.

15        Q.    It's much harder to mend fences.

16        A.    Yeah.  Much harder.  Much harder.  But because

17   I told him, work with them to move the hazardous

18   material to Los Indios.  Well, he did it the worst

19   possible way.  He just sprung it on them, ah, the CMC

20   told me to do it.  And that's a pattern --

21        Q.    It came back to you.

22        A.    That's me.  That's a pattern that you see

23   repeated over and over again.  Another incident that we

24   had with Los Indios was that --

25        Q.    Before I move on from that, so it was your idea

1   to try to do it.  I understand you're saying that, you

2   know, it was done incorrectly.  But I got lost on why

3   you were trying -- Solomon Ortiz was concerned about

4   utilizing that bridge, is that what it was?

5        A.   Yes.  It want's it utilized more.

6        Q.   And so you thought that would be a way for it

7   to get utilized.

8        A.   Get utilized, right.

9        Q.   Because it's out of the community.

10       A.   The other two bridges are very congested --

11       Q.   I see.

12       A.   -- so it was better to move some of those

13  trucks over there.

14       Q.   I see.

15       A.   In fact, another thing I wanted to mention was

16  that Solomon Ortiz wanted the bridge to be operating 24

17  hours.  And we don't have -- it's very little utilized.

18  Very few people use it.  Well, now they do.  But back

19  then, back then three years ago, very few people used

20  it.  So it didn't make any sense to open it 24 hours.  I

21  didn't have the staff to open 24 hours.  Instead of

22  telling them that, he would not tell them that.  It was

23  all my fault, I didn't want to give him the resources.

24  I never gave Brownsville any resources.

25       Q.   That's what Ortiz heard?

1     A.    That's what the entire community and Ortiz and

2    everybody heard from him, I never give the community

3    enough -- I never give Brownsville enough resources, and

4    that's why he can't do it.

5                   MS. BLESSEY:   Who are you meaning by

6    "him"?

7     A.    I'm sorry.   Mr. Flores.   We had a meeting -- I

8    had a meeting -- things got very bad.   I mean, there

9    were front page articles in the Brownsville paper

10   saying --

11    Q.    About the hazardous material?

12    A.    She hates Brownsville.   She only wants -- she

13   only helps Laredo.   The judge, the normal -- the judge,

14   the county judge said that in a meeting.   So I thought

15   I'm going to go down there and mend fences because these

16   people don't understand the problem.   So I went down.   I

17   had a meeting with the entire community to explain,

18   look, guys, I don't hate you.   I don't have the

19   resources.   I just can't do 24 hours and the volume

20   doesn't warrant it.

21          So then they said, well, we were promised

22   24 hours.   We were promised that when Customs got more

23   resources, we would have 24 hours.   I said, I didn't

24   promise you 24 hours.   I just got here.   I don't know

25   who promised you.   Well, we were promised 24 hours.

1     Q.  The county judge was saying that?

2     A.  Saying that.  Somebody in Customs promised them

3 24 hours.  I didn't do it.  I don't know who could have.

4 But it wasn't me.  And then somebody -- and so I tried

5 to explain.  And then somebody asked Mr. Flores, well,

6 what do you think about this.  So instead of saying,

7 well, we don't have the resources, he says, well, every

8 side has a point.  I think both sides have points.

9     So, you know, it's like, I'm going to wash my

10 hands of this.  I'm not going to take -- I'm not

11 accountable, I have nothing to do with this whole thing.

12 So he never, ever supports the Customs policy.  It's

13 just -- I think what happens to him is he has

14 forgotten -- Mr. Flores has forgotten who he works for.

15 He's more interested in keeping the community happy,

16 than in doing what is good for the service or for the

17 taxpayers.

18     And every time something comes up with the

19 community, immediately it's the CMC's fault.  It's not

20 me.  Instead of making the problem easier, he makes it

21 worse.  He never agreed with what I said.  He never

22 reinforced what I said.

23     One of his chiefs was there.  One of his chiefs

24 stood up and said, we can't do it, we don't have the

25 resources, and the volume doesn't warrant it.  But the

1    port director, who is supposed to be in charge, did not

2    do it.  And that's, again, a common theme, he's never

3    accountable.  He's a port director, but he's not

4    accountable.  He's a port director if it's good, but not

5    if it means making a hard decision or making somebody

6    mad.

7        Q.   It seems like by now his appraisal would say

8    fail.

9        A.   Yeah.  I haven't given his appraisal this year.

10       Q.   Well, I mean, I'm not even this year.  I'm

11   talking about already.  I mean, from the picture that

12   I'm having, wouldn't it be on his first -- you know,

13   this is September.  I know it wasn't --

14            MS. BLESSEY:  I think you're not getting

15   into the distinction between performance and conduct.

16   There's a distinction between performance and conduct.

17       A.   In the beginning I thought his problem was he

18   didn't know any better.  Now it's a matter of he knows

19   what to do, he just doesn't want to do it.  That's

20   conduct.

21       Q.   Oh, okay.  So at the beginning, you were

22   thinking you might be able to train him.

23       A.   And that's why I wanted to do a performance

24   improvement, then he could learn, he could be trained.

25            MS. BLESSEY:  And just -- I mean, from a

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   legal standpoint, appraisals don't reflect conduct.

2   They reflect performance.  And I think a direct

3   reassignment is a way to address maybe conduct.

4       Q.   Well, wouldn't performance, I mean, his

5   performance as far as -- what you're saying, even the

6   way that he didn't follow the policy here, the Customs

7   policy and went out before, you know, the 90 days and

8   didn't do it with their input and so forth, and then

9   just sprung it on them.  Isn't that performance?  I

10  mean, you know, he violated --

11      A.   It's conduct if it's malicious.  And I think he

12  did it on purpose to get me in trouble.

13           Oh.  You said if anybody ever was a witness.

14  Yes.  We did have a witness in one of them, yeah.

15  Here's one there's a witness and there's a report on

16  what happened.

17           MS. BLESSEY:  Can you identify what you're

18  talking about?

19           MS. REBA:  Yeah.  I'm waiting for her to

20  finish writing.

21      Q.   Yeah.  Well, I'm glad you're waiting.  Because

22  I'm still confused and you're going to clear up, I

23  guess, you know, why it doesn't -- I'm confused why it

24  doesn't show up on the performance appraisal, even if

25  it's conduct, you know, that he didn't give time, follow

1    the correct procedure.  Isn't that a violation?  I mean,

2    wouldn't that show poor performance, he doesn't adhere

3    to the Customs policies?  I'm confused.

4              MS. BLESSEY:  I think she had testified

5    earlier that they had looked into a PIP, a possibility

6    of a PIP, and they had gone that route.  I mean, I can't

7    testify.

8         Q.   Yeah.  You did say --

9         A.   Yes.  We started on a PIP and then we had to

10   stop.  And I'll get to that.

11        Q.   Okay.

12        A.   Okay.

13        Q.   Okay.  We want to return to the PIP

14   exploration.

15        A.   Yeah.  We'll return to the PIP.

16             MS. BLESSEY:  From a legal standpoint, you

17   can't fail somebody without PIPing them first.

18             MS. REBA:  Right.  You have to do a PIP

19   first.  Then you fail them.  Because you have to give

20   them an opportunity to improve before you can fail them.

21        Q.   And this was -- so September of '96, you had

22   just gotten here in February, so it wasn't a whole year

23   yet, but your first performance appraisal with him, you

24   could have, I guess, at that time talked about

25   performance improvement.

1      A.    At that time, I was --

2      Q.    This is September, so --

3      A.    At that time, I was planning to do a

4   performance improvement to him at that time.  But we'll

5   get there.

6      Q.    All right.  Okay.  I'll wait.

7      A.    In August '96, we had another problem.

8      Q.    And let me ask you something.  I'm going to

9   turn off the tape.

10          (Tape off)

11     A.    This was back in January of '96, before I even

12  came to the CMC, the service -- let me explain about

13  service ports.  I have 10 ports, but they're not all

14  equal.  Laredo is a service port, which means that there

15  are certain functions that they perform for the other

16  ports and certain services they provide the other ports.

17  One of them was coordinating what we call the line

18  release program.  And this is a document dated August

19  16th, '96.  Do you have it there?

20     Q.    Okay.  I'm looking for the sticky --

21     A.    No.  This one.  It's line release, Kramer.

22     Q.    I thought I could find it by the sticky, but --

23             MS. BLESSEY:  What's the date?

24             MS. REBA:  August 16th, '96.

25     Q.    Okay.  May '94, '95, April '96.  August 16,

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1    '96?

2        A.    Uh-huh.

3        Q.    Report of meeting in Brownsville?

4        A.    Uh-huh.  That's it.

5        Q.    Oh, okay.

6        A.    It didn't have a sticky?

7        Q.    Yes, it did.

8        A.    Okay.  Carol is very organized, so...

9        Q.    Okay.

10       A.    Okay.

11       Q.    So let's see.  You were saying that Laredo

12   performs this function for the other ports, the land

13   release program.

14       A.    Right.  But land release is a method of

15   releasing shipments, of identifying those shipments that

16   are low threat for drugs, that are repetitive shipments,

17   and that we don't have any problems of classification or

18   evaluation.  In '95 we went under a lot of attack from

19   Senator Feinstein saying that line release was not

20   secure enough and that drugs were coming in through line

21   release and that we had to get rid of it.

22              So what Customs did was to revamp the line

23   release program, add some security measures, and tie it

24   to a carrier initiative program.  And the carrier

25   initiative program, CIP, is a program that the driver,

1   the trucker, the owner of the trucking company, the

2   shipper, all have to be clear beforehand, they have to

3   go through background investigations, they have to be

4   clear as people that have no ties to the drug culture at

5   all.  So if you want your shipment to clear through line

6   release, you have to be a signatory of CIP.

7         And headquarters mandated that we have to

8   cancel all the CIPs -- I mean, all the line release, all

9   the people who had line release privileges, and then ask

10  to sign off to CIP, then we can turn them on for line

11  release again.

12     Q.   Now, what -- I understand the CIP, but why did

13  headquarters cancel -- you said all those in line

14  release had to be cancelled and then reapplied?

15     A.   All the people who had line release privileges,

16  you could only be in line release if you were also CIP.

17     Q.   All right.

18     A.   So what they did was, they turned everybody

19  off, and as I signed for CIP, then they turned me on for

20  line release.

21     Q.   All right.

22     A.   So I couldn't do line release unless I had

23  already done CIP.

24     Q.   All right.

25     A.   So in January, the service port director sent a

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    message to all the ports saying, this is what you have

2    to do, you have to turn everybody off and turn them on

3    as they get to January 1st.   Somewhere mid April,

4    something like that, they sent another message reminding

5    everybody, remember you have to turn all your line

6    release people off and turn it back on as they sent off

7    for CIP.   In July, all the ports had complied, except

8    Brownsville.

9            So I sent the message to Brownsville, to the

10   port director saying you have to do this.   And I got a

11   message back from a Senior 11.   A Senior 11 is not even

12   a supervisor, not even a manager.   It's just a very low

13   level inspector.   Saying Laredo was doing it the wrong

14   way.   Brownsville was doing it the right way.   They

15   didn't have to do it.   This Senior 11 is writing the CMC

16   director telling me he's not going to do it.   So the

17   attitude of the port director permeates the entire port.

18   So I sent a message back --

19        Q.   Do I have a copy of this message?

20        A.   Yes.

21              MS. BLESSEY:   You have everything we have.

22              MS. REBA:   It should be here.   This is the

23   last one here.

24              MS. BLESSEY:   Can you identify it?

25              MS. REBA:   The last two pages?   The last

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  two pages?

2          MS. BLESSEY:  Does it have a date or

3  anything?

4          MS. REBA:  July 11.

5      Q.  Okay.  What we're looking at is subject -- it's

6  a memo just typed out.  Subject:  Line Relations and CIP

7  from Ed Pimeo.

8      A.  (Inaudible) by Oscar Martinez.  Oscar Martinez

9  was the Senior 11.

10     Q.  All right.

11     A.  **These are the last three lines.  We here in**

12 Brownsville did not have everyone on line release

13 reapply, even though that's demanded from headquarters.

14 It was nothing that told us it had to be done.  Even

15 though they had received two messages from the service

16 port.

17     Q.  So it says, I have been asked -- I talked to --

18 I was asked to reply in absence of George Aguilar.  Who

19 **is George Aguilar?**

20     A.  **One of the supervisors.  If you will see**

21 **through all these documents, it is never the port**

22 **director.  It's always somebody else.  So it's a lack of**

23 accountability, lack of responsibility.

24     Q.  So I guess he was here at that time.  July '96

25 he wasn't out somewhere?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    A.   Well, I can't say he wasn't.

2    Q.   Yeah.  But he would have --

3    A.   When you're the port director, you're

4    accountable.

5    Q.   When people are out, do you assign somebody

6    to --

7    A.   You should have someone acting, yes.  Always.

8    Yeah.

9    Q.   This doesn't say acting, does it?

10   A.   No.

11   Q.   Absence of George Aguilar.

12   A.   So then I send back a message to them, to the

13   port director saying you will do it.  You will purge

14   your line release files.  And that's the message dated

15   August 9th and is here in this package too somewhere.

16             MS. BLESSEY:  Is it a memo or what kind of

17   document?

18             MS. REBA:  It's a memo from me to -- from

19   director of South Texas to port director of Brownsville,

20   Texas.  Subject:  Line Release.  Here.  Here you go.

21   Q.   Okay.  So is this dated -- what is it?  It's

22   hard to read.  August 9th?

23   A.   August 9th, I think, yeah.

24             MS. BLESSEY:  What year?

25             MS. REBA:  '96.

1    Q.   Okay.  So this is to port director, from
2    director of South Texas CMC.
3    A.   August 9, '96, yeah.
4    Q.   On July 1st, only CIP approved carriers are
5    authorized to enter -- merchandising license (inaudible)
6    in review of the line programs.  By correspondence,
7    please confirm when you have accomplished this task,
8    along with a copy of your SOP.
9    A.   So all he -- and I have it somewhere else here.
10   I thought I did, but it's not in this one here.  If I
11   find it, I'll show it to you.  But anyway, here is -- he
12   answered me back saying, you know, why are you picking
13   on me.  So I said, look, I'm coming down.  I'll meet
14   with you.  Let's try to work this out.  There's no need
15   in getting upset about this.  So I went down with, at
16   the time, with Joe Garcia and Bruce Kramer, who was my
17   deputy at the time.
18              MS. BLESSEY:  What was the time period?
19              MS. REBA:  August 16th, '96.  And --
20   Q.   Joe Garcia and who?  I'm sorry.
21   A.   Bruce Kramer, who had been acting CMC director
22   while I was -- before I came in and who was my deputy at
23   the time.  And this cover sheet here, report of meeting
24   in Brownsville is Bruce Kramer's report of what happened
25   in the meeting.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.    I see.

2    A.    And so I started going through all the issues,

3    you know, explain again the process owner concept.  And

4    then Mr. Flores complained that why does Laredo get

5    preferential selections at schools.  How come always

6    inspectors go to -- the inspectors have to go to school

7    before we can hire them.  Why do the inspectors in

8    Laredo always go first before Brownsville.  So we

9    explained to him, when they clear their background, they

10   go.  It's just a matter of clearing their backgrounds.

11   As soon as yours clear their backgrounds, they'll go

12   too.  It's out of my control.

13         And then we started talking about line release

14   issues.  And we tried to explain it.  And it turned into

15   a shouting match between him and me.  It turned into a

16   shouting match because he argued that what he -- what we

17   were asking him to do was not acceptable, that he could

18   not do it.

19   Q.    And all these people were present.

20   A.    All these people were there.  Of course, he

21   couldn't explain why in seven months he never has said a

22   word of why it was not acceptable, because the first

23   memo was in January that went from the service port.

24   Not a peep out of Brownsville at all until now.  But it

25   was not acceptable, he couldn't do it.  And then his

1  chief said what he always tells me, what the port would

2  like for them is to be told what is wanted of them, give

3  them the resources and leave them alone.  And I'm going

4  to explain, you know, it's not simple.

5       And then they said they don't have enough

6  resources.  Well, we showed the port -- Mr. Flores

7  showed how he didn't have enough resources.  And we

8  showed them how, yes, he has enough resources.  We

9  identified three or four inspectors he could use that he

10  was wasting in other places.

11       Q.   Joe Garcia is the one I'm going to interview?

12       A.   Uh-huh.

13            MS. BLESSEY:  And Kramer.

14            MS. REBA:  And Bruce too.  And Kramer too.

15       Q.   Okay.

16       A.   And then in the back here, I have another

17  summary that I did later on.  But let me pull it out

18  because it refers to this meeting.  Because after that

19  meeting, he and I met alone.  Let me -- I will find it.

20  As I go through this, I'll find it.

21       Q.   All right.

22       A.   Anyway, so this is -- so this is -- you have

23  witnesses.  You can talk to Joe Garcia and you can talk

24  to Bruce Kramer, where it turned into a shouting match.

25  He screamed and yelled at me in front of everybody.

1    Q.  And again, then, that's not anything you would

2    take action on?  Insubordination?

3    A.  That's conduct.  Yes.  I can.  But -- let me

4    get there.  Okay.  Let me get there.  We had other

5    problems.  Budget.  The port cannot handle its budget.

6    Mr. Flores has no concept of what it is to balance a

7    checkbook and what it is to spend money.  He thinks is,

8    I need it, I spend it.  And no concept of you can be

9    overspent because you're anti-deficient.  No concept.

10   It's like, I'm going to spend it, I'm going to spend it.

11   Q.  So the port director is in charge.  He doesn't

12   have like a budget person that's in charge of it?

13   A.  Oh, yeah.  He has a budget person.  But

14   ultimately, you're the one who signs.  And I'm the one

15   who signs.  I'm just signing for CMC.  And I don't sign

16   unless my budget person explains to me, you have the

17   money and you can spend it and it's legal to spend.  His

18   budget person has to do the same thing for him.  Or

19   either he doesn't do it or I don't know what.  But

20   ultimately, he's responsible.  But if you go down to

21   September 4th, '96, right there --

22   Q.  Okay.

23   A.  -- we give out the overtime.  It's an e-mail.

24   September 4th, '96.  Bruce, Maria, and copy to Wonzel.

25   Wanda Leva is my budget officer.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.    Okay.

2      A.    And overtime is probably the most important

3  issue for inspectors and for ports on the border.  We

4  use so much overtime because we never have enough

5  people.  But still, overtime is very valuable.  If you

6  run out of overtime early in the year, then you have to

7  close your doors.  You can't function.  So you have to

8  really manage your overtime well.

9           Well, because the ports have not managed their

10  overtime as well as possible, in '96 we gave the ports

11  three-quarters of the year of overtime and we kept the

12  last quarter.  But we told them, we're only giving you

13  three-quarters because we don't want you to overtime the

14  entire budget in the first two months and then not have

15  enough.  Manage your budget for those three quarters.

16  We will put the last quarter in at the end so you have

17  it.  But we're going to keep it just to make sure.

18           The budget officer goes to all the ports.  He

19  visits every port.  Goes for conciliations, does visits

20  to ports, explains to them how it works.  Many times,

21  explains over and over again, both to the port director

22  and to the budget person in the port.

23           Well, Brownsville went the entire year with

24  three-quarters of their overtime.  They didn't know that

25  they had another quarter of money there.  Never even

1    looked.  He had never bothered to look or didn't know

2    how to look in the file, so they had returned an entir-

3    quarter of overtime money because they didn't use it.

4    And this is the report from the budget officer telling

5    us about it.

6        Q.  Now, they would have been notified that it was

7    three-fourths of the -- that they were only getting,

8    what you told me, the one-fourth had been held back.

9        A.  Several times.  Several times.

10        Q.  Verbally?

11        A.  Yes.  Several times.  He says, on several

12    occasions, guys explained and reminded the ports that we

13    had only close to three-quarters of salaries.  Verbally

14    we had port directors' meetings where the budget officer

15    always makes a presentation.  And he sends in CC mails

16    all the time.

17        Q.  And this goes to the port director and I guess

18    to the budget officers?

19        A.  And the budget officers, yeah.  He did budget

20    training twice for the port directors and the budget

21    officers.  He says, here, I explain and coach each port.

22            MS. BLESSEY:  For the tape, were you

23    referring to a certain section on the document?

24            MS. REBA:  Oh.  The top part.

25            MS. BLESSEY:  Top part of what?

1          MS. ROJAS:  Second paragraph, on several
2    occasions.  Well, actually, there are two paragraphs
3    only on that message from Jerry.
4          Q.   Okay.
5          A.   It was posted in December.  The last quarter,
6    it was posted in December.  I guess.  That's what it
7    says here.
8          Q.   I have explained and coached each port that
9    they had to use the figure that was posted to the budget
10   and divide this figure by three, and then multiply the
11   product by four to determine their '96 fiscal year
12   allotment for their respective object class for these
13   specific captions.  Okay.  So what you're saying is,
14   somehow the message did not --
15         A.   I don't know.
16         Q.   But Brownsville wound up returning one-fourth
17   of the budget --
18         A.   For overtime.  And yet, the following year, we
19   get a request saying we needed more overtime because we
20   don't have enough.  And they managed to do it with
21   three-quarters.  So it shows you that there is such a
22   lack of management of the budget in the port.  And that,
23   again, goes back to the port director because he's
24   ultimately responsible.  Just like I'm ultimately
25   responsible.  Okay.

1    Q.   Okay.   Are we getting close to the PIP

2    proposal?

3    A.   Yeah.   Let me -- let me -- let me get back to

4    that.   On that message, early message where Mr. Trotter

5    told me to talk to Diane and see what I could do --

6    Q.   Okay.   But Diane just came a few months ago,

7    you said?

8    A.   Yeah.   But she was in Houston.

9    Q.   Oh, I see.

10   A.   So I was -- she was helping me out because I

11   didn't have anybody.

12   Q.   Oh, okay.

13   A.   And what happened was, before we reorganized,

14   Houston was a region and had oversight of all the ports

15   on the border, plus Houston.   And so she had -- she

16   covered all these ports.   She had responsibility for all

17   these ports.   When we broke up into CMCs, we all had to

18   have our own LER person, and she did only Houston.   But

19   because Houston is not that big anymore, she had plenty

20   of free time.   That's why Mr. Trotter says, well, she

21   knows everybody and she has free time, she can help you

22   until you find your own person.   So that's why she sent

23   me to her.

24   Q.   I see.

25   A.   So he told me to go talk to her.   That first

1  summary that I gave you was a summary I did to take to

2  her to talk about.  And we were going to put him on a

3  PIP.  We were going to write up a PIP.

4      Q.   And what time frame was that that you were

5  talking about?

6      A.   That was somewhere, September '96.  Somewhere

7  around September, October '96.  See, I didn't date it,

8  but it was around that time.  It was near the end of the

9  year.  Because I wanted to do by the time I did the

10  appraisal at the end of the year.  I wanted to have the

11  PIP done by the time I did the appraisal at the end of

12  the year.

13      Q.   In September of '96 you had a conference about

14  a possible PIP?

15           MS. BLESSEY:  I think she's guessing,

16  though.

17      A.   I'm guessing.  It's around that time.  I

18  really -- you know, more or less.

19      Q.   Right.

20      A.   I'm guessing.

21      Q.   With Diane.

22      A.   With Diane, you know.  I wanted to do it -- no.

23  I wanted to do it before September because I wanted to

24  put him in a PIP before I did the appraisal.

25      Q.   And the appraisal was November, you said?

1    A.   The appraisal is anytime after October.  So I
2  want to put Mr. Flores in a PIP before I did the
3  appraisal to give him an opportunity to improve.
4    Q.   Right.  Because he has a time period of how
5  long?
6    A.   I don't remember.  But he has to be on a PIP
7  for a certain period of time before I can, I can, you
8  know, give him the bad appraisal.
9    Q.   So it wasn't September.  It would have been --
10    A.   It must have been before that, but I really
11  don't remember.
12    Q.   August or July.
13    A.   It was -- I don't really remember when it was.
14    Q.   Okay.
15    A.   So we started working on --
16    Q.   And you took this document?
17    A.   I took that document and all the parts out --
18    Q.   Process owners and --
19    A.   Yeah.  I took that document and all the
20  background material for that document.
21    Q.   All right.
22    A.   We discussed it.  She was getting ready to work
23  out on the PIP.  And then I was told by Mr. Trotter,
24  take no action, don't talk to him unless you have
25  witnesses, don't do anything at all.  There are bigger

1    issues at hand.  I said okay.  I didn't know what he was
2    talking about, but I figured he knew better and he was
3    the boss.  I said, well, do I give him his appraisal
4    when the time comes.  He said, don't give him his
5    appraisal.  Don't do anything.  So I did nothing.
6        Q.    So that would have been like October '96, after
7    October '96 that you didn't give an appraisal.
8        A.    Right.
9        Q.    And you didn't take any further action on the
10   PIP.  I understand this was July/August when you were
11   talking to Diane.  Sometime there, July/August, Trotter
12   told you, don't take any more action.
13       A.    Don't take any more action.
14       Q.    Then on the appraisal you didn't --
15       A.    I eventually gave an appraisal, but it was
16   a lot later.  I finally gave an appraisal.  It was like
17   in February.  Because I kept saying, I have to give
18   Mr. Flores an appraisal.  I have to give him an
19   appraisal.  What do I do.  And finally Diane talked to
20   Mr. Trotter and she says, okay, give him his appraisal.
21   So then I gave him an appraisal.
22       Q.    So he didn't explain, you didn't ask, because
23   he's the boss.
24       A.    He's the boss.  He said, there are bigger
25   issues, you don't need to know.  And so I don't need to

1  know, I don't need to know. But he did tell me,

2  document everything. Don't talk to him unless you have

3  witnesses. Make sure everything is in writing. And

4  document everything that happens. And I did. And

5  that's why I have all of this.

6      Q.   Okay. Let's see.

7           MS. BLESSEY:  So that was the last thing

8  of the PIP issue. You never raised it again, even

9  though --

10          MS. REBA:  No. Ever since. You know,

11 every time something happens, I sent a message to

12 headquarters where I said, what do I do. Well, don't do

13 anything.

14     Q.   Trotter kept saying, don't do anything.

15     A.   Don't do anything.

16     Q.   As far as PIP.

17     A.   Don't do anything. And still, no one has told

18 me do something. I mean, I still don't do anything,

19 just document.

20          (END OF TAPE 2, SIDE A; BEGINNING OF SIDE B)

21     Q.   All right. So let's see. We've gone

22 through -- you know, since we were talking about

23 overtime, I wanted to ask a question and I know that

24 it's skipping forward. But might as well talk about it

25 now, if that's all right. And that's the overtime for

1    the opening of the new bridge, Veteran's Bridge --

2        A.    Uh-huh.

3        Q.    Okay.    Did Flores request from you overtime --

4    about to be able to open that?  Was that a timely

5    request?  Did you give him the overtime?

6        A.    Yeah.  I did.  I didn't give him the overtime.

7    I'm trying to remember the sequence of events.  We knew

8    he was going to need overtime because they gave us

9    positions, headquarters gave us positions for the

10   opening of the bridge, but they didn't give them to us

11   until late in the year.  So they gave us --

12       Q.    Headquarters gave an amount of money.

13       A.    Right.

14       Q.    For overtime.

15       A.    No.  To hire people for the bridge.

16       Q.    Oh.

17       A.    But because they gave it to us late in the

18   year, by the time we hire them when they went to school,

19   they weren't going to be all in place by the time the

20   bridge was open.  Some were in place, but not all of

21   them.  So we knew he was going to need some additional

22   overtime to supplement the people he didn't have.  So we

23   did an estimate.  I asked him for an estimate on what he

24   was going to need.  And his estimate was totally,

25   totally out of realm or reality.

He was assuming that he was going to have every lane open 24 -- I mean, it was just, the assumptions were all not reasonable at all.  So I sent it back and I said, you need to look at this differently.  You need to look at A, B, C and D and you need to make these assumptions.  So I sent it back.  You need to change that.  So then --

Q.  So the bridge opened April '99, right?

A.  Yeah, yeah.

Q.  And so his -- when you were talking about his request and then you sent it back --

A.  He got the overtime before the bridge opened. He got the overtime.  And he had already had people come back from school.  So when the bridge opened, he had people that had come back from school.  And he already had the overtime.  I went and get -- I did a special request from headquarters for overtime.  I got it approved.  And I had the overtime for him.  So he had the overtime.  He just didn't have all he wanted because his request was unreasonable.

Q.  So he requested and you-all worked it out and it all arrived, the overtime, before April of '99.

A.  Yes.

Q.  And so, do you know, do you have a figure of the amount of --

1    A. No. I didn't know that this was going to come
2   up, so I don't have anything about that here, but I can
3   get you some stuff.
4    Q. Okay.
5        MS. BLESSEY: Do you have anybody to
6   corroborate that deals with overtime?
7        MS. REBA: I'm sorry?
8        MS. BLESSEY: Do you have anybody who
9   you deal --
10       MS. REBA: Well, Gil is the one who -- Gil
11  Jordan, my deputy, he's the one who handles all the
12  budget and all the overtime. He's the one who really
13  did all the numbers. And he's the one who corresponded
14  back and forth with Mr. Flores on the overtime. So I
15  have to get all that from him.
16       MS. ROJAS: Okay. Well, I think I'm
17  speaking to him, am I? No. No. I guess not.
18       MS. BLESSEY: I haven't been notified.
19       MS. ROJAS: Oh, okay. I guess I'm not.
20       MS. BLESSEY: I think you're thinking of
21  Joe Garcia.
22       MS. ROJAS: Oh, okay. No, well, I think I
23  talked to Jordan to schedule Diane Tudson.
24       MS. REBA: Oh, that's right. Yeah, you
25  did. Because she works for him.

1      Q.   But anyway, okay.  Before April 9th, then, you

2   had enough overtime.  He first requested -- Flores

3   requested an unreasonable amount and then you requested

4   him to reanalyze it.  And then he submitted another one

5   that was approved?

6      A.   It was still not what needed to be done.  And

7   in fact, here there's a message from Gil Jordan telling

8   me how unreasonable those requests are where he was so

9   frustrated about it.

10     Q.   Okay.

11     A.   Let me see.  It's here somewhere.

12     Q.   Okay.  February 9th, there's one from Gil

13   Jordan in trying to get a budget reconciliation done.  I

14   don't know if that's what you're looking for.

15     A.   Oh, no.  That's not it.  That's one where they

16   overspent and spent -- put the money in the wrong

17   account.

18          MS. BLESSEY:  Who do you mean by "they"?

19     A.   I'm sorry.  The port director overspent his

20   accounts and -- here it is.  If you go back to July

21   22nd, '99, way, way in the end, there's a whole bunch of

22   things clipped together.

23     Q.   Bob?  This one?

24     A.   No.  It looks like this.  Author, Maria Pena.

25          MS. BLESSEY:  It should be right before

1    the appraisal, I would think.

2              MS. REBA:  Do I have appraisals?

3              MS. BLESSEY:  Yeah.  They're in the back.

4              MS. REBA:  It's clipped right there.

5              MS. ROJAS:  January.

6              MS. REBA:  No, no.  July 22nd, '99.

7              MS. ROJAS:  March, July 21st.

8              MS. REBA:  21st?  Oh.  I'm sorry.

9              MS. ROJAS:  Yeah.  I saw that, but you're

10   right.

11        Q.   Okay.  In this package --

12        A.   No.  This is a whole bunch of things clipped

13   together.

14        Q.   All right.

15        A.   But on the second page -- not the second page.

16   Third -- fourth page.  This is a message from Gil Jordan

17   to me.

18        Q.   All right.

19        A.   It says, Gil Jordan to Maria Reba dated March

20   30th.  Brownsville strikes again.  When we opened

21   Los Tomathis bridge, he had two cargo lots.  He had the

22   V&M and he had Gateway.  Both cargo lots were going to

23   be closed --

24        Q.   Cargo what?

25        A.   Cargo lots.  That means where we process cargo

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  trucks.

2      Q.   Okay.

3      A.   We process trucks in V&M and we process trucks

4  at Gateway.  We're going to close both of those and

5  process trucks only in the Aron's bridge.

6      Q.   Okay.

7      A.   When you combine two cargo lots into one, you

8  have a savings, a tremendous savings, because there's

9  a lot of duplication.  You have two of everything.  So

10 you save at least a third of your personnel.  When

11 Mr. Flores did the estimate for Los Tomathis, he did not

12 include the savings of that third savings.  That did not

13 occur.  They were going to leave the cargo staff the

14 same, so they're going to have twice the -- Brownsville

15 was going to have the staffing for two cargo lots in the

16 Aron's bridge.  Total waste of resources.

17          When you work like we do on the border, seven

18 days, 24 hours a day, you have -- and the inspectors

19 work in shifts, in eight-hour shifts -- if you schedule

20 the inspectors in a five-day workweek, which means you

21 work Monday through Friday and Saturday and Sundays on

22 overtime, overtime is going to cost you twice as much.

23 It's very expensive.  But if you work on a seven-day

24 workweek, where every day of the week is your regular

25 day and your overtime is only when you work more than

1    eight hours in a day, then your dollars go farther.

2            We been trying to get Mr. Flores to change to a

3    seven-day workweek from the very first day I came to

4    here.  He still insists that it cost more to do a

5    seven-day workweek.

6            So this is -- oh, and the minimums, minimum

7    staffing means you have a minimum number of inspectors

8    working at this shift.  I have to have at least this

9    many.  Well, if I have from eight to -- let's say from

10   eight to four, I have a lot of trucks coming in, my

11   minimum is very high.  But from midnight to eight, and I

12   really don't have a whole lot, my minimum should be

13   lower.  Well, again, the minimums were supposed to be

14   very high no matter what time of the day.  So there's

15   a lot of things that that's why their estimate, the

16   estimate for Brownsville was so high.

17           And so this is a message from Gil Jordan to me

18   saying, I just got off the phone with one of the chiefs

19   in Brownsville and they're still telling him that they

20   need more money when they don't.  And so, his -- I mean,

21   Jordan is really all upset because he can't seem to get

22   through to this port that they need to be efficient how

23   they use their resources.

24       Q.    So it seems that maybe the budget person in

25   Brownsville -- I know that ultimately Flores is

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   responsible, but he needed, the budget person needed

2   training, too, because he would have had to figure these

3   things out as far as like the, you know, that you don't

4   need the same amount of men during midnight as you do

5   during the day.

6        A.   Well, the budget person doesn't schedule the

7   shifts.   The chiefs schedule the shifts.

8        Q.   So they should work together, then, I guess, is

9   what you're saying to arrive at what --

10       A.   Well, the port director sets the rules.   The

11  port director says this is how I want my port run.   And

12  so -- the chiefs are on overtime too.   So the chiefs are

13  going to try to make a shift as much money as possible

14  because they're dipping their hand in it.   It's the port

15  director who is responsible to say, we are going to do

16  this in an efficient way and we're going to do this and

17  we're going to go seven days a week.   It's a decision of

18  the port director.   The port director sets the policy.

19  And then the chiefs and the budget people, you know,

20  implement it.   But the policy has to be set at the top.

21       Q.   I see.

22       A.   Speaking of budget --

23       Q.   So I guess it's been like that, the way that

24  has shown up, it's been like that forever, not a

25  seven-day week, but a five-day and then overtime on

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  Saturday, Sunday.

2      A.   And I have made the ports that didn't do it.  I

3  think Brownsville is the only one.  So I mandated, you

4  will look at seven-day workweek.  So little by little,

5  some of the things have changed to a seven-day workweek.

6  But I think it was a matter of, oh, we got a new bridge

7  here.  This is the port you need to do.  Bring in our

8  five-day workweek again.

9          And so, that was part of the problem I had with

10  Mr. Flores.  I kept trying to tell him, look, I'll give

11  you the overtime.  I have it.  But you have to give me a

12  reasonable request.  Because I don't have overtime to

13  waste.  I want this overtime used where it's necessary

14  and where we can use it to increase our enforcement.

15  Not to waste it, having guys hanging around with nothing

16  to do.  I want the overtime to be used so we can get

17  those drugs.

18      Q.   And it wouldn't be your place to mandate the

19  seven-day week for Brownsville, then, since he wasn't

20  doing it?

21      A.   Well, I tell him I want a seven-day workweek,

22  unless you can explain to me why it's not better.  And

23  this is the argument that Gil and the chiefs are having,

24  where we're saying we want seven-day workweek and the

25  chief is saying, no, no, it cost more that way.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.    I see.  And this is current, this is July '99.

2    A.    No.  March '99.

3    Q.    Well, still.  I mean, it's this year.

4    A.    Yeah, yeah.  Now, if you go back to the second

5    page --

6    Q.    So some of the ports still have, including

7    Brownsville, still has five day.

8    A.    I think Brownsville is the only one left with a

9    five day.

10    Q.    Okay.  I'm sorry I interrupted you.

11    A.    If you go back to the second page, if you go

12    back to the second page, June 30th is a message from Joe

13    Garcia to Mr. Flores.

14    Q.    Uh-huh.  I asked Jerry Oliva to credit the port

15    with 92,000 in special operations money, the money if

16    this was done, the money is allocated.

17    A.    Joe Garcia handles the overtime money for

18    enforcement operations.  Whenever we do special

19    enforcement operations and we want to go and attack a

20    certain problem, he gives out the money.  He gave

21    them -- he gave Brownsville money, $2,000, in special

22    operations money on June 5th.

23    Q.    He gave them 92,000.

24    A.    92,000.  Shortly before -- he sends his message

25    on June 30th.  So sometime before June 30th, he received

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

 1   several phone calls asking for an additional $5,000 in

 2   overtime to conduct an operation.  And he's saying you

 3   mean in less than a month you spend $92,000.  Who's

 4   managing the resources there.  Who's, you know, running

 5   the show.

 6        Q.   Now, is it possible to -- is it allowable to

 7   take money from -- overtime money from the other bridges

 8   and put it toward overtime for the new bridge in the

 9   meantime?

10        A.   Within his port, he can move his overtime

11   anywhere he wants.  That's his pot of money.  He can use

12   it any way he wants.

13        Q.   Okay.  So if he had already used -- so that

14   might be an explanation.  I don't know that that's it.

15   I was just trying to understand how 92,000 could have

16   been spent so fast.

17        A.   I don't think it was spent.  It's just that

18   there's no controls.  There's no control in the port.

19   The port director doesn't know how much money he has

20   because he doesn't check the report, he doesn't make his

21   people maintain reports, there's no accountability.  And

22   so it's easier to ask me for more money than to see what

23   they have.  Just like they didn't spend for an entire

24   quarter of money, by the end of next year they ask for

25   more.  It's easier to ask than set out the proper

1   controls in the port.

2      Q.   So something -- the other ports do have reports

3   from the other, you know, from the chiefs or from the

4   budget officer, whatever, they give notice, that in

5   Brownsville they don't.

6      A.   It's part of the management of the port

7   managing your budget.  It's a critical part of, you

8   know, the new way in which we do business is you got to

9   manage your budget.  And Brownsville is the only port

10  where my budget officer had continually has problems

11  with overspending or spending in the wrong accounts.

12     Q.   And so, then, what was the response to Joe

13  Garcia asking Jorge about, am I to conclude that all the

14  92,000 has already been spent in less than a month?

15     A.   He never responded.

16     Q.   So what happened?  He was asking for more

17  money --

18     A.   We didn't give it to them.  Since we're here on

19  this package, we might as well -- I mean, this happens

20  later on, but it's another instance of the continual

21  pattern on the port director of lack of responsibility,

22  of accepting responsibility, of lack of accountability,

23  of lack of involvement in what happens in his port.  If

24  you go to the third page in this package --

25     Q.   Same package.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    A.    Same package.

2    Q.    July 22nd, third page.

3    A.    Third page is -- the top part is a message from

4  Mr. Flores to me dated April 29th.

5    Q.    All right.

6    A.    K-9 team leader vacancy.

7    Q.    Uh-huh.

8    A.    Okay.  What happened here was, he had a vacancy

9  for K-9 team leader.  And the port directors used to

10  select the team leaders.  But under the reorganization,

11  it has pulled up to the CMC director because some port

12  directors were not exercising this prudently.  They were

13  making the wrong decisions, picking the wrong people.

14  So headquarters mandated from now on the 11's are picked

15  at the CMC level.

16    Q.    That's with (inaudible) new.

17    A.    Okay.  At the CMC level.  So there was a

18  vacancy for a team leader.  And I received a package

19  from the port with a recommendation.  And the package

20  had a letter from Mr. Flores saying I recommend Ruben

21  Raphael.  He's the best.  He's wonderful, you know.

22  He's capable.  All the good things about Mr. Raphael.

23          And then there were recommendations from

24  several of the supervisors that Mr. Raphael works for,

25  not just for him, but the other handlers too -- this is

1   a K-9 enforcement, we call handlers, for the other K-9

2   officers too.  And so I reviewed the recommendations of

3   the supervisors and I found that he really didn't --

4   that the one that Mr. Flores was recommending was not

5   the one that the supervisors rated the highest.

6       In fact, several of the supervisors mentioned

7   that he had been verbally counseled.  So I call

8   Mr. Flores and I ask, you know, I'm a little concerned

9   here because the supervisors don't recommend him,

10  recommend others more, and in fact, it shows here that

11  he was verbally counseled.  And I said, what was he

12  counseled about.  So he said, well, I'll get back to

13  you.

14      And then he called me back and he said, he was

15  counseled for using sick leave, for abuse of sick leave.

16  And abuse of sick leave is usually that you take sick

17  leave either the day before or the day after you have

18  your day off so you end up with a long weekend.  And he

19  was doing this almost every week.  So he was counseled

20  about that and a letter had been put in his personnel

21  folder.  He was counseled in June '98.  A letter was put

22  in his personnel folder for six months and removed in

23  December '98.  He said it was removed.  He had

24  straightened out.  They had no more problems.

25      And I said, okay.  I still want to see a copy

1    of his leave record.  So the port sends me the leave

2    record and he says -- it shows that he still was doing

3    it.  Between June when the letter was put in his record,

4    and December when it was pulled, he continued the

5    pattern.  He still did it every pay period.  After the

6    letter was pulled, he continued the pattern.  He was

7    never counseled again.  And then he had a miraculous

8    recovery.  He stopped taking leave the day that an

9    announcement for that job came out.  And then he didn't

10   take it again.  So you can't even say, well, the poor

11   guy was sick.  There was something wrong.

12            So I send Mr. Flores a message saying, you

13   recommended him.  You told me he had straightened out.

14   I have several questions.  First, why did you say he had

15   straightened out when he hadn't.  Why nobody counseled

16   him when he continued doing it.  And why did you

17   recommend him for a supervisor position when he's such a

18   poor role model.

19            And his answer was, well, I'll look at it

20   again, but when I talked to you, I had not received,

21   reviewed, analyzed, nor verified any of the additional

22   information.  So why are you recommending him, why are

23   you telling me this, if you haven't even looked into it.

24   And that's a pattern.  It's never his fault.  It's never

25   him.  It's somebody else.  I wasn't there.  I didn't do

1   it.  I was too busy.  So it's just a pattern of lack of

2   responsibility.  Constant lack of responsibility.

3              MS. BLESSEY:  Okay.  12:30.  Do you want

4   to take a break?

5              MS. ROJAS:  Oh, I'm sorry.  Yes.  We are

6   taking a break.

7              (Break)

8       A.   Okay.  Since we are running out of time, let me

9   go forward to the end and work my way back.

10  First thing I want to go, is go way back to the end,

11  just the facts, March 15th, '99.  And it says, Bob, this

12  is the info you requested.  It's a handwritten --

13      Q.   And that's the front page.  Okay.  Yeah.  I got

14  it.

15      A.   Okay.  That, and then right before it is also

16  one that says March '99.  It's a two-pager without a

17  title.  That one.  That starts, "In '97, Mr. Flores."

18  Okay.  We'll talk about these two things.  When we had

19  the change in the administration, Mr. Winwood and

20  Mr. McNamara came.  Mr. McNamara was --

21             MS. BLESSEY:  Did you say the dates or

22  what the documents were?

23             MS. REBA:  Yes.  March '99 and March --

24      Q.   We're going to refer to them when we get there?

25      A.   Yeah.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.   Okay.  So one of them is --

2    A.   One is March '99, the two-pager.  And the

3  handwritten one is March 15, '99.

4    Q.   All right.

5    A.   Mr. McNamara asked me to give him a rundown of

6  what was happening in Brownsville.

7    Q.   I'm sorry.  So you were saying after the change

8  of the administration.

9    A.   Administration.  Yeah.

10   Q.   When Winwood came in, McNamara asked you for a

11  rundown.

12   A.   Right.

13   Q.   Okay.

14   A.   And so the first thing I did was, I had kind of

15  given him an overview of some of the things that were

16  happening.  He asked me certain questions that he wanted

17  more information.  And in response to his questions, and

18  unfortunately, I don't have his questions with me.  I

19  don't remember if he just told me over the phone or

20  what.  But the document, the two-page document was my

21  answer to his questions, to his original questions.  And

22  I attached to this two-page document a lot of background

23  information.

24        And one of the things that I told him was that

25  for three years I had tried to correct the situation in

1   Brownsville, but there had been delays due to big
2   picture concerns and other operational priorities.  And
3   that's what Mr. Trotter always told me, there's a bigger
4   issue involved and we can't act right now.  And so, and
5   I told him I am hopeful that there will be closure soon.
6          MS. BLESSEY:  And you're referring to a
7   certain section in the document?
8          MS. REBA:  Yeah.  I'm sorry.  Fifth
9   paragraph.  Fifth paragraph.
10     Q.   I have attached documentation on another
11  incidence.
12     A.   Yeah.
13     Q.   Okay.
14     A.   And then I went on to explain how Mr. Flores
15  continually keeps saying I discriminated against him --
16  that's the next paragraph -- because I treat him
17  differently than I treat other ports.  And I explained
18  to Mr. McNamara, it's not that I treat him differently,
19  it's just that I get a different reaction.  In other
20  ports when I make suggestions, the port directors take
21  them.  In the case of Mr. Flores, when I make
22  suggestions, he becomes defensive and he accuses me of
23  picking on him.
24          And so, I went on to do -- gave him an example
25  of the different reactions.  There were several

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   allegations of mismanagement, both in the port of

2   Hidalgo and the port of Brownsville.  I sent a

3   management review.  Gil Jordan and Joe Garcia went to

4   Hidalgo and did a management review in Hidalgo.

5       Q.   That's also one of your 10 ports, Hidalgo?

6       A.   Yeah.

7       Q.   Okay.

8       A.   They did a review.  The port director said,

9   okay.  And they came up with recommendations.  This is

10  what we found and these are the problems.  The port

11  director said, okay, I'll take care of it.  Within a

12  week, I had a plan he had drafted and that he

13  implemented to correct the deficiencies.  After they

14  went to Hidalgo, they went to Brownsville.  They did a

15  review --

16      Q.   In time frame, when did they do that review in

17  Hidalgo?

18      A.   It was late '98.

19      Q.   Okay.

20      A.   After Hidalgo, they went to Brownsville.  They

21  did a review.  They were told there also.  When I sent

22  it to Mr. Flores, his reaction was, I need the

23  background material so I can defend myself from biases

24  and retaliation.  And his assumption was that I was out

25  to get him.  His answer to the report was, and we'll go

1    into that later, was there really was nothing wrong.  It

2    was just minor, minor, minor little things that can be

3    corrected.  Never addressed the major issues that the

4    report found.

5        I have tried to explain to him that I want to

6    resolve our differences.  I really don't want to be

7    picking on him all the time.  I don't pick on him.  All

8    I want him to do is acknowledge that I am his

9    supervisor, for him to acknowledge that his port needs a

10   much stronger enforcement posture, and that's all.  All

11   ports are subject to the same reviews Brownsville is.  I

12   send my groups to do reviews in all the ports.

13       Q.   Oh.  So it's a periodic kind of review?

14       A.   Yeah.  We review the K-9 program, we review

15   budget, we review management control.  We review

16   everything every so often.  That's the main purpose of

17   the CMC.  What happens in Brownsville is, when they go

18   there and they identify a problem, when the next

19   periodic review goes, he has made no changes, he has

20   made no corrections.  So then of course I go back there

21   again faster than the other ports.  Because when you

22   return to the other ports, the port director has made

23   the changes necessary.

24       So, yes, he gets more reviews than other ports

25   because he doesn't take action when we identify

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    problems.  I am extremely concerned because he's the
2    only of my larger ports that has no seizures in cargo in
3    the entire time that I've been here.
4         Recently, since I wrote this, he did get a
5    seizure in cargo, but it was because the driver told him
6    that there were drugs in his truck.  Otherwise, they
7    wouldn't have found it.  So I'm very concerned that the
8    port of Brownsville and first manager is so lax.  In a
9    port that large, surrounded by drugs everywhere, a major
10   cartel right across the river from them in Matamoros,
11   that they can't find trucks -- drugs in the trucks.
12        Q.   Now, in the cargo -- you know, while ago we
13   were talking about the 2,000 pounds and the 3,000
14   pounds.  Is that the same kind of -- is that the cargo
15   trucks you were talking about?
16        A.   Yes.  That's what I mean.
17        Q.   Well, so, they've never found any?  Those two
18   were found by the informant and --
19        A.   All the time I have been here, nothing in the
20   three and a half years I've been here, nothing.  Except
21   now last -- a couple months ago some -- very short time
22   ago, and again this one because the driver that was
23   carrying the drugs said, look, the people who hired me
24   to do this, I think there's something wrong.  I think
25   there's drugs in my truck.  That's the only -- and

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1    that's the reason they found them.  Otherwise -- and

2    then they found another truck the next day because it

3    was identical to that, so they realized -- the port

4    realized that it was the same method.  That is the only

5    drugs in cargo that that port has found in all that

6    time.

7         Q.   Even with the K-9, even with the procedures you

8    said about punching certain places and how they do

9    sometimes --

10        A.   Because the port director keeps insisting there

11   are no drugs coming in my port, nothing is coming in,

12   I'm so tough, I scare them away, the inspectors believe

13   it.  So they go through the motions.  They don't really

14   do -- they open, yeah, but they don't even look.  They

15   don't let the K-9 -- the K-9 officers are not allowed to

16   do their job the way they're supposed to do it.  The

17   inspectors go through the motion.  When they drill, they

18   always drill in the same place.  The smugglers know

19   that.  And so they're not going to put their drugs where

20   they're drilling because they always drill in the same

21   place.

22        Q.   That doesn't make sense to me.  What do you

23   mean they drill in the same place.  I mean -- it would

24   be random.

25        A.   Yeah.  If I'm an inspector and every time that

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   I drill I just go like this, they're going to put either

2   below or above.

3            MS. BLESSEY:  You're on tape.  Can you

4   explain what you're saying.

5       A.   You're inside a container, a truck, a trailer.

6   The inspector goes inside the trailer to drill and see

7   if there is drugs inside the walls of the trailer.  If

8   he goes like this --

9            MS. BLESSEY:  Say it.

10      A.   -- at arm level --

11           MS. BLESSEY:  Chest level.  Arm level.

12      A.   -- chest level, they're going to put the drugs

13  either below or above.  If you always drill from the

14  ceiling, they will put it in the wall.  If you always

15  drill from the walls, they put it in the ceiling.  So

16  they know.  And if your inspector really believes

17  there's drugs here, I'm going to find them, then you're

18  not going to do this.  You're going to go here and maybe

19  here --

20      Q.   And random.

21      A.   -- and random.  And you'll keep, you know,

22  changing the way you do things and looking carefully and

23  running the dog and doing all these things.  But if you

24  don't believe there's drugs, you're just going to go

25  through the motions.  And that's what happens in

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Brownsville.

2        Q.    And so the evidence that you have that the

3    inspectors are not doing a random check is that there

4    have not been any drugs found --

5        A.    Right.  Exactly.

6        Q.    -- in the past three and a half years that

7    you've been here.

8        A.    And before that, who knows how long.

9        Q.    Except the one that was identified a while back

10   that we talked about and recently two of them.

11       A.    Right.  That's it.  The whole time.  All the

12   other ports have seizures.  Even the little ports gets

13   large seizures in cargo.  The other two major ports have

14   tons of seizures in cargo every year.

15       (END OF TAPE 2, SIDE B; BEGINNING OF TAPE 3, SIDE A)

16       Q.    You were saying that in other ports, you have

17   tons of seizures in trucks, from trucks --

18       A.    Right.

19       Q.    -- from cargo trucks.

20       A.    And yet the port director in this port keeps

21   insisting that there are no drugs coming in his port and

22   that he's running a very efficient operation.  And he's

23   my best port director and, yet, he can't find drugs.

24   And there's drugs everywhere around Brownsville.  I

25   can't believe there are no drugs coming in.  We know

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    they're coming in because when the driver told us there

2    were drugs in his truck, they were there.  Plus, a lot

3    of other trucks that the driver is not telling us that

4    have the drugs, and yet, Brownsville can't find them.

5         And his attitude has permeated the attitude and

6    actions of the entire port personnel.  And that's why

7    they have problems in enforcement, that's why the port

8    is floundering in administration, that's why the port is

9    floundering in budget.  And that's why I in this paper I

10   recommended to Mr. McNamara that he needs to reassign

11   where he can be more closely supervised.

12        At one time he must have been a good officer or

13   they would not have promoted him as a port director.

14   And maybe with close supervision he can be productive

15   again.  But he cannot be left in charge of operations.

16   The size of Brownsville and as critical as Brownsville

17   is for the border, we're four hours away from him.

18        Q.   Okay.  And so you sent this to McNamara in

19   March?

20        A.   I sent this to McNamara.  And then he called

21   back and he said, can you summarize all of -- because I

22   sent him a lot of backup material -- all this backup

23   material I sent him.  He said, can you summarize this in

24   two pages.  So this is the one that I sent him in two

25   pages.  And the last -- if you see the last two pages in

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    the back --

2       Q.    Okay.  And that's the one that --

3             MS. BLESSEY:  Can you identify it for the

4    tape?

5       Q.    That's to Bob.

6       A.    To Bob.

7       Q.    And it was faxed on March 19th, '99.

8       A.    And on the back is a two-page document that

9    starts on April 1st, '96.  And this one goes over some

10   of the things we already talked about, you know, the

11   trailer that was drilled and released, and the line

12   release, the busters.

13            MS. BLESSEY:  Are there certain paragraphs

14   you're referring to?

15      A.    Yeah.  The first few paragraphs.  And then

16   there's some paragraphs here that are also --

17      Q.    And they're dated -- all that is from '96.

18      A.    They're all dated.  They're all dated from '96.

19   There's certain things here that I would like to

20   highlight because they're important and I think there's

21   some documents in here that go with this.  For example,

22   paragraph one, two, three, four, five, six, seven,

23   eight, nine, ten -- paragraph number ten.

24      Q.    Ten on the --

25      A.    On the two-pager.

1      Q.   On the third page of the memos that start "To

2   Bob."

3           MS. BLESSEY:  Are these the documents that

4   starts April 1st, '96?

5           MS. REBA:  The trailer, yeah.

6           MS. ROJAS:  March 15th, '99.

7           MS. REBA:  The summary starts April 1st,

8   '96, a trailer was drilled.

9      Q.   Okay.

10     A.   It refers to a review of Brownsville by Denise

11  Crawford.  And if you look in your pile of documents on

12  the top, February 4th there's a report.

13     Q.   Okay.  What date?

14     A.   February 4th, '97.

15     Q.   Oh.  '97.  So that should be on the top.

16     A.   In the pile of documents.  That's the report I

17  referred to on this board.

18     Q.   Here we go.  Is this it?

19     A.   That's it.  That's the one.  What happened was,

20  the trade community kept going to headquarters asking to

21  make Brownsville a service port because the CMC was not

22  giving the proper resources.  The CMC was not giving the

23  proper support.  The CMC was not giving them what they

24  needed to do.  The trade community raised the issue with

25  Congressman Ortiz regarding Customs services and

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 202 of 318

1    activities.  So Denise Crawford was sent down to

2    Brownsville to do a review and this is her report.

3          And her findings were first, that there are no

4    major Customs service issues with the trade community in

5    Brownsville that appeared to warrant further exploration

6    of a service port designation.  That means that they

7    really are not, not being served by the CMC.  And that

8    they are getting all the service they need.  And that

9    there's really no reason for them to want to be a

10   service port.  The underlying theme was that they really

11   believed that they were not getting the proper resources

12   and they kept quoting numbers.

13        Q.   Okay.  Flores kept saying they're not getting

14   resources.

15        A.   The trade communities.  Well, the trade

16   community is saying that Brownsville was not getting

17   proper resources, that Laredo was getting more.  Now,

18   the only way that they could know what resources Laredo

19   and Brownsville was getting was through Mr. Flores.  And

20   then she said on her third paragraph here, at the bottom

21   of that first page -- second page --

22        Q.   Okay.  Section three?

23        A.   Yeah.  At the bottom here, last sentence here.

24        Q.   It also appears clear?

25        A.   It also appears clear based on the knowledge of

1    the trade community in what should be internal Customs

2    business and without any showing of good faith effort to

3    help minimize these issues with the trade, that the port

4    director of Brownsville appears to be letting the trade

5    community fight his issues in public on his behalf and

6    further strain the relationship with his CMC director.

7         Q.   Okay.   So this is '97.   Let me make sure that I

8    understand.   The trade community, the trade meeting,

9    talked to Ortiz and they raised concerns that they have.

10        A.   And Ortiz went to headquarters --

11        Q.   That Laredo was getting more resources than

12   Brownsville.   And Ortiz had it.   And Denise Crawford,

13   she's with Customs?

14        A.   Customs.   She's in headquarters.   She works for

15   the deputy commissioner.   Even back then in '97, if you

16   look back -- these are not numbered.   So if you count

17   from the 10, one, two, three, four, five, six, seven,

18   eight, nine, ten, eleven, twelve, thirteen, I think.

19   Now go one more.   No, keep going.   It's further -- no.

20        Q.   Further this way?

21        A.   Yeah.   Yeah.   Let me get it for you.   Here you

22   go.   This was her closing meeting with Mr. Flores.   And

23   if you look at the second paragraph -- well, you have a

24   paragraph and then you have two indented --

25        Q.   Uh-huh.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    A.   -- the second one indented.

2    Q.   All right.

3    A.   He says, Mr. Flores wants the anti-Brownsville

4    attitude to stop.  He believes that Maria Reba is

5    indifferent to him and Brownsville and that she's

6    arrogant too.  So even back then, he was already decided

7    that he didn't want any part of me.  And if you go down

8    to one, two, three, four more, he said, he doesn't think

9    there is anything that can be done to improve the

10   situation.  It's gone too far.

11           MS. BLESSEY:  What's the time period on

12   this?

13   A.   This is February '97.  Well, the report was

14   February '97.  Her meeting was -- she went down shortly

15   before that.  Sometime in December I think.  '96.

16   Q.   Okay.  So back to you were responding to

17   McNamara --

18   A.   So this is one of the things that I reported to

19   him.  But here's the report from Brownsville.

20   Q.   Okay.

21   A.   In June '97, my budget officer visits all the

22   ports.  He visits all the ports several times a year.

23   You go down -- another paragraph.

24   Q.   I think I closed it.

25   A.   Oh, no, no.  It's not in the -- it's in --

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1          Q.    It's in this one.

2          A.    Again, on the two pages that starts 4/1/96, a

3     trailer was drilled.  This is the summary to McNamara.

4     It's one, two, three -- three from the bottom.

5          Q.    Okay.

6          A.    On June '97, the budget officer visited all the

7     ports to reconcile accounts.  All the ports were

8     reconciled.  All the ports balanced, except Brownsville.

9     Brownsville was overspent.  There had been no attempt to

10    reconcile.  Again, the port director's defense was

11    Brownsville does not get enough money.  Laredo gets it

12    all.  He made threats of going public with unspecified

13    accusations.  I'm not going to go alone.  I'm going to

14    take you down with me.

15         Q.    So I -- a while back you said, you know, you

16    considered putting him on the PIP.  Trotter said hold

17    off.  That was like '96.

18         A.    I'm still holding off.

19         Q.    This is '97 now.

20         A.    I'm still holding off.

21         Q.    And are you still sending the memos, Trotter,

22    letting them know?

23         A.    I'm still sending memos.  I'm still letting

24    them know.  And they're still saying hold off.

25         Q.    That's all the response you got from Trotter?

1     A.    That's all.  Just hold off.  You will know when

2    you need to know.  On July 1st, '97 is a report that I

3    received from my financial officer on that visit to

4    Brownsville where he made threats that if he goes down,

5    they're going to go down with him.  Never explained what

6    he meant, but he did say that he was going to contact

7    Congressman Ortiz.

8     Q.    That he was going to contact --

9     A.    He was going to contact Congressman Ortiz by

10   July 1st, '97.

11    Q.    I don't want to skip this issue and it's kind

12   of not in what we're talking about, I guess, but it's a

13   recent issue.  And that is a meeting that was held --

14   okay.  Border cooperative initiative.

15    A.    A meeting.  BCI.  Border --

16    Q.    Three weeks.  Within the past three weeks or --

17    A.    Or so.  Within a month or six weeks.  I don't

18   know when.

19    Q.    So anyway, were you at attendance at that

20   meeting recently?

21    A.    I don't know.  We have of a lot of BCI

22   meetings.

23    Q.    Oh.  Okay.  But sometime when there was going

24   to be -- it was in Brownsville.  And there was going to

25   be the -- the new bridge was going to be shown and there

1    were dignitaries accepting awards and so forth?

2        A.    I don't know.  I don't remember.  There were

3    several meetings.  I know there was one where there was

4    some awards that I was not there.  There's another

5    one --

6        Q.    The one that you were at.

7        A.    I don't know.  That I was?

8        Q.    Just recently, yes.

9        A.    There were awards given out?

10       Q.    Yes.

11       A.    I wasn't at any of the awards.

12       Q.    In Brownsville.

13       A.    There was a meeting where there was an award

14   given by the deputy commissioner on that truck that they

15   got that the driver told them.  I came down to give that

16   award.

17       Q.    No.  I just wondered what your -- what had

18   happened, if you had noticed anything.  Supposedly

19   Flores received an award, but so did other agencies --

20   border (inaudible) issues, so there's several agencies

21   working together.

22       A.    I hadn't been at any meeting where he had an

23   award anytime in the last few weeks.

24       Q.    Okay.

25       A.    No.  I haven't been in any place like that.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.   Okay.

2      A.   So I don't know what he's talking about.

3      Q.   Okay.  All right.  Apparently, you know, I

4  didn't identify it enough to you.

5      A.   No.  I'm sorry, I don't --

6      Q.   So you do come to Brownsville frequently?

7      A.   A lot.

8      Q.   Oh, you do?

9      A.   A lot because as a result of Denise's request

10  for a report, one of the things she says is, the trade

11  community was under a wrong assumption that I didn't

12  care and that I didn't give Brownsville anything.  And

13  the best way to eliminate that was for me to come down.

14      So they have trade meetings every quarter.  And

15  if I'm in town, I will come down to all their trade

16  meetings and meet with the trade.  So I don't make it

17  every time because sometimes I'm traveling.  But if I'm

18  in town, I will come to the trade meetings to hear all

19  the requests, you know, all their needs, any complaints,

20  any problems they may have.

21      A lot of times they have wrong assumptions, so

22  then I clarify it.  They say, why didn't you send

23  inspectors.  Well, it's not that I didn't send

24  inspectors.  This is what really happened.  And a lot of

25  times I clarify things that they really have a complete

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    wrong impression.

2        Q.   Okay.  All right.

3        A.   Okay.  So here's that July 1st meeting -- I

4    mean, July 1st memo from the financial officer.  That

5    speaks to this.  But leave that one open because we're

6    still talking about that.

7        Q.   All right.  Well, I have that.

8        A.   Okay.

9        Q.   Somewhere.

10       A.   Then after that, September '97, the mayor of

11   Brownsville, the city manager and others visited

12   headquarters to complain about a trade notice closing

13   one of the bridges on weekends.  They went down to

14   complain.  They went to headquarters and they said that

15   Laredo, meaning me, had put out this trade notice

16   without any notice and that it was terrible, how could

17   you do it without talking to us.  I knew nothing about

18   the trade notice.

19            So when I inquired into it, Mr. Flores told me

20   that, yes, he had put the notice out and that he had

21   discussed it with the brokers and the brokers didn't

22   have any problem.  It was just a minor issue that had

23   since been corrected.  And so, I responded to him, it's

24   not a major (sic) issue when the mayor and the director

25   and the head of the Brownsville chamber goes all the way

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    to headquarters to say that they had been treated badly.

2    And I said, what gave them the idea that Laredo did

3    this.

4        And he says he doesn't know how they got that

5    idea, that he had explained to them that it was

6    (inaudible).  So then I sent that back, the message back

7    to headquarters.  And the person they talked to says,

8    well, believe me, they were convinced that this came out

9    of Laredo.  So I called the Chamber of Commerce

10   director, the Chamber of Commerce, to explain to him

11   what had happened.  And he kind of brushed me off.  He

12   didn't believe a word I said.  He was convinced that I

13   done this on purpose to somehow hurt him.  And then on

14   September '97 is all the back and forth --

15        MS. BLESSEY:  What are you referring to?

16   A.    September '97, this is a CC mail message to

17   me -- well, it's from me to me.  I do that when I want

18   to put things in files, you know, when I put things in

19   folders of my CC mail.  I forward myself a message I

20   sent, so that's why I don't know why I -- I think I sent

21   the message to Joe Gorman, who is the person at

22   headquarters, telling him this problem, where I said,

23   once again, I'm on the defensive for something I had no

24   idea what's going on.  Very soon he will be out of

25   control unless I can do something.  It's another plea

1    for help.  I have to do something.

2        Q.   And what date is that?

3        A.   September '97.  And here's all the background.

4    When I sent a message to Mr. Flores saying, what do you

5    mean, you know, I didn't make this decision.  And when

6    headquarters says, well, they were sure you did it, and

7    all that happened.  So here's September 10, '97 --

8        Q.   So what about the mayor.  Did you call him?

9        A.   No.  I just gave -- the most vocal -- well,

10   headquarters, the guy at headquarters told me the most

11   vocal was the guy from the Chamber.

12       Q.   Okay.

13       A.   And he suggested I call him.

14       Q.   Okay.

15            MS. BLESSEY:  Is this requested in your

16   documents to McNamara?

17            MS. REBA:  Yeah.  It's one of the targets

18   in McNamara's message.  I'm going down looking at

19   McNamara's now.

20            MS. BLESSEY:  Okay.

21       A.   So this is McNamara's.  Then the next part of

22   McNamara's was when I gave his fiscal year '97

23   appraisal.  His response to my appraisal was, that I

24   chose to belittle and ignore his efforts, that I only

25   focused on negative remarks.  My style is to concentrate

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    on the negative, but I failed to credit positive

2    achievement.  I made malicious, inaccurate and false

3    comments.  I erroneously mislead.  I manipulated the

4    port's budget to solve my problems.  I chose to bypass

5    and violate rules.  I interfere with port operations,

6    and on and on and on.

7         Q.   Is this his response --

8         A.   This is his response.

9         Q.   -- on the appraisal form from (inaudible)?

10        A.   Yes.

11        Q.   You just told me I have those with us?

12        A.   You have them, yeah.

13             MS. BLESSEY:  It should be the last thing

14   in your documents.  I know it's the last thing in

15   these -- let me try to organize them and see.

16        Q.   What do they look like?

17        A.   Okay.  I'll show you.  I'll show you if I find

18   it.  Oh, the package just right now, here's the

19   appraisal.  The package looks like this.

20             MS. BLESSEY:  What's that date there on

21   the right say?

22             MS. REBA:  February 4th, '97.

23        A.   It should be on the bottom.  It's not?

24        Q.   Well, that's (inaudible).

25        A.   Because I didn't put it in alphabetical.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.   February 13th.

2      A.   I didn't put it in chronological order.  It was

3  at the end.

4      Q.   Okay.  Well, February '99.  Maybe it's in one

5  of the other piles?

6           MS. REBA:  It was separate, wasn't it?

7           MS. BLESSEY:  Yeah, it was.  I had it

8  separate.  But we put it on the bottom.

9           MS. REBA:  Okay.  It will show up.

10          MS. ROJAS:  We'll look from yours, I

11 guess.  Mine will show up.

12          MS. REBA:  Okay.

13          MS. ROJAS:  If it doesn't, I can ask you

14 for it.

15          MS. REBA:  You can look at mine.  Here's

16 his response.

17     Q.   Please see attached documents that list my

18 responses when my '97 appraisal was communicated.

19     A.   That whole page is.  That whole page.

20     Q.   And that's January 29th, '98.

21     A.   No, no.  That whole page is his answer.

22     Q.   Yeah.  Uh-huh.  Yeah.  You chose to belittle --

23 these are the ones underlined -- chose to belittle or

24 ignore.  Style is concentrate on negative.  Three pages.

25          Is this it?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1          MS. BLESSEY:  No.  It would be in that big

2     pile.  I'll get her to make another copy of it or

3     something.

4          MS. ROJAS:  Okay.  All right.

5          MS. REBA:  We'll get you another copy.

6       Q.   Anyway, I should have all the appraisals for

7     '96, so.

8       A.   You should have all of these, yeah.

9       Q.   If I don't, I'll --

10      A.   Okay.

11      Q.   A while ago you were saying that periodically

12    you reviewed all the ports and that --

13         MS. BLESSEY:  I think she might have still

14    been testifying about the documentation she sent to

15    McNamara.

16         MS. ROJAS:  Right.  Okay.

17         MS. REBA:  Yeah.  I haven't finished.

18    This is McNamara.

19      Q.   Right.  So anyway, and then you -- but wasn't

20    that part of it, you were telling -- it was at this time

21    we were talking about the reviews of the ports -- the

22    ports' budget.  So anyway, what I wanted to ask you, and

23    you said that his -- you were explaining to me.  I guess

24    I need a clarification about you said you had his port

25    reviewed more often, but that was because when you first

1   did the review, then you made recommendations.  When the

2   second review went over, which was routine, they saw

3   there had been no changes.

4           Consequently, you sent more reviews more often

5   than to the others, but there was -- I mean, from what

6   you're saying, it didn't get corrected.  So isn't there

7   another step?  Why would you send just more and more and

8   more and more reviews?  Wouldn't there be a need to --

9       A.   Well, yeah.  If I could take action, but I

10  can't take action because I've been told, don't take any

11  action.  Just document.  So I keep documenting.

12      Q.   So, I mean, you couldn't like send a team to

13  take care of that, to give training on budgets or to get

14  training on the K-9 --

15      A.   Training -- they have been trained in budget

16  many times.  All the ports get at least twice a year

17  training.  My budget office visits Brownsville probably

18  more often than any other port to train them.  So try to

19  work with Mr. Flores, try to work with his budget

20  officer, try to get them to understand how budget works.

21  He probably spends more time in Brownsville than

22  anywhere else.  So it's not a lack of training.

23      Q.   You're thinking that he knows how to do it,

24  they know how to do it, they're just wanting not to do

25  it to make you look bad for some reason?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1     A.    Or because they just -- because he just wants

2    to do things his way.  He can't be bothered to balance

3    his budget.  It's about that.  He's just going to spend

4    because he needs it.  Don't bother me with minor details

5    of balancing a budget.  I don't need to do that.  I sent

6    out a K-9 officer for six months to try to help with the

7    K-9 program.

8     Q.    Is that Wilder?

9     A.    Uh-huh.

10     Q.    When was that, more or less?

11     A.    Well, I'm getting there.

12     Q.    Oh, you are?  We are going to cover that?

13     A.    Yes.  I'm getting there.

14     Q.    Don't want to miss it.

15     A.    Okay.

16     Q.    All right.  Okay.

17     A.    Okay.  There's a couple things here I'm going

18    to jump just because we're running out of time, right?

19     Q.    Right.

20     A.    We had a K-9 officer called Brian Colentine.

21    He was a supervisor and K-9 officer in Brownsville who

22    was in Brownsville.

23              MS. BLESSEY:  Is this the same --

24              MS. ROJAS:  Yes.

25              MS. REBA:  Still McNamara.  Still

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    McNamara's list.

2        Q.    Brian Colentine.

3        A.    Yeah.  And he was fed up because the K-9

4    officers were treated like second-class citizens.  They

5    were not --

6        Q.    He left Brownsville because he was fed up.

7        A.    Yeah.  This was October '97.  There's a CC mail

8    from me to Mike Lovejoy on October '97 that talks about

9    Brian.  You can look at it if you want.

10       Q.    It's also in this package?

11       A.    Yeah.  Well, it's in your other package, but

12   it's --

13       Q.    Oh, okay.  Give me the date.

14       A.    October 16th, '97.  The CC mail from me to

15   Lovejoy.

16       Q.    Okay.

17       A.    And he left because he was fed up because he

18   couldn't do his job, he wasn't allowed to do his job.

19   The K-9 handlers were exiled to one corner of the dock

20   and they weren't allowed on the rest of the dock.  They

21   weren't allowed to examine.  Inspectors would not go

22   with them to do pre-primary rolling.  They just couldn't

23   do their job.  So he left.

24           At the same time, headquarters was concerned

25   because there were lack of cargo seizures in

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   Brownsville, there was a less productive K-9 performance

2   in Brownsville than other ports in the country, and that

3   there's a three-year fall in the cost effectiveness

4   ratio of the K-9 program in Brownsville.  So

5   headquarters, because of those numbers, the fall in the

6   numbers and because Brian left, headquarters scheduled a

7   K-9 review in December '97.  And then they came in and

8   did their review.  And that is a package, big fat

9   package that you have with a rubberband.

10       Q.   Okay.  And the reason that headquarters

11  scheduled a K-9 review in December '97 was lack of cargo

12  seizures --

13       A.   Seizures.

14       Q.   -- because Brian left and --

15       A.   Less productive -- remarkably less productive

16  K-9 performance than in other ports and a three-year

17  fall in the cost effectiveness ratio of the K-9 program.

18       Q.   In the cost effectiveness --

19       A.   Ratio of the K-9 program.  You know, for so

20  many hours of using the dog, what did you get about it.

21       Q.   Okay.

22       A.   And that, all the documentation on that, it's

23  on this package surrounded by rubberband --

24       Q.   Oh, yeah.  I did see something that said K-9 on

25  it.  All right.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      A.   And that starts with a CC mail message from
2   Al Tenent to myself, dated February 4th, '98.

3      Q.   Al Tenent.  Yeah.  February 4th, '98.

4      A.   And that's the whole background.  It's the
5   review what the people who went to the -- did the review
6   did and the results, the response from Mr. Flores and
7   what happened.  And what happened was, they went in
8   there.  And this was, this was December '97.  So it's a
9   year, almost two years after the review that Mr. Lovejoy
10  did when that first job went through.

11          And they found exactly the same things
12  Mr. Lovejoy found -- lack of enforcement, laid back
13  attitude, no unpredictability.  The same things Lovejoy
14  found, they found again.  Lack of the K-9s and the
15  inspectors getting along, not being able to work
16  together.  They found exactly the same problems, the
17  same weaknesses a year and a half later.

18          So the review made recommendations.  And the
19  board director's response was, these were
20  unsubstantiated generalizations.  They were inaccurate
21  and they were short-changing the port.

22          MS. BLESSEY:  Are you reading from a
23  document?

24          MS. REBA:  I'm reading from my notes to --
25  from my notes to McNamara (inaudible).  It's in here in

1  this package, the document that he wrote back.

2  Somewhere in here.

3      Q.    Oh.  You had that in here.

4      A.    Yeah.  It was in there.  And his response is in

5  this document too.  So I thought, well, you know, they

6  have all these problems.  In a year and a half, they

7  haven't managed to fix it.  He hasn't managed to

8  communicate to his port the importance of enforcement.

9  He hasn't managed to communicate to his port the

10  problems they had.  Now we have a vacancy for a

11  supervisor K-9 officer.  I don't want to put in a

12  brand-new K-9 officer there and make him be responsible

13  for implementing all these recommendations.

14      Q.    That's what Brian was when he left?

15      A.    That's what Brian was.  So what I thought is,

16  instead of promoting somebody new to implement all these

17  recommendations, I'll bring in an experienced officer

18  who has already been an instructor of the academy, who

19  knows how to train K-9 officers, who has worked at a

20  large port to implement these recommendations, try to

21  fix these problems, and then I can promote somebody

22  after he fixes it and take over and then use some kind

23  of a maintenance.  And that's when I detailed Jim Wilder

24  there for six months.

25      Q.    Now, did he have more duties, other than to

1    implement these recommendations made by the review.

2        A.    He was supposed to implement the recommendation

3    made by the review, which covered not just a K-9

4    program, but the entire enforcement of the port because

5    the review identified that there were very lax

6    procedures in the enforcement.  So he's a manager.  He's

7    supposed to look at the entire picture and see, you

8    know.  Because you can't just say, here are the dogs and

9    here are the inspectors.  And that's what Brownsville

10   has always tried to do.

11           You can't -- they're supposed to work together,

12   they're supposed to work as a team.  If one doesn't do

13   his job, the other one is hurt.  So both have to walk in

14   unison and both have to work together towards a common

15   goal.  You can't keep them separate.  You can't just

16   say, he's just a K-9 officer, he can't be talking to the

17   inspectors, no.  They have to work together.  Otherwise,

18   it don't work.  And that's the problem in Brownsville.

19       Q.    But inspectors are going to poke the hole and

20   the K-9 officers --

21       A.    With the dog.

22       Q.    -- would smell --

23       A.    Right.  Come with the dogs.

24       Q.    All right.

25       A.    But if the inspector doesn't believe the K-9

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    officer, if the inspector doesn't have the right

2    records -- you know, the K-9 officer can be the best K-9

3    officer in the world and it's not going to work.

4        Q.  If he won't accept the recommendation of the

5    K-9.

6        A.  Right.  Or if they don't give him the right

7    truck to look at, then there's nothing that will work.

8    So I sent Wilder there for six months --

9        Q.  Oh, I'm sorry.  So besides implementing the K-9

10   program, he was supposed to also address the issue of

11   lax of enforcement?

12       A.  Well, the report -- the report did not talk

13   just about K-9.  The report, and it's here on this

14   package with the record with the rubberband, talks

15   about -- let me find it -- there's no good capability

16   for examination of tankers.  So that has nothing to do

17   with the --

18             MS. BLESSEY:  What are you referring to?

19       A.  The report.  The report that's in your package

20   that is -- what I have here is a draft directed to Adams

21   and Trotter, so he doesn't have a date.  But it starts,

22   in the week of December 1st, '97, a combined group of

23   (inaudible) and field employees.

24       Q.  I guess my question, I understand that there

25   were a lot of problems, but why would a K-9 officer be

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  tasked, why would you have given him the job

2  responsibility, it sounds like to bring on more

3  enforced --

4      A.   He went in to implement the results of the

5  report.  And the report covered cargo.  The report

6  covered --

7      Q.   But how could it --

8      A.   He's a manager.  A manager is a manager.

9      Q.   Okay.

10     A.   A manager is a manager.  An inspector can --

11     Q.   I'm not saying I wouldn't answer what your

12  reason was for doing it.

13     A.   An inspector can manage a K-9 handler.  A K-9

14  supervisor can manage an inspector.  A manager is a

15  manager.  They're all very close together.  Inspectors

16  can do K-9 work.  K-9s can do inspector work.  There

17  really isn't a whole of difference, other than one has

18  dog in his hand.

19     Q.   Right.  But I guess what maybe I'm

20  misunderstanding, sounds almost like he was like

21  supposed to be the port director, take the port

22  director's place and get things organized, get things in

23  order.  I don't mean just about -- maybe I'm confused.

24  Not just about the K-9 program and the inspectors, but

25  also about the budget and about everything that was

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    done.

2          A.    Oh, no.   No.   He was also supposed to --

3                (END OF TAPE 3, SIDE A; BEGINNING OF SIDE B)

4          Q.    Okay.   He was supposed to --

5          A.    He was supposed to look at the report --

6          Q.    Just the report.

7          A.    -- at the report.

8          Q.    And so, I'm confused on what the report -- it

9    didn't go into budget and all that.   It just talked

10   about the cargo seizures not being high enough and --

11         A.    How things are not examined properly.

12         Q.    Okay.

13         A.    K-9 officers are demoralized because they don't

14   feel like they're (inaudible).

15         Q.    Okay.

16         A.    Enforcement (inaudible) is not being used.   A

17   lot of things -- he was not supposed to be the port

18   director.   He was supposed to go in and look at in truth

19   what the chiefs were supposed to have been doing and

20   were not doing.

21         Q.    Okay.

22         A.    To try to implement the problems that were

23   found in this report, that had been found in the report

24   of April '96 by Lovejoy, that had been found in three

25   previous reports that had happened before I came on

1   board.  And when you talk to Joe Garcia, he can talk

2   about those.  There were three previous reviews,

3   nationwide, national reviews, that went to Brownsville

4   and found exactly the same problems.  And they still

5   hadn't been fixed.

6        Q.   Okay.

7        A.   So he went on his detail -- Mr. Wilder went on

8   his detail and started the detail, started looking

9   around, started talking to the K-9 officers.  First

10  thing that he did was look at the shifts that the K-9

11  officers were being involved in.  And the shifts were

12  all wrong.  They were not utilized properly.  So there

13  were times when you had too many and other times you

14  didn't have any K-9 officers.  And when you don't have a

15  K-9 officer on a shift, that's very dangerous because

16  the smugglers take (inaudible) of that to go in because

17  the dog is such a good tool.

18       So the first thing he did was work on the

19  schedules, work on the shift schedules so they would

20  work more efficient, more effective.  And so the money

21  that he had to -- overtime money for his K-9 officers

22  would go farther and he could use much -- cover much

23  more shifts.  And then he started looking at when the

24  K-9 officers were being used, how were they being used,

25  what's the best thing to do.

1     And then he started -- as he looked around
2  because he just wanted to see how the K-9 operations
3  were being utilized or the K-9 operations were doing
4  what they're supposed to do, he just kind of stood
5  around and watch around and watch out what was
6  happening. And then he started noticing some very
7  disturbing things.
8     Q.   And he reported to you.
9     A.   Correct. He started noticing some very
10 disturbing things. One of the things that he noticed
11 was that the port was reporting as examining trucks and
12 cars that they really were not examining. Or they were
13 reporting that they were doing what we call intensive,
14 which is when you do a really in-depth exam, for cars
15 and trucks that were just getting a look-see. No
16 intensive exam. The port was reporting as unloading and
17 examining trucks that were not being unloaded. The port
18 was reporting that there had been an intensive K-9 exam
19 on trucks, but the K-9 hasn't even been anywhere near
20 it.
21     And that's when he started getting concerned
22 because if his K-9 handlers were shown that they did an
23 intensive exam on a truck and then that truck was found
24 to have drugs, then his K-9 handler is going to hurt.
25 That's when he started getting concerned about all this

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   misreporting because he was going to hurt his K-9

2   officer.  He tried to bring it up to management, to the

3   chief in charge.  Said you're the chief, you're in

4   charge of this whole operation, you need to do something

5   about it.  And he kept getting that you're just a K-9

6   handler.  Go away.  You don't need to get involved in

7   this.

8          Well, yeah.  He has to get involved in it

9   because his K-9 handlers are involved.  Plus the whole

10  operation.  He's a manager.  He seen errors in the whole

11  operation and he's bringing it up to the guy who's in

12  charge and he's telling him, you know, this is not your

13  business.  Go away.

14         Then it started getting worse.  He started

15  noticing that trucks were being not checked in, again,

16  the problem of not putting in text.  There were a couple

17  shipments of shrimp trucks where the importer was

18  subject to an alert for smuggling.  So if those trucks

19  had been input in the system, they would have been sent

20  to be examined for intensive examination.  And yet, they

21  were released.  They were quoted as being examined, but

22  they were released and nobody even looked at them.

23         So Joe Garcia went down.  The port director was

24  very upset.  He didn't want him there.  He wanted to

25  kick him out.  He was a spy.  Get rid of him.  Joe

CONTINENTAL COURT REPORTERS, INC.  (713)522-5080

1   Garcia went down there, was down there on some review of

2   something.  I don't remember what for.  But he talked to

3   Mr. Flores about it and asked him why are you acting so

4   negatively to him.  He's just trying to help.  If there

5   are any problems in your operation, don't you want to

6   know.  If there are any weaknesses, don't you want to

7   know so you can fix them.

8          No.  No.  Insisted that he was a spy, that he

9   was suspicious, that I was aggressive, that I was trying

10  to intimidate him, I was tripping up his power, that I

11  interfered with the port, undermine the work of his

12  port, same thing that he always says.  Just get rid of

13  him.  Take him away.  He's just a dog handler.  And that

14  is the same attitude.  You know, he's just a dog

15  handler.  Well, no, he's just not a dog handler.  He's a

16  manager.  K-9 officers are managers, just like the

17  inspector manager supervises the manager.

18         So that was -- that was, again, just part of

19  this note to Mr. McNamara.  So shortly after that, then

20  he left.  He went back.  He left.  And so I went to fill

21  the job.

22      Q.   So --

23      A.   Yeah.  Wilder.  I --

24      Q.   For six months?

25      A.   Yeah.  Six months.  Went back --

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.   And so you went and filled that job.

2      A.   I went to fill that job.  I went over to fill

3   that job.  The candidate, the candidate that the port

4   director recommended, his wife was also a K-9 officer.

5   So I told the port director I think he's a very good

6   officer.  He probably would be a good supervisor.  But

7   what do we do about his wife.  And the response was, oh,

8   that's no problem.  She can work here too.  So I tried

9   to explain to him, we can't do that.  You cannot have

10   relatives working for relatives.  And his answer was --

11      Q.   It's just amazing.

12      A.   Yeah.  So he said, oh, that's no problem.  I'll

13   just have someone else sign her appraisal.  Well, that's

14   not enough, you know.  It's not have someone sign her

15   appraisal, she can work for him.  And even if she

16   doesn't -- you figure out some way of her not working

17   for him -- if I'm supervising your wife and you are my

18   fellow officer, I'm going to be careful what I do

19   because I don't want to make my friend mad.  So it's

20   just a very delicate -- I didn't think it was a good

21   idea.

22         So she, I guess, got the idea that I didn't

23   think it was a good idea that she worked for her husband

24   and she asked for a transfer to another port.  She

25   didn't have to transfer.  It just wasn't (inaudible).

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    So she just reported to a different port.  And she was

2    happy her husband is getting a promotion and she was

3    just going to go over to another port.  That was fine.

4         About a couple days before she was transferred

5    to the other port, she called my human resources officer

6    all upset because top management in Brownsville had told

7    her they didn't understand why she was leaving.  There

8    was no problem with her working for her husband.

9         Q.   When was this?

10        A.   October '98.

11             MS. BLESSEY:  Is this in the documents of

12   McNamara?

13             MS. REBA:  This is in McNamara's, yes.

14        A.   So it's just again, it's just like a total

15   disregard for rules and regulations.

16        Q.   Okay.  SCEO, what is that?

17        A.   Supervisor Canine Enforcement Officer.  You

18   know, I go down there and I see inspectors sitting on

19   secondary.  You know, secondary is -- when you first

20   cross the bridge, the booth for the first -- you see the

21   first inspector, that's primary.

22             If that car has to be examined more

23   intensively, we send it to what we call secondary, which

24   is a canopy behind there where the inspectors are

25   supposed to be there doing their work and examining

1    these cars and watching for anything that looks

2    untoward.  And if a car was released from primary but it

3    looks wrong, pulled it in and -- they're supposed to be

4    doing enforcement out there, to be constantly on the

5    lookout, checking for what to do and sub things.

6          You go to Brownsville and you go to Los Indios

7    and the inspectors are sitting on the chairs in

8    secondary just shooting the breeze.  So I had mentioned

9    that to the port director many times.  And his answer

10   is, well, you know, the shack, the shack behind is too

11   small.  They don't all fit in there.  And so I said,

12   well, they're not supposed to be in the shack.  They're

13   supposed to be out there doing enforcement.

14         And so his answer is, well, if they examine too

15   many cars, their cost -- what did he say -- their

16   efficiency ratio would go down.  Instead of going out

17   there and looking for more cars to examine and trying to

18   be more enforcement minded, he's, no, I only want to

19   examine a few cars, so.  Since I'm not going to find

20   anything, it won't look too bad.  And that's the

21   mind-set.

22      Q.    So in other words, like if he looked at 100

23   cars and didn't find anything, that looks bad.  But if

24   you look at 10 cars and --

25      A.    And didn't find anything, it didn't look as

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    bad.

2         Q.    -- didn't find anything, it doesn't too bad.

3         A.    Instead of I'll examine them better, no, I'll

4    just examine less and meanwhile sit in chairs.  That's

5    the attitude of that port.  The port is the second

6    largest in the CMC.  It has 20 percent of all the

7    inspectors.  And yet, they rank fifth out of 10 ports in

8    seizures.

9         Q.    You have that here.

10        A.    I have that there.  So, you know, and there's a

11   whole bunch of other things here, but we're running out

12   of time.  I just figure I'll skip them.  But because of

13   all these problems, Mr. Trotter suggested, and since he

14   kept telling me you can't take action for whatever

15   reason, he suggested maybe if you bring a mediator, you

16   and him can sit down and work out your problems.  And I

17   said, okay, look, I'll do whatever it takes.  I just

18   want to straighten out this port and make this port work

19   right.  I'll do it.  Tell me when and I'll do it.

20             And then he went and asked Mr. Flores and he

21   said, no.  I am doing things my way.  I am taking care

22   of it.  I don't need any mediator.  And he refused.

23   That's the last one here.

24        Q.    And when would that have been, that suggestion?

25        A.    It was right before the change.  Because

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    shortly after that was when Winwood came.  So late last

2    year.  I don't really remember.

3         Q.   March he came.

4         A.   I'm sorry?

5         Q.   March is when Winwood came.

6         A.   I don't remember.

7         Q.   Okay.

8         A.   So I sent him that.  And then the other

9    thing --

                    MS. BLESSEY:  When you say "that" --

11        A.   I'm sorry.  I sent Mr. McNamara this thing that

12   says, Bob, this is (inaudible) you requested, where

13   there's two pages of bullets for him, plus a copy of the

14   report of (inaudible).  Remember I said that Gil Jordan

15   and Joe Garcia went and did a report of Hidalgo and did

16   a report of Brownsville.  The report, the review of

17   Brownsville they did was because of the things that

18   Wilder had found.  I was very, very concerned about all

19   these trucks getting through without being input or

20   being examined.

21             So I asked Joe and Gil to go there and take a

22   look, a clear look at what's happening.  And at the same

23   time, see what had happened from the time that

24   headquarters did the K-9 review and see if anything had

25   changed and if it had been improved.  So they went down.

1   And this February '99 is the report from Jordan and

2   Garcia on the review they did in Brownsville.

3       Q.   That's Gil Jordan?

4       A.   Gil Jordan and Joe Garcia.  It's February 9,

5   '99.  And what they did was they went in there and they

6   looked at everything that Wilder had --

7               MS. BLESSEY:  Did you find that?  Are

8   these the same documents?

9               MS. REBA:  Oh, no.  I'm looking at my

10  notes.

11              MS. BLESSEY:  Okay.

12              MS. REBA:  I wanted to make sure because

13  we're winding down, that I didn't need to cover

14  something.

15              MS. BLESSEY:  Okay.  That's all right.  I

16  was halfway listening.

17      A.   Okay.  So they went there and they went through

18  all the things that Wilder had alleged that he had

19  found.  So they went in and they took a look at

20  everything, of all the things that Wilder had alleged.

21  And they went one by one all the things, the findings

22  that Wilder had made.

23              MS. BLESSEY:  February '99, so it should

24  be towards the end.

25              MS. ROJAS:  It has that big copy on there,

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  didn't it?

2           MS. REBA:  Yeah.  Yeah.

3           MS. ROJAS:  Give me those appraisals.

4  Let's see if somebody can make copies.

5           MS. REBA:  Oh, yeah.

6           (Brief pause.)

7      Q.   Okay.  So we have -- we're looking at the

8  document that says "memo" and it's February 1999 to Port

9  Director --

10     A.   Brownsville, from me.

11     Q.   Port director, Brownsville, from --

12     A.   Port director (inaudible) Texas.  And this is a

13  copy of the report.  And I had sent him and telling him

14  he has 30 days to respond and what action he was taking

15  to respond, to take care of the deficiencies found in

16  the report.  And the report found the same things that

17  Lovejoy had found in April '96, that the K-9 program had

18  found in December '98, '97, that had been found in the

19  previous three reports that happened before I even came

20  on board.

21          They still are not coding things right.

22  They're reporting things that are not -- they're

23  inconsistent in how they code inputs, what things come

24  in the country and what are examined.  But these

25  inconsistencies are always in their favor.  They always

1    reported they examined more than they actually reported.

2    The port director never carried any kind of review of

3    the port to see if anything had changed or any

4    improvement had been made.

5            Even though Wilder had brought it up to the

6    chief and to the port director several times, from the

7    time Wilder left, to the time the review was made, no

8    change had been made.  They still were misreporting

9    those things.  The recordation of the enforcement

10   activities still inaccurate.  The examination of cargo

11   lacked control.  There was no accountability.

12           Sometimes exam was done on primary, sometimes

13   it was done at the docks, sometimes it was done in

14   between.  And when someone signs, says I examined this,

15   they went and asked, did you examine this.  Oh, no.  I

16   said, well, how come you signed it.  Well, so and so did

17   it and he told me to sign it for him because he was

18   busy.  And then you go to so and so.  Oh, no.  So and so

19   did it.

20           And so, there's no way of telling who actually

21   examined the truck even if it was examined.  So if I

22   have a crooked inspector, I could release a truck and no

23   one will ever know because there is no accountability,

24   there is no audit trail, there is no way of telling who

25   did what when.

1    Q.   And tell me again, why was this review

2   conducted?  This one.  I know there had many -- Wilder

3   and so forth.

4    A.   Because Wilder had reported that there was this

5   lack of control in how things were reported.  And he had

6   reported that things that were subject to tax alerts

7   were not being examined.  And that was very scary

8   because there could be drug shipments coming through

9   right and left.  So I wanted to make sure how bad it

10  was.  So based on the things that Wilder found, that's

11  why we did a management review.  It was -- when you get

12  an allegation of mismanagement, you have to act upon it.

13  And when Wilder came back with allegations of

14  mismanagement, I have to act.  And so I did administer

15  to inquiry.

16   Q.   And who was on the team of the review?

17   A.   Gil Jordan, my deputy.

18   Q.   And Joe Garcia.

19   A.   And Joe Garcia, the director of anti-smuggling.

20   Q.   And they also did it in Hidalgo.

21   A.   Correct.  It was a different issue in Hidalgo.

22  But they did both.  They just went down and did both.

23   Q.   All right.  So when it says persons interviewed

24  somewhere in Hidalgo, of course one is Wilder.

25   A.   No, no, no.  This is all Brownsville.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.    This report is Hidalgo.

2    A.    This is a separate report for Hidalgo.

3    Q.    Okay.

4    A.    This is all Brownsville.  So I sent it to

5    Mr. Flores and I said, this is the report.  You know,

6    tell me what you're going to do about it.  And that's

7    when he wrote back saying, well, you need to give me

8    more time to address the allegations of findings.  I

9    want all the exhibits because without it I will be

10   deprived of the very critical data.  I will be deprived

11   of due process that could be affected by misinformation,

12   bias, (inaudible) fairness, or possible retaliation.

13        So he's already, you know, when we did the

14   report for Hidalgo, I said, here's the report.  Take

15   care of it.  He said, okay, I'll take care of it.  We

16   give the report to Flores to take care of it.  Well, you

17   got to give me more time because I got to make sure that

18   you're not going to do terrible things to me.  So we

19   gave him an additional 30 days.  We sent him all the

20   background.

21        And he came back with, well, this was just

22   minor problem, just minor little misunderstandings.

23   It's, you know, no big deal.  Never addressed the issue

24   of lack of control.  Never addressed the issue that no

25   one is in charge.  It's just no big deal, nothing is

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   wrong.  And so he took no action.  And that's, I think I

2   said in my -- in this package here to Bob, the one that

3   had Bob --

4       Q.   The one we had referred to before.

5       A.   Yeah.  On the first page I summarized the

6   results of the inquiry.

7       Q.   Okay.

8       A.   And then at the bottom I said, the port

9   director's response to the administrative inquiry failed

10  to address serious problems identified by inquiry,

11  particularly accountability and failure in supervision.

12      Q.   Are you talking about Bob McNamara?

13      A.   Right now, yes.  Yes.  So it's just like, you

14  know, he can't even be --

15      Q.   So by a supervisory, that was Wilder.

16      A.   Yeah.  That's Wilder.

17      Q.   Okay.  So let's go back to the appraisals.

18  Then as far as the reflection of this poor performance,

19  I know you told me one where he responded, the three

20  pages.  Was that the '97?

21      A.   Yes.

22          MS. BLESSEY:  I don't know if that's being

23  characterized whether she put performance or conduct.

24      Q.   You did say something that he objected to,

25  whether it was conduct or performance, whatever.  What

1    did I do with it.

2        A.    You just gave it back to me.

3        Q.    Yeah.

4              MS. BLESSEY:  The appraisals, we looked at

5    them last.

6        Q.    We're just going to look at what it says, what

7    it's showing.  Because I would think that something is

8    showing up, whatever it is.

9        A.    Well, what I did when I give these appraisals

10   every time --

11       Q.    It's pass/fail.

12       A.    It's pass/fail.  But then I would attach

13   something saying -- I would discuss with him where I

14   thought that he needed improvement, that he needed

15   improvement.  And then because I was told put

16   everything -- and even before I was told put everything

17   in writing, I was starting to put in writing because he

18   has selective memory.  I would tell him something.  And

19   then sometime I'll say, how come you didn't do it.  You

20   never told me.  Or that's not what you told me to do.

21   So I started putting things in writing so that he

22   couldn't get confused over what I had told him.

23             And so -- you have the package there, right?

24       Q.    Yes, I do.

25       A.    So on the first one --

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.   So the first one, I have '97.  Is that what

2    you're saying the first --

3    A.   Yeah.  Right here, '97.  Yes.  '97.  I told

4    him, your performance is successful, however, there are

5    some weaknesses that need to be addressed.  And then I

6    listed.

7    Q.   I'm looking for that page here.  Oh, probably

8    here it comes.  There it is.  Performance is successful

9    and some weaknesses in leadership.

10   A.   And now, this is the first one, if you

11   remember, that Mr. Trotter says, don't give it to him,

12   don't give it to him.  And finally he said, wait.  It

13   was February by the time he said, okay, give it to him.

14   By then it was too late, so I mailed it to him.  And I

15   said I'm sorry these fell through the cracks.  I haven't

16   been able to do it before.  Here's your appraisal.

17   Please let me know if you want to discuss this in any

18   way.

19         I never heard back from him.  So this is what I

20   sent him.  I assume that since I never heard back from

21   him that he agreed that these were weaknesses and that

22   he was going to start working on them.  Because I never

23   heard back from him on this one.  Well, the first time

24   around he never answered at all.  So that's this one.

25   Q.   Wasn't there an issue that it was sent to the

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    wrong director or --

2        A.    Well, I don't mail my own letters.

3        Q.    Sure.

4        A.    My secretary does.  When she mailed it, instead

5    of saying port director of Customs, she wrote port

6    director.  I mean, I don't think that that is so

7    horrible that she made the mistake, forgot to put "of

8    Customs."

9        Q.    So you're saying he did get it.

10        A.    He got it.  Yeah, he got it.  It just got

11    delivered to the port director in INS first, and then

12    they gave it to them.

13        Q.    Okay.

14        A.    I mean, I don't know that that is such a

15    terrible thing to do, but I think he made a big deal

16    about it.  Then we had the mid-year review.  Right after

17    that page, you have the mid-year review for the

18    following year, right after.

19        Q.    Are we looking at the next appraisal or the

20    same appraisal?  '97 appraisal?

21        A.    No.  No, no.  The next appraisal.

22              MS. BLESSEY:  What CC mail message are you

23    referring to?

24              MS. REBA:  April 29th, '97.

25              MS. BLESSEY:  So it should be a lone page

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    with that.  Yeah.  Right there.

2        Q.   Okay.  So what --

3        A.   This was the mid-year review.

4        Q.   Oh.  The mid-year review.

5        A.   The mid-year review for the following year.

6        Q.   Okay.

7        A.   And again, what I did was, he was pass/fail.

8    Well, then, I discussed some issues with him on what

9    things I thought he needed improvement.  And then I sent

10   him this message to confirm what I had said just so

11   there was no doubt in his mind of what I expected him to

12   do.  And this is to confirm that some of the things we

13   discussed in mid-year review.

14       Q.   Okay.

15       A.   And again, I never heard back from him.  Then

16   we -- then I did his following year, the end of the year

17   appraisal.

18       Q.   September '97, to ending of September '97.  Is

19   that the one we were talking about?

20       A.   Right.  Yeah.

21       Q.   Okay.

22       A.   Which I gave it to him in December '97, a

23   couple months late, because I did everybody late that

24   year because we had a port director's conference.  So I

25   did everybody in December.  So again, I gave him the

1   appraisal, I discuss everything with him, and then I

2   sent him a CC message saying, please see attached

3   document that lists the items we discussed at your

4   appraisal. And the deliveries we agreed upon. And

5   that's the one where he answered with a three-pager.

6       And this is some of the things that I discussed

7   with him. What I had done by then is, I had my staff do

8   one of these for every port. So when I sat down to do

9   the appraisal, I had some data, some facts and numbers

10  that I can discuss with him. · You know, you're doing

11  well here, you're not better here, this and that.

12      Q.   Okay. And this is the most one?

13      A.   That's just his plan.

14      Q.   Oh.

15      A.   I haven't done anybody's appraisal this year.

16  Things have been hectic and I haven't done the

17  appraisals this year. That's just his plan.

18      Q.   Do you have a mid-year, this year?

19      A.   I haven't done a mid-year either. Well, the

20  year is not over. I just haven't done the mid-year. I

21  didn't do the mid-year. And then it got really late, so

22  I figured I would just do the end of the year when the

23  end of the year comes.

24      Q.   Okay.

25      A.   Okay. So that's that.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Q.   So when -- did I hear the insubordination, that

2    he was insubordinate to you?  I mean, I know that one

3    time in there, I'm going to corroborate with the others

4    that he yelled or spoke loudly or whatever.

5    A.   Every time I talk to him is, you're out to get

6    me, I'm going to get even with you, I'm going to take

7    you down when I go down.  I'm like a corner animal.  A

8    corner animal is when they corner, they attack.

9    Q.   He said those things?

10   A.   And, you know, you'll be sorry and we'll take

11   action, at the top of his voice.  And so I told him, you

12   know, Jorge, there's no need to yell.  There's no need

13   to be excited.  We're just, you know, this is just

14   professional.  This is business.  Well, I'm not going to

15   take this from you, you know, I'm never going to take

16   this from you.  No one has ever treated me like this.

17   And it becomes where he's not rationale.  So I don't

18   know how to deal with it.  I tried.  I tried to

19   rationalize.

20        I called his previous director and I said, you

21   know, how do you deal with this man.  And she says,

22   well, I always coddled him and I pumped up his ego and

23   tell him how wonderful he was and pumped up his male ego

24   and make him think he was wonderful.

25   Q.   That was -- what's her name?

1    A.   Audrey Adams.  And I told him he was great and

2    then I cried and then I pled for his help.  And then

3    that way I can -- I said, I'm not going to do that.  You

4    know, I'm sorry, but I don't have time to do that to

5    him, if I have to deal with him every time.  No, I'm

6    sorry.  He's an adult.  He has to be treated like an

7    adult.

8    (END OF TAPE 3, SIDE B; BEGINNING OF TAPE 4, SIDE A)

9    Q.   We were talking about corroborating, the loud

10   voice or yelling.

11   A.   Yeah.  Most of the time has been --

12   Q.   And threats.

13   A.   -- has been by ourselves because he's very

14   careful about that.  But every so often, he loses it in

15   front of people.  And so he's done it I know in front of

16   Joe Garcia, Bruce Kramer, his chiefs, and Helena has

17   been a witness of it where he has done that.

18   Q.   Okay.  So how did the opening of the new bridge

19   go?  Was that successful as far as -- I understand

20   public relations, you say that must have been

21   successful.  I guess that goes along with the rest --

22   A.   Yeah.

23   Q.   -- of what's happened.  But what about the

24   overtime.  He got enough positions and overtime and so

25   forth to open successfully?

1      MS. BLESSEY: I'm a little confused what
2  this has to do with -- I thought we were looking at the
3  director reassignment or proposed reassignment.
4      Q.  I'm just talking about general performances
5  where we're at.  And so I was just wondering how that
6  has, you know -- that was a current event that happened.
7  I think April '99.  So I wanted to know how was that.
8      A.  Well, that was really interesting because he
9  had the money, he had all the money for the overtime.
10  And based on his expenditures, he would have had enough
11  money to take him to the end of the year in excess.  And
12  then right around the time the bridge opened, his
13  expenditures shot up.  And so all of a sudden they were
14  going to be in the hole by a lot of money.  Not because
15  of the bridge, but because they're using a lot more
16  overtime than the other bridges, even though they had
17  less work than the other bridges because they didn't
18  have the cargo work.
19      And the passengers, they were sharing the
20  passengers with the new bridge.  So it was like all
21  controls were off and it was less (inaudible) at the
22  top.  But yet, the bridge opened well.  They had no
23  problems.  They had enough people to open enough lanes.
24  The first week there were a couple lanes, long lines,
25  where our people figured it out.  But now it's working

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 248 of 318

1  all beautiful and there are no long lines, there are no

2  problems.  They still are unable to manage their

3  overtime, they are unable to plan ahead.  And they are

4  unwilling.

5      Q.  Okay.  And what about the people.  I think he

6  got some new personnel on the bridge.

7      A.  He got some new personnel, yeah.  Yeah.  What

8  happened, like I said, we got the money for the new

9  people late in the year.  So by the time that we got the

10  money and we started selecting and doing interviews and

11  they had to go through background and they have to go

12  through school, they been trickling in.  But I think

13  a lot of those people are already on board.  Every time

14  somebody new comes in, it's less overtime you need.  And

15  that's another thing.  When he submitted the overtime he

16  was going to need, he totally forgot that he had new

17  people coming.  So he didn't include the new people in

18  his estimates.

19      Q.  I think we have about 20 minutes if there's

20  something --

21      A.  How much?

22      Q.  Twenty minutes.

23      A.  Oh, okay.  Well, I have a couple of other

24  things that I can go over.  Talking about how his

25  attitude permeates the entire port, his -- it's my port,

1    I'm going to do what I want.  Don't tell me what to do.
2    Don't bother with me.
3         We had an instance where there was a seizure
4    made in Hidalgo and they did a control delivery on that.
5    And control delivery means, a port control delivery
6    means that the driver does not know that we know he has
7    drugs in that car and we're going to follow.  Our agents
8    are going to follow it so that he can lead us to the big
9    fish.  The driver is not important.  Sometimes he
10   doesn't even know what he's carrying.  They just pay him
11   a couple dollars.  We want the big fish.  We want the
12   kingpin.  So we do a control delivery, a port control.
13        That's very dangerous because if anyone finds
14   out, our agents could get killed.  We had a seizure in
15   Hidalgo.  The intelligence office in Brownsville poured
16   out a message to the entire Customs Service about that
17   seizure and about the control delivery that was going
18   on.  The port director in Hidalgo was very upset.
19        First of all, you have no business putting on
20   notice about my seizures, the data that you put in there
21   was wrong, and besides, you shouldn't be doing --
22   talking about port control deliveries what's going in
23   on.  You could endanger their lives.
24        Q.  Now, Flores put out the information about what
25   was happening?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      A.   Mr. Flores' Intelligence Office put it out.  So

2  his guy.

3      Q.   And he put it out where?  On e-mail?

4      A.   To the entire Customs Service.  So I sent him a

5  message saying, I'm very concerned about what looks like

6  the inability to follow established procedures.  The

7  established procedures are you report only on your own,

8  not on others.  And besides -- and that's national

9  guidelines.  That's not my --

10      Q.   When did you do this?

11      A.   February '97.

12      Q.   Oh, okay.

13      A.   And those are national guidelines.  And

14  besides, your message could then endanger the lives of

15  those doing this.

16      Q.   And I have a copy of this one?

17      A.   Yeah.  You have a copy of that.

18      Q.   And it's dated what?

19      A.   It's from me to Mr. Flores dated February 13,

20  '97, Subject:  Failure to Follow.  His answer was, oh,

21  that was just an overreaction.  There was no big deal.

22  There's no big problem.  And then so I answered back to

23  him, I don't think it was overreaction.  There is an

24  established procedures that was developed precisely to

25  avoid incidents like this.  And we were all at the

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  meeting where it was agreed.  You were at that meeting

2  that was all agreed.  And for control delivery, when

3  there are lives at stake, one cannot be too careful.

4  But it's always, no big deal, no problem, we didn't do

5  anything wrong.  Lack of accountability.

6      Q.   So in other words, I guess that what you're

7  saying is, he didn't convey the information to the

8  person who put out the bulletin.  He should have

9  counseled him.

10     A.   He should have.  Should have counseled him,

11 don't do it again.  Instead, he just --

12     Q.   You don't think he did because he said it's no

13 big deal.

14     A.   No big deal.  No big deal.  This is the other

15 one where here's another instance of lack of managing

16 their budget.  We talk about how in '96 they had a full

17 quarters to spare.  In '97 they're asking -- he's asking

18 for -- he is saying Spring Break is around the corner

19 and he wants us to give him additional overtime to

20 handle the students when they cross in Spring Break.  In

21 Spring Break they'll go to the island, to handle them.

22          So not only he had a full quarter to spare the

23 year before, now he wants additional money, even though

24 he didn't spend it all, to handle students.  Well, the

25 extra money that we have is for enforcement operations

1  to look for drugs, not to deal with kids.  A failure to

2  manage the budget.

3      Q.  Well, does he mean the kids have drugs?  Is

4  that what he meant?

5      A.  Well, just to process them because they come in

6  in mass.  You got thousands of them.  So you have to

7  open a lot of lanes and handle a lot of cargo.

8      Q.  I see.

9      A.  Otherwise, the lines get very long.  This is a

10  CC mail from me to my budget officer, Juan Olitha.

11  February 21st, '97.  And to Bruce Kramer.

12      Q.  Bruce Kramer.  And who was the other one?

13      A.  Juan Olitha.  Plus, he had received 40 people

14  since the end of the year.  So he had 40 people, getting

15  the extra people.  He didn't use a full quarter of

16  overtime the year before and yet he's --

17      Q.  He got 40 new people?

18      A.  At the beginning of last year.  '97.  Beginning

19  of '97, yeah.

20      Q.  Oh, '97.

21      A.  Yeah.

22      Q.  I was confusing that --

23      A.  Oh, no, no.  That was the year --

24      Q.  Okay.

25      A.  So he didn't use a quarter of the overtime.  He

1   got 40 new people.  And yet, he's asking for more
2   overtime for Spring Break.  So my answer was, you just
3   have to come up with the facts and show me why you need
4   it.  Just saying you need it is not enough.  You know,
5   now it's a matter of managing your budget and doing
6   facts and numbers.  And you know, I'm not the only one
7   where he just kind of says, go away, don't talk to me.
8   Here's a message March 6, '97 from Linda Wilcox to me
9   where she had received a call from the SAC, the Special
10  Agent in Charge --
11      Q.   Okay.  No, I don't know who Linda Wilcox.  What
12  is she?
13      A.   She used to work at the CMC.  She's somewhere
14  else now.  She's -- I forget where she is now.  But she
15  was part of my staff back then.  And when I was out,
16  sometimes she acted in my place.  I called from the SAC
17  saying that we had a commitment that we give them an
18  inspector to work with the agents in doing intelligence
19  work.
20          And the inspector from Brownsville was always
21  only half-time.  He was always using that inspector for
22  other things.  And so she says, well, why don't you talk
23  to the port director about it.  And he said, well, every
24  time I talk to him he says, yeah, yeah, yeah, yeah, and
25  then he walks away and never does anything.  So he

1 wanted to appeal to me and see if I could tell him to do

2 that. put him in full-time.

3     Q.   What kind of inspector -- was he a K-9

4 inspector?

5     A.   No. Just a regular inspector. But he was

6 working with the agents in a special -- we have a

7 special unit called ICAN, Intelligence Collection Unit.

8 And we're supposed to allot to put in an inspector in

9 there to work with the agents in gathering information,

10 gathering intelligence.

11     Q.   So he hadn't accepted the agent, the ICAN agent

12 there at the port?

13     A.   What he was doing, he wasn't making the

14 inspector available full-time like he was supposed to.

15 He was always pulling him out to do other projects.

16     Q.   Oh, I see.

17     A.   And so the SAC is saying, hey, I need this guy

18 full-time. And he keeps pulling it away. And so when

19 he talked to him, to Mr. Flores, he says yeah, yeah,

20 yeah, and then he never did anything about it. So the

21 SAC wanted me to try to take care of it.

22     Q.   I see. And so what did you do?

23     A.   Nothing. I can't get him to do my own work.

24 You think I can get him to do what the agents want? You

25 know, you asked did you ask headquarters what to do,

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    well, I kept sending these desperate pleas that I need

2    to do something.

3        Q.    What date is that one?

4        A.    This one is March 31st, '97.  And he went to

5    Trotter, Denise Crawford.  The title is Port ICAN

6    Management Meeting.  But it really deals with other

7    things.  There was a new project, Port ICAN Project that

8    we were going to do on the ports.  And all ports -- the

9    major ports had to participate.  And Brownsville was one

10   of them ones who had to participate.  And so there were

11   some meetings that were going to be happening about that

12   project.  And he was already saying, well, I don't have

13   enough people.  I can't do it.  I don't have enough

14   resources.

15       Then I got a report from Bruce Kramer about --

16   we were trying to work a deal in Los Indios for extended

17   hours.  And we were having trouble getting it to happen.

18   And so I gave Mr. Flores strict instructions, this is

19   what you're going to agree to, this is what you need to

20   achieve, here's how far you can go.  You can't go

21   farther than that.  He went to the meeting and he agreed

22   to do something totally contrary to what I told him what

23   to do.

24       And then I said, why, why did you do that.

25   Well, it was a difficult meeting and they were adamant

1  and I didn't want them to get upset, and so I had to

2  agree. Again, you know, let's make the trade happy.

3  Forget what my boss wants.

4          So I send this message to Mr. Trotter saying,

5  you know, I have two problems here. One is, he's

6  setting a precedent for future negotiations, if he's

7  agreeing to something that's totally unreasonable. It

8  makes me wonder about his intentions and his ability to

9  make the right decisions if he has to say no to somebody

10 in the trade. And third, what's he going to do when

11 this port ICAN management comes in. Is he going to

12 sabotage it just like he did this one. So we need to do

13 something. And so I sent these up to him like another

14 warning, you know.

15     Q.   And what reply did you get from Trotter?

16     A.   Nothing. Nothing. Just hang in there. Hang

17 in there. Things will get better.

18     Q.   Didn't you start to suspect that where was it

19 going to end.

20     A.   Well, I figured there was something going on,

21 but I didn't know what it was. And I figured, they

22 don't want to tell me, then I'm a good soldier.

23     Q.   You thought maybe there was something in the

24 mill about his performance or something you would get?

25     A.   I didn't know. I didn't know.

1    Q.   Just didn't know anything.

2    A.   I didn't know.  I had no idea.  No idea.  I

3    couldn't imagine what it could be.

4    Q.   And they just kept telling you, hold on, hang

5    in there.

6    A.   Hang in there.  This too shall pass.  So I hung

7    in there.  Okay.  Here we go again.  Okay.  Another

8    incident of lack of accountability.  We had -- I got a

9    message from the K-9 program in headquarters.  This is a

10   CC mail message from me to Peter Baish dated March 21st,

11   '97.

12   Q.   Beige, B-I --

13   A.   B-A-I-S-H.  And what happened --

14   Q.   The date?  I'm sorry.

15   A.   March 21st, '97.

16   Q.   Okay.

17   A.   We have regular dogs that looked for drugs and

18   we have currency dogs that look for money.  Brownsville

19   had a currency dog and they wanted to convert it to a

20   regular dog, narcotic drugs.  The outbound program,

21   Mr. Baish is in charge of the outbound program, didn't

22   want to lose that currency dog because currency is a big

23   issue too.  The money going out of the country is money

24   that they use to buy drugs coming in.  So if you can

25   stop it from going out, then you stop that shipment from

1    coming in. So money seizures are very important.

2          So they didn't want to stop -- they didn't want

3    Brownsville to convert that currency dog back to a

4    regular dog. So they asked them, please don't do it.

5    And they said, oh, I don't have any money. The CMC

6    doesn't give me any money. I can't do it.

7          So headquarters sends me a message saying, you

8    know, do you want to reconsider letting Brownsville get

9    a currency dog. And I answered back, it's not me. He

10   has money for all the dogs he wants. He has to decide

11   whether he wants a currency dog or not or whether he

12   wants another one of the other ones. He is the port

13   director. He has to be responsible. But it's a lot

14   easier to blame me. And so, it's just the same, lack of

15   I'm not accountable. It's her fault. Every time

16   there's a hard decision to make, he won't make it. He

17   just will not make the hard decision.

18        Q.  We're winding down. We have five more minutes.

19        A.  Okay. Well, you know, like I always said, I'm

20   not the same one, I'm the only one. This is May 14th,

21   '97, a memo from Bruce Kramer to Jorge Flores. Again,

22   Jorge Flores complained to Bruce that he didn't get

23   enough inspectors and that he's been short-changed and

24   that they were giving them to somebody else. And so

25   Bruce explains to him in this CC mail message, that not

1   only he was not short-changed, he got proportionately

2   more than anybody else.

3       Q.   That was '97 or '99?  March 14, '97?

4       A.   '97.

5       Q.   March 14, '97.

6       A.   It's called, the subject is "Need

7   Clarification."  And it's all the same, you know.  It's

8   all the same.  Same old, same old.

9       Q.   I would like to interview the previous CMC that

10  was in her title.  Audrey --

11      A.   Audrey.

12      Q.   Is she still with the agency?

13      A.   Yes, she is, but I guess you have to -- I, you

14  know.

15      Q.   No.  I mean, I'm not asking you permission.  I

16  was just saying.

17           MS. BLESSEY:  I believe she's in

18  California somewhere now.

19      Q.   All right.  Well, I looked over -- there were

20  some issues --

21      A.   Read it all.  Read it all.

22      Q.   But we went over a lot of things.

23      A.   Yeah.

24           MS. ROJAS:  Let me turn this off then.

25                   (END OF INTERVIEW)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# ORIGINAL

INTERVIEW OF

CHARLES W. WINWOOD

TAKEN ON JULY 28, 1999

CONTINENTAL COURT REPORTERS, INC. (713)522-5080



DEFENDANT'S
EXHIBIT
6

1          MS. ROJAS:  -- 28th, right?

2          MR. WINWOOD:  Correct.

3          MS. ROJAS:  And present is Charles Winwood?

4          MR. WINWOOD:  Correct.

5          MS. ROJAS:  And Grace Rojas.  And --

6          MS. BLESSEY:  Carol Blessey.

7          MS. ROJAS:  Carol Blessey.  Okay.  Mr. Winwood,

8  as I told you, you are considered a subject in this

9  investigation.  What I'm investigating is an allegation

10 of reprisal for whistle-blowing.

11         Would you raise your right hand?  I'm going to

12 administer an oath.  Do you solemnly swear to tell the

13 whole truth, nothing but the truth, so help you God?

14         MR. WINWOOD:  Yes; I do.

15

16                      *  *  *

17

18 QUESTIONS BY MS. ROJAS:

19     Q.    Okay.  Let me take some background information

20 on you.  Okay.  So what is your full name.

21     A.    My full name is Charles, middle initial "W,"

22 Winwood, W-I-N-W-O-O-D.

23     Q.    And your title.

24     A.    My title is Assistant Commissioner, Office of

25 Field Operations.

**3**

```
1        Q.    What is your rank, GS or SES?

2        A.    SES-4.

3        Q.    And do you have a card?

4        A.    Yes, I do.

5        Q.    Okay.  Great.  That way I don't have to go

6   through all the business address stuff.

7        A.    Here's a card.  This is great.  Nobody asks for

8   one.

9        Q.    Is it a new one?

10       A.    Yeah.

11       Q.    So you get to show it off.  Here's my card in

12  case you need anything in the future.  Okay.  Great.

13             MS. BLESSEY:  I don't like to get new

14  cards.  The reason I get new cards, I move.

15             MS. ROJAS:  I know.

16             MR. WINWOOD:  Well, you know, it's like --

17  well --

18             MS. ROJAS:  That's all right.  I can turn

19  it off, if you want.

20             MR. WINWOOD:  Funny about cards real

21  quick.  I just got these.  My wife surprised me with

22  them when I got this job several months ago.  The

23  commissioner has decided he's going to have a whole new

24  card for everybody instead of this one.

25             MS. ROJAS:  Oh, what a shame.  Oh, well.
```

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1          MR. WINWOOD:  Oh, well.

2     Q.   Anyway, so you just became the assistant

3 commissioner when?

4     A.   Effective February 7th, 1999.

5     Q.   Okay.  And were you with Customs before that?

6     A.   Yes, I was.

7     Q.   What were you before?

8     A.   Prior to that, I was the Assistant

9 Commissioner, Office of Strategic Trade.

10     Q.   How long of a career do you have with Customs?

11     A.   I started with Customs on January 2nd, 1972.

12     Q.   Okay.

13     A.   Just a kid.

14     Q.   Yeah.  We all were in '72.  Well, some of us

15 may not have been born then.

16     A.   I mean, just a kid now.  I'm just a kid now.

17     Q.   Okay.  Yeah.  I'll go along with that too.  I

18 am also.  All right.  So let's see.  What I wanted to

19 **discuss was the, basically the reassignment of Jorge**

20 **Flores.**

21     A.   Okay.

22     Q.   Do you know who he is?

23     A.   Yes, I do.

24     Q.   When did you first meet him?

25     A.   Rough estimate, somewhere around the -- had to

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  be the late '80s, possibly early '90, '91.  I'm just

2  guessing.  I was at the port of Brownsville reviewing

3  operations and giving a special award to one of his

4  employees.  It was either Officer of the Year or

5  Supervisor of the Year under our old organization.  He's

6  also been at different management meetings that were

7  held throughout my tenure in headquarters, whatever job

8  I had.  Occasionally I would see him at some of these

9  management meetings.

10      Q.   Okay.  So you've known him quite a while then.

11  And you were conducting your review of operations, you

12  said?

13      A.   This was way back.  This was a different

14  circumstance.  It was more familiarization for me.  I

15  was a relatively new assistant commissioner under an old

16  organization.  I was assistant commissioner for

17  inspection and control.  I was relatively new to the

18  position and it gave me an opportunity to review border

19  **activities.  I had gone from one end of the border,**

20  **San Diego, all the way down to Brownsville.  And it was**

21  **more of making me more familiar with some of the**

22  **day-to-day activities in a lot of the ports that I had**

23  not had the opportunity to visit before prior to my

24  appointment as assistant commissioner, inspection and

25  control.

```
1        Q.   Okay.
2        A.   At the time, we had no line of authority over
3   the field.  I was more of a -- our old Customs Service
4   headquarters jobs were policy and procedure jobs.  So as
5   an assistant commissioner, I was responsible for policy
6   and procedure implementation and oversight.  Our
7   regional commissioners had line authority over the ports
8   at the time, which did not report to me.
9        Q.   And he was not in your chain of command --
10       A.   No, he was not.
11       Q.   -- as far as his supervision --
12       A.   Not as far as line authority, he was not.  He
13  reported to a district director, who reported to a
14  regional commissioner.
15       Q.   Okay.  So when did he -- was it when you
16  changed over to your new position, office of field
17  operations, is that when you first -- he came under your
18  line of authority?
19       A.   Correct.
20       Q.   So a few months ago you hardly knew him?
21       A.   Knew of him?  Knew of his location and had
22  talked to him several times, yes.  That's the extent of
23  it.
24       Q.   Okay.  So I have the letter regarding his
25  reassignment.
```

1      A.    I have a copy.

2      Q.    Oh, you have a copy.  Okay.  And it's dated May

3    3rd.

4      A.    Correct.

5      Q.    So May 3rd, '99.

6      A.    Correct.

7      Q.    And you became effective February 7.

8      A.    Correct.

9      Q.    So tell me what happened to make that

10   decision -- made you come to that conclusion so quickly.

11   It seems to me very quickly.

12     A.    Okay.

13     Q.    And who was involved in the decision?

14     A.    Okay.  I have to give you a little bit of

15   background.

16     Q.    All right.

17     A.    I was asked to take the job with the rotation

18   that the new commissioner of Customs instituted after he

19   got here.  He got here in August of '98.  I believe it

20   was August of '98, wasn't it?  Yeah, I think so.  Yeah.

21     Q.    New commissioner.  And is that Kelly?

22     A.    Yes.  Mr. Kelly.  He reported officially

23   on-board in August.  Although he was the designee, he

24   had to wait for confirmation.  He was on-board for four

25   or five months watching and evaluating the organization.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  Decided to make some rotation changes of the assistant

2  commissioners. He asked me in January that he was going

3  to reassign me. I got one of these letters also. Same

4  letter, different name. Reassigning me to the assistant

5  commissioner of field operations.

6      As a part of that, he also asked me, because he

7  had decided to change the structure of Customs and go

8  from a headquarters policy office to line authority over

9  the field, which we had not had before, to the extent

10  that he wanted to have it. He said, so I want you to

11  rethink the structure of headquarters field operations.

12  I want you to take a hard look at the structure and the

13  port activities within field operations. And you need

14  to make some decisions about filling vacancies, who

15  would be in charge, et cetera.

16      So one of my immediate tasks was restructuring

17  field operations at the headquarters level, reassigning

18  folks to take over new responsibilities here, and then

19  **look at the field structure to make sure that we had the**

20  **right people in the right places based on this new line**

21  **authority over the field, to include establishing the**

22  **field directors. We called them at the time, CMC**

23  directors. There's 20 of them out there. To include

24  changing the authority of the field directors, the CMC

25  directors, over the ports.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    Before I came here, the CMC directors did not

2   have line authority over the ports.  301 ports reported

3   to headquarters and the field directors were more

4   administrative.  And so I was asked to change that

5   structure to include position descriptions and

6   everything.

7        Q.   I'm confused because I did see evaluations --

8   I'm going farther back than this year -- that had the

9   CMC, Maria Reba as the supervisor signing for Jorge

10  Flores.

11       A.   They did oversight, they did policy review.

12  They did some of that.  But they did not have -- they

13  had no ability to give so-called direct orders without

14  approval from headquarters.  It was a strange -- it's

15  hard to describe.  I don't think you will see it in any

16  other organization.  And that's one of the things

17  Mr. Kelly wanted to change right away because it was

18  fuzzy.  All right.  So you saw some things, but it was

19  fuzzy.

20       Anyway, so I was -- background -- asked to take

21  a hard look at everything.  My first thing I did was

22  restructure field operations and direct assignments in

23  and out of headquarters.  I directed two people in,

24  directed one out, and reassigned an SES'er within,

25  reassigned a couple staff people out and brought in some

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   new leadership within the organization and building

2   transfers of senior executives.

3       Q.   All this from January '99 to present?

4       A.   Yes, ma'am.  I move quick.  New structure, new

5   responsibilities, new accountability.  Needed a

6   different perspective, different skill sets, a mix of

7   some new ideas and people from the field to help run

8   this organization.  So much so, that one of the people I

9   directed in here had just been transferred to New York

10  and only been up there for nine months, had made the

11  move, and I asked him to come back.  He had just left

12  here.  He had only been gone for nine months.  And I

13  asked him to come back.  He was in a different

14  organization with a different job and was assigned to

15  New York and I assigned him back.  That's my deputy.  My

16  new deputy.

17      Q.   And who's this?

18      A.   Bob McNamara.  So that was part A.  Part B,

19  while I was doing that, I was taking a hard look at

20  where were the critical vacancies and what were some of

21  the issues that were emerging or had emerged that were

22  coming to my attention around the country.  And if I may

23  step over here, I think this will pick up --

24      Q.   Oh, sure.

25      A.   -- but I want to use a map.  I keep this in my

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  office because half the time I don't remember where

2  everybody is at.  When I came here, some other activity

3  had already occurred.  I was asked to reorganize this

4  building.  And at the same time, the commissioner was

5  making some moves about needing new perspective, new

6  views, new ideas in places that needed a fresh

7  perspective of management style, skills and issues that

8  needed to be addressed.  It may be the incumbents,

9  although very competent, had been there and couldn't

10  handle them anymore.

11        For instance, in Miama, the commissioner

12  temporarily assigned the field director from Miami to

13  Washington on a special White House Task Force to give a

14  fresh perspective of the overall management of the CMC

15  and detailed somebody from my office who reports to me

16  dialing from Miami.  At the same time, he transferred

17  the port director of Miami airport from Miami to

18  Southern California, Los Angeles, and transferred the

19  port director of Los Angeles to Miami.

20        At the same time, he told me that one of the

21  people that reported to me here in Washington, one of my

22  officer directors, was going to be reassigned from

23  Washington to New Orleans as the field director.  And

24  the field director in New Orleans was being assigned to

25  me in Washington.  The field director in the Gulf,

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  New Orleans decided to retire. And so a person replaced

2  him. He didn't report to headquarters. He retired.

3  She reported to New Orleans as the new field director.

4  I had transferred within that first month two

5  or three people here and rotated some people within the

6  building from one job to different jobs and completely

7  reorganized my trade group and assigned new managers,

8  new staff, et cetera.

9  Q. Well, it sounds like you hardly had time to

10 think about what you were going to do when you did it.

11 A. No, no. I gave it a lot of thought. My mind

12 works 24 hours a day, seven days a week. I think, I

13 ask, I look, I watch, and then I make a decision. So

14 a lot of information. Plus, there's a lot of

15 information you see by what's happening in operations.

16 We were setting up a self inspection program. I had set

17 up two new offices.

18 Yeah, I was very busy. This is an active

19 organization. I was extremely busy. But I was here

20 seven days a week, 24 hours a day, and whatever it took

21 to get this done. Because my view is, if you don't

22 reestablish a sound structure when you're asked to take

23 over new accountability and responsibility, everything

24 else falls apart. You got to have the leadership. You

25 have to have the organizational structure set up. You

1   have to have the procedures laid out so people can work

2   most effectively.  And my whole life here in this new

3   job was dedicated to that.

4          I delegated discipline.  I delegated

5   administrative matters.  I told other folks to take care

6   of that business.  I had to concentrate on establishing

7   a solid structure here in getting the right players in

8   the right places based on the circumstances as I could

9   understand them as I was reviewing the operations.  So

10  yeah, I've been very busy.  But that's what I did.  I

11  also brought a new mission support person in.

12  Transferred him to another office and promoted him so

13  they could take care of all my administrative matters.

14         If you think that's something, I'm responsible

15  to make all selections now.  All selections.  All

16  selections.  Every job that enters into field

17  operations, I have to sign the (inaudible).  Every one

18  of them.  I have 13,500 people.  Okay.

19      Q.   And you want it that way?

20      A.   That's the way the Commission decided it should

21  be.  Okay.  So that movement was going on.  In addition

22  to that, I knew I had severe issues that I needed to

23  address.  And it all started right here, if I can find

24  it.  Right here.  El Paso, Texas.  And Chicago,

25  Illinois.  And Atlanta, Georgia.  There's how it all

1   started.

2          I'll start with Chicago. When I got here, I
3   was told that the port director's job in Chicago had
4   been vacant for almost a year. I had no port director.
5   They had actings rotating through. You know how that
6   is. It's, you got acting people rotating people through
7   all the time. They had done two job announcements.
8   They couldn't seem to get people to apply or the type of
9   candidates they needed.

10         I walk in this place, they say, you got a
11  problem. We haven't had a port director in Chicago.
12  Right on my mind, I said, I got to fix that. Issue one.
13  Issue two, I had a vacant seat in El Paso. A very
14  active. A very -- very active. Let's just leave it at
15  that. A very active port for all kind of reasons --
16  enforcement, processing, cargo, cars. Tremendous union
17  issues. All kind of problems down there. Personnel,
18  et cetera. No active port director acting for quite
19  sometime. I needed to take care of that because the
20  problems were mounting. The problems were building.

21         Atlanta. I had a port director who had been
22  there for a long time. There was all kind of issues.
23  Hostile work environment allegations. EEO complaints.
24  Personnel actions. Mounting grievances. Allegations of
25  wrongdoing on the part of proper procedures for personal

1   search.  You name it.  The man had decided to retire and
2   was leaving and was going to leave a void.  And it was
3   time for a change there anyway.

4        So I had a major issue there.  I had to figure
5   out what to do.  So my first body of action was, let's
6   take care of my triangle right away.  With that in my
7   mind, I said, when I do that, I got to watch where I
8   create other holes and I got to also analyze, are there
9   other things I want to address in other places.  So
10  there's my triangles.  I'm thinking about that first.

11       And the second part was, that I knew for
12  El Paso, I started searching around.  And I knew where I
13  had a strong candidate up here, Blaine, Washington.
14  Okay.  My mind says if I do Blaine, then I got another
15  piece of the puzzle.  Okay.  So that's how it started.

16       So I started analyzing what are the strengths
17  and weaknesses of this person, what are the concerns
18  here, what am I going to do about Chicago, what are the
19  issues and concerns, what are the issues in Atlanta.
20  What are the issues in New Orleans now that I got a new
21  field director down there.  What are the issues in any
22  place around the border.  What is my issue now because
23  the commissioner has decided to take the port director
24  out of Norfolk, Virginia.  I got issues there that I
25  call the external issues.

1       I don't have real good solid what I call trade

2   relations.  External issues as we call them.  Trade,

3   shipping companies, et cetera.  The guy was brought up

4   here to be the public affairs officer.  Good guy.  Best

5   public affairs (inaudible), but he was put down there.

6   He has no operational background.

7       There's constant debates going on with the

8   trade in Norfolk about equitable treatment, fair, proper

9   staffing, that Baltimore gets more attention.  It's

10  constant.  It's constant.  I needed to address that.  I

11  needed somebody with that good external field

12  background, operational background, but good external

13  relationship skills.  That's how it started.

14      And I did that myself.  That was all me.  I

15  didn't want to be bothered with other people trying to

16  get in my way, so I did that.  So that's how the puzzle

17  started.  I decided then to take a look at other areas

18  and how these pieces fit.  And I knew that every time I

19  made a move, it was going to cause -- every action

20  caused a reaction.  So I mapped it all out for myself.

21      As it turned out, I end up making between eight

22  and nine moves and I did them relatively all at the same

23  time.  Because this was a package.  This was a system.

24  This was a puzzle.  This was a process of reorganizing

25  based on what was going on in that location, what I

1  thought the needs were, what skill sets might help

2  address those needs, who might be the best person or

3  persons to take care of that for us in this organization

4  and when I could get it done.  That's the background.

5      So I started then formulating in my head and I

6  come up, and I would not make a move until I had a group

7  of them.  I didn't want somebody to think that one is

8  onesies and twosies.  Because what it does, you do that,

9  you fill one hole and then you create another hole, you

10  let that simmer for six months.  What have you done?

11  You created another problem.  So I wanted to do this all

12  at one time.

13      So I decided that for purposes of the skill

14  sets I needed in El Paso, I needed this guy in Blaine.

15  He had strong internal management skills, strong

16  enforcement background, works real hard with union

17  issues and administrative issues, and is the kind of guy

18  that is a good, fair, equitable disciplinarian.  Knows

19  how to handle things fairly.  The issue of El Paso with

20  union problems, discipline problems, people knowing

21  where they stand and what they should do.  And he's

22  very, very, very good at that.  So I decided that he

23  needs to go to El Paso.  I hadn't called anybody yet.

24      Secondly, I knew up here that my experience in

25  the Office of Strategic Trade and I focused mostly on

1    commercial stuff, businesses, import transactions,

2    establishing accounts with major corporations,

3    et cetera, major trade programs.  People don't realize

4    that Blaine, Washington is a major trade port.  I felt

5    that I needed somebody that had a strong commercial

6    background because they were doing very well with their

7    inspector activities, their union activities, their

8    administrative activities, their disciplinary

9    activities.  I mean, strong procedures because he had a

10   strong manager.  But I felt that this really needed some

11   commercial attention.

12         You know, we have two major organizations with

13   field operations.  We have the line officer, the

14   inspector, and we have the commercial people, the import

15   specialists who collect money and classified goods and

16   that kind of stuff.  And that group needed some strong

17   leadership, new ideas, and somebody that came from their

18   ilk.

19         I looked around.  I said the guy in

20   New Orleans.  Port director had been there all his life

21   and only knows New Orleans, but well-known for his

22   commercial background.  Well-known for his technical

23   skills in the commercial environment.  Well-known for

24   his skills in the classification business and the

25   revenue business.  I said, hah.  Strong leader, El Paso.

Commercial guy, Blaine.  The puzzle is coming together.
Norfolk.  Guy is leaving.

Always have these constant debates with the
vessel companies, external outreach, dealing well with
the public, dealing well with the trade community,
dealing well with the brokers.  They always feel like,
you know, we need more attention.  We don't get the kind
of attention we need.  I looked around, I said, who has
that.  Jorge Flores.  One thing he has is reputation.
No matter what anybody says, he has good external
relationship skills and has established a great, I
think, a good reputation down there for dealing with
outside entities.  I said logical.

In addition, I also looked at the numbers and
the stats to find out what was happening in enforcement.
I said, you know, it might help Brownsville if I do this
and have a real new look, are we doing enough internally
in Brownsville in the enforcement area.  The numbers
aren't the same as they might be in Laredo and San Diego
and in Dallas as far as narcotic seizures and successful
events all the time.  Maybe a fresh look, instead of
having the same person all the time.  Maybe a new look,
new idea.

So I started calling around to folks.  I didn't
tell them why.  I said, I'm looking for somebody that

1  has the right personality, that has skill sets on the

2  enforcement side, can maintain good external

3  relationships, is a professional, like the professional

4  we have there and other locations.  Anybody have any

5  suggestions.  And somebody suggested somebody to me.

6  And I said, you know, and I also, I would like to have

7  somebody, if possible, of a Hispanic background because

8  it helps that community.  It's a very large Hispanic

9  community, both on the business side and the public

10  side.

11        And several names came to my attention.  One of

12  them was Margie Gutierrez.  So I checked her out.  And

13  everything people told me appeared to be true.  I said,

14  okay.  There is the answer for that situation.  I first

15  look at Brownsville.  She has those maintenance skills

16  for personality outreach, just like the present

17  administration, but she also brings a different view

18  maybe on internal issues, enforcement issues, and what's

19  happening with the narcotics trade in that part of the

20  border.  So I said good candidate for Brownsville.

21        New Orleans.  In my mind -- remember now,

22  nobody knows about this but me.  I haven't talked to the

23  commissioner yet.  I haven't talked to the field

24  director.  This is me.  I'm just doing my business.  I'm

25  giving you a lot of background, but I want you to know

1  how this all formulated in my head. Now I got the whole

2  New Orleans and I'm saying, what's my issue in

3  New Orleans.

4         Well, New Orleans is a -- considered by some to

5  be a good old, you know, stuff happens in New Orleans.

6  You know, good times roll. But, you know, it's a very

7  serious port for us. And at one time, at one time,

8  things change. Trends change. Shipping companies

9  change. The oil business is low now, you know. We used

10  to have refineries and all kind of oil issues down

11  there. That's all changing. Shipping patterns have

12  changed.

13         But New Orleans is very close to our makeup.

14  You know, I think you know a little bit about Customs.

15  Our major narcotics problem runs from here to here. We

16  call it the southern tier. And guess who's right in the

17  middle of that southern tier. New Orleans. Strong

18  commercial guy. Focus on the commercial side. The

19  commercial world is changing in New Orleans. I'm

20  thinking I need a fresh look from the standpoint of the

21  enforcement side. Somebody that brings different skill

22  sets here.

23         So I got this guy going up here to run my

24  commercial stuff. What about New Orleans. I got a new

25  field director down here. We're going to get a fresh

1   start.  We know we got enforcement issues that need to

2   be addressed.  Maybe a fresh perspective.  People

3   bringing new ideas, different thoughts, how to address

4   it.  I looked around.  I said, I know the person.  Plus,

5   I can't have people living their whole life on the

6   border, living their whole life at a sea port, living

7   their whole life up here.  Customs is big.  We're one

8   organization.  Everybody has their own views, but we

9   need this cross for organization.

10          Leticia Moran.  She's been in Laredo.  She

11  worked for me in headquarters.  Strong enforcement

12  background.  Great communication skills.  Understands

13  the commercial side.  Had been a port director

14  previously.  Was now in an administrative job.  I felt

15  here's a talent that she could get back in a line job.

16  She was working in the CMC in an administrative job.

17  Needs to be back in a line job.  That takes care of my

18  New Orleans problem.

19          So once I formulated those six moves, then I

20  start taking a look.  What am I going to do about -- I

21  forgot about Chicago.  Chicago and Atlanta.  What I did

22  is, not getting the type of candidate we need in

23  Chicago, I reached out and said, you know, I got this

24  great person who is an administrator doing

25  administrative stuff in Atlanta.  She's in the CMC in a

1   non-line job.  She used to be -- she's a black female --
2   used to be a chief inspector in Los Angeles.  Ran a
3   major operation.  Now she's down here in Atlanta doing
4   administrative stuff.
5         There's nothing wrong with that by the way, but
6   I know she had the background and skills.  I said, I
7   need to get a fresh look in Chicago.  I called her and
8   said I'm assigning you to Chicago for a minimum of
9   90 days to take a look at this line operation, what do I
10  need in Chicago, et cetera, et cetera, et cetera.
11        Knowing that the guy in Atlanta was retiring
12  and I had all these problems with personnel, EEO,
13  allegations of discrimination, hostile work environment,
14  Anita who was right there -- because our field office,
15  our CMC and our port are like two miles apart -- I'm
16  saying, take Anita out of this administrative job, but
17  don't throw her into the frying pan.  Because people
18  say, hey, same-same.  No fresh look.  So I picked Anita
19  and I ask her to go to Chicago for 90 days.
20        I reach out to a black female in New York.  And
21  I say, Robin, I got a problem.  I need help in Atlanta.
22  The port director is retiring.  I don't want to assign
23  somebody within that location.  I need you to get on and
24  take over Atlanta for a minimum of 90 days.
25        Then I reannounced the Chicago job because it

1    was a promotion.  It was a 15 job.  And I said, guys, we
2    need to reemphasize the skill sets we need, put a new
3    announcement out, announce the job in Chicago.  And then
4    hopefully I'll get the type of candidates that they
5    didn't get in the previous administration and we'll make
6    a permanent selection in Chicago.

7          It ended up, I kept both those people longer
8    than the 90 days.  But anyway, so that was all
9    happening.  So I did those two things first.  Got those
10   temporary assignments.  Moved New York to Atlanta,
11   Atlanta to Chicago.  Got that set up.  Got them running.
12   Put a new announcement up for the Chicago job.  I had
13   it -- there was an announcement up before I got here for
14   El Paso and decided not to fill off the register.

15         And decided, then, once I had all these names
16   laid out for why I wanted them, for the skill sets, the
17   fresh view, the issues I felt needed to be addressed in
18   these six locations as my first go-around, plus the ones
19   that I had already done in headquarters, I decided,
20   then, here's my picture.  And I laid it out in a map
21   like this.  I hand drew it, though.  And I explained to
22   people, to my boss, this is what I want to do.  Here to
23   El Paso, Laredo to Gulf, Gulf to here, Dallas to
24   Brownsville, Brownsville to Norfolk, laying out the
25   external versus the internal issues, new fresh

1  perspective across the board, handling major holes where
2  vacancies were that I felt were critical and needed to
3  be filled before I moved anybody else.

4          At first it was, you know, lateral to lateral.
5  Active port director to active port director.  But not
6  only that I needed to do, I had holes.  Nobody in
7  Chicago.  A guy leaving Atlanta.  A major problem in
8  El Paso.  Norfolk coming open.  It allowed me then, it
9  was like (inaudible).  It was easy because I had holes
10 in addition to people.

11         So I laid that whole map out and went down and
12 I had to get permission.  I had to justify what I was
13 doing in a sense and I'm saying, this is my thinking.
14 And I explained it to the commissioner because, you
15 know, he has to know these things.  And I said, this is
16 what I'm going to do.  He looked at it and he says
17 logical (inaudible.)  So I did it.

18         Strictly on work, strictly on multiple moves,
19 strictly on need based on the activity and location, and
20 strictly on my understanding of, I knew the skill sets
21 of five other people.  I did check out, because I knew a
22 little bit about Ms. Gutierrez, but I didn't know of the
23 skill sets and of the reputation of the others.  And,
24 therefore, I built that into the moves that I was
25 making.

1          And I wanted to pressure you in Brownsville
2   from the Portland side.  I definitely needed to pressure
3   you for external in Norfolk.  I definitely needed a
4   strong leadership in El Paso.  I definitely needed
5   commercial up here.  And I definitely needed a complete
6   review of a different approach to the work in
7   New Orleans because the trends have changed, the world
8   has changed, their shipping patterns have changed.
9   Everything had changed.  It happens.  It happens all the
10  time.  It happens all the time.  So --
11       Q.   Okay.
12       A.   That's what I did.
13       Q.   Sounds logical to me.  And work got off and
14  quick.
15       A.   No, it was quick.  You got to figure, I was
16  told by the commissioner -- I mean, whose definition of
17  quick?  I was asked by the commissioner sometime in
18  January that he was -- I wasn't asked.  I was told that
19  he was reassigning me, which he has the right to do.  Of
20  course I asked where.  It's important to know what I'm
21  going.  He told me.  He said, there's major issues
22  there.  Reorganization.  Restructure.  I need you, fresh
23  view.  I want a hard look.
24          Fine.  From the moment he asked me, assigned me
25  for that job, my second question was when.  This was in

Case 1:01-cv-00057  Document 18  Filed in TXSD on 11/15/2001  Page 287 of 318

1    January. He said soon. Two to three weeks. From that

2    moment forward, my brain started working. I began to

3    close out my operation and immediately focus on what's

4    happening, what's the new structure supposed to be like.

5    I started calling folks about how should we reorganize

6    headquarters, et cetera. I started lining up people for

7    the headquarters job immediately.

8         When I walked in here February 7th, I already

9    had in my head who I was bringing in here, who I was

10   asking to go to other locations in headquarters, who I

11   was reassigning in the building, and for what reason I

12   was reassigning him. So if you think that's quick,

13   maybe it is. But that's -- I focused immediately. I'm

14   a very focused guy. I put things in compartments and my

15   first issue was, get headquarters restructured, identify

16   people for the right jobs based on the proper skill

17   sets. First job. Ignore everything else. And that's

18   what I did.

19        Second job, take a look at the documentation

20   for this headquarters structure, you know, policies and

21   procedures, et cetera. So I put a key team to do that.

22   Third job, once I identified my key people, I asked

23   them, I delegated discipline and review of that kind of

24   stuff to my acting deputy. He was only acting at the

25   time, Bob McNamara, because we couldn't get him down

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   here fast enough.  I brought in a new mission support

2   person.  I said, you take care of all the personnel

3   actions and all the issues, and only bring things that I

4   have to sign by authority and nothing else.

5             (END OF SIDE A, BEGINNING OF SIDE B)

6             ... reassign people over there, got people

7   detailed in, and set up a project there because it was

8   very hot at the time.  Something we had to do.  And put

9   a task force to take care of the hearings that we were

10  facing because I walking in cold on major, major

11  congressional hearings.  And I got everybody assigned to

12  do that.  And then I sat back and started looking at the

13  field personally.

14       Q.  All right.  So were you aware of allegations

15  that Mr. Flores had made regarding violations of

16  procurement codes?

17       A.  No.

18       Q.  You were not aware?

19       A.  No.

20       Q.  When did you become aware of any allegations

21  he's made regarding procurement regulations?

22       A.  I don't know about those allegations.  I can

23  tell you in general about some concerns about supposed

24  allegations, but those specific ones, no, no.  What I

25  had was, as I said, I delegated all discipline, all

1    those issues.  (Inaudible)  I said, go take care of
2    those.  My deputies take care of those.  Bob McNamara.
3    Bob McNamara had done some inquiries.  Had people
4    calling him about allegations with different people,
5    different parts of the country, et cetera.
6            He came to see me about a couple.  He had done,
7    you know, he had made the phone calls.  That was his
8    job.  That's what he was looking into.  He had talked to
9    people.  I didn't want to really talk to him.  He came
10   in to see me and said, we have an issue, a couple issues
11   that I would like to talk to you about.
12           I'll tell you what I told him.  I said, unless
13   it is something that I am required to take action on,
14   unless it is something where there is serious
15   violations, malfeasance in the office, firings,
16   whatever, under my watch, and if it happened since
17   February, I'll talk to you.  If you're bringing me any
18   old news about whatever, I don't want to know about it
19   because I'm trying to keep myself -- I got things I'm
20   working on.  That's your job.  (Pause in tape.)  ...some
21   issue.  Anyway, I'm almost --
22       Q.    Yeah.  We have about 15 minutes left.
23       A.    No problem.  I'll give you as much time as you
24   need.
25       Q.    Okay.  So we were saying -- you were telling

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

McNamara --

A.    Okay.  I don't want to know about it.  So he
said, well, you got to know.  You got to know.  I've
talked to a bunch of people and he said there's
allegations being made by EEO complaints and disputes
between Flores and his management and people who have
been involved in this for some time.  And I have this
case file that I asked him to send me so I could read
all this.  And I would like you to go through it.  I
would like you to give my recommendation.

And I said, I won't go through it.  And I don't
want your recommendation unless there is something you
found that I am required to take some action because
there's evidence before us that somebody did something
wrong that requires adverse action.  If you can't tell
me that right now, I don't want to know, because that's
old history, that is just allegations probably.  If it's
not founded or anything, I don't need to know.  I have
my own plans I'm putting together.  I don't want to
know.

He went through and he said, well, yeah, there
are a series of things.  And he kind of said there's
some EEO complaints, that previous EEO complaints have
been filed, in general.  He didn't tell me what the
allegation was, like who had discriminated against who,

1    and whether it was for age, sex, race, whatever.  He

2    just said there's been EEO complaints.  There's

3    allegations of not getting along between the two bosses.

4            I said, okay.  That's nice to know.  Thank you

5    very much.  Don't need to know this.  My plan had

6    already been formulated by the way.  This had all been

7    worked out in my head as far as what I was doing.  And

8    he was going to leave me the outline, said I'll give you

9    a synopsis.  I said, I don't want it.  I don't need it.

10           Again, unless there's some action I need to

11   take, there's some serious allegation that I am now

12   proposing official in some fashion, give me the case

13   file, give me the proposal letter, I'll take care of

14   business.  If it's just discussion, I don't want to know

15   about it.  I do not want to know about it.  So I sent

16   him away.  I said, take your files and take what you're

17   supposed to do out of here.  And he went away.

18           When I prepared my list and finalized who and

19   where and why, I had to go to personnel to get the

20   letters.  These.  Because they write these.  By the way,

21   this is the standard letter.  Everybody gets this

22   letter.  I got this letter.  I can show you my letter.

23   My letter said the same thing.

24       Q.   Okay.

25       A.   Exactly the same thing.  And I had exactly the

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  same choices. That's the system. That's what you do.
2  So I had to do two things. I had to go to personnel to
3  get this. The second thing we have to do is the
4  commissioner put a new system in, which I think is
5  excellent. Any time we decide to make any move, any
6  reassignment, any promotion, he has a system we call
7  vetting. We have to give the names to personnel.
8  Personnel then works with Internal Affairs. Personnel
9  folders and all administrative offices.

10      And they what we call "vet" the names. They
11  turn the names in and they say, if there's any
12  allegation, pending investigation, previous violation,
13  adjudication of any cases, the selecting transferring
14  official needs to know that so he can take that into
15  consideration. I put in, of the six moves, I think I
16  put in eight names. I put two backup names and I can't
17  even remember who they are now. But I put two backup
18  names just in case somebody fell through the cracks
19  because I wanted to make these six moves. All the names
20  came back clear, no problem.

21      Once I had that, then I went to personnel. I
22  asked them to write the letters. As a courtesy, once
23  personnel found out who and why and what I was doing and
24  the names had been vetted, they said, you know, there is
25  some history of the past administration with one of your

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    people.  I said, okay.  Who?  And they said Flores.  And

2    they said, as a courtesy, you might want to call the

3    Houston counsel's office, which is Jimmy Destefano.  I

4    think you work for Jimmy, don't you?

5        A.    Uh-huh.

6        Q.    Okay.  And just let him know what you're doing

7    just in case.  I said sure.  As a courtesy I'll do that.

8    Because first of all, I respect Jimmy.  I used to work

9    with him in the past.  And it's a courtesy.  I said

10   fine.  I said, I understand I'm not asking his

11   permission.  So I called Jimmy.

12            MS. BLESSEY:  And the content of the

13   conversation is attorney/client privilege, though.

14       A.    Okay.  But I just did make the phone call as a

15   courtesy.  And that was it.  And I said, I'm doing this.

16   That was the end of it.  And people wanted to talk to me

17   some more.  I said, I don't want to know.  That was it

18   of my courtesy thing.  Because there was nothing there.

19   Vetted, clear, clean, no problems, clean background, no

20   allegations, no proposals against any of the people.

21   None.  Therefore, I asked for the letters.

22       Q.    That would be like disciplinary proposals, you

23   mean?

24       A.    Yes.  Active investigations, disciplinary

25   proposals.  I even get reviews of past adjudicated

1   cases.  If there was an adjudicated case, like I was

2   suspended for 14 days, you should know that, why I was

3   suspended.

4        Q.   But you wouldn't get like information like

5   there's an EEO case --

6        A.   No.

7        Q.   -- that hasn't been decided or an OSP -- OSP

8   case?

9        A.   No.  I won't get the details of that, no.

10       Q.   That's checked also?

11       A.   I think so.  I think so.  I mean, they do that.

12  They just vet.  I get back a clean opinion.  Or I get a

13  sheet back that says, there's something you should know.

14  Sometimes just information I should know.  And I have to

15  take that into consideration just so I know.  But

16  anyway, so once they were vetted, once they were clean,

17  and then Bob McNamara came to see me one more time and

18  talked about something in general.  And I said, I won't

19  talk about anything else because I got a clean review of

20  the people.  I'm going to do what I need to do.  So

21  please don't bring up these issues anymore.  It's none

22  of my business.  It is, but it isn't.

23            MS. BLESSEY:  Just for clarification,

24  though, you weren't aware of his whistle-blower

25  allegations?

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

MR. WINWOOD:  Oh, no.  Absolutely not.
No.  None, whatsoever.

MS. BLESSEY:  And you recognized there was
an enforcement problem in Laredo?  I mean, in
Brownsville.

MR. WINWOOD:  Yeah.  One of my issues, as
I said, is I want somebody to take a fresh look at.  I
mentioned that I was concerned.  My problem in
Brownsville was, are we doing the right thing on the
enforcement side.  And would it be healthy to have a
clean, fresh perspective.  Just like I got external
issues in the Norfolk side.  Would it be helpful to have
a fresh, clean view.  Yeah, exactly.  In El Paso I had
personnel issues that needed strong leadership.  I
needed a fresh leader.

Q.  And you said you had already made the decision
to move Jorge Flores even before McNamara came in to
discuss what, you know, he decided not to.

A.  I was considering a bunch of moves to include
that one, yes.  Absolutely.  Not just that one.  Matter
of fact, it didn't start with Jorge.  It started with
El Paso and Blaine and Atlanta and Chicago.  And I built
from there because I needed -- I knew I was going to
build holes, so I was going to build a domino effect.
And so, yeah, that was all being taken in consideration.

1    But Jorge Flores wasn't the first place.  The
2  first place was El Paso, then Blaine, then New Orleans,
3  then Norfolk right after Atlanta.  Atlanta and Chicago
4  were slightly different.  But Atlanta and Chicago were
5  really first.  They were really first.  I focused on
6  them first.
7    Q.    All right.  Besides McNamara trying, or, you
8  know, attempting to talk about --
9    A.    Nothing.
10   Q.    What about Trotter.  Did he tell you anything
11 about Flores?
12   A.    Nope.
13   Q.    Or Reba?  Maria Reba?
14   A.    No.
15   Q.    Anyone?
16   A.    No.
17   Q.    Tudson?  Diane Tudson?
18   A.    Who?
19   Q.    Diane Tudson.  She's an (inaudible) specialist.
20   A.    I don't know her.
21   Q.    Okay.  All right.  Oh, are you aware that he
22 filed an appeal to MSPB or that Jorge Flores, whether or
23 not he filed an appeal to MSPB or whether he filed an
24 OIG complaint?
25   A.    No.  All I know is why you're here.  That

1   there's some allegation of some whistle-blowing status

2   that I knew nothing about.  I found out about this just

3   probably less than two weeks ago.  Less than that.  All

4   of a sudden it came up out of nowhere.  To me, it was a

5   surprise.  Nobody came to see me.  Nobody called me.

6   Nobody notified me.  Nobody informed me.  There was no

7   indication of it.  Nobody seemed to know of anything

8   about this, least of all, me.  None, whatsoever.

9        Q.   And what McNamara told you was there were

10  concerns and issues.  There were a couple of issues he

11  said?

12       A.   EEO.  EEO complaints.  And some kind of dispute

13  or seemed like he wasn't getting along on a level with

14  his bosses.  Didn't even get into details of it, but

15  there seemed to be some disputes as to who was supposed

16  to do what and that kind of stuff.  But no details.  I

17  didn't want the details.

18       Q.   So let me understand it.  You did not know that

19  Jorge Flores had made allegations of procurement

20  violations?

21       A.   No, I did not know about any procurement

22  violations made by Jorge Flores.  I did not.

23       Q.   And today is the first time you heard that?

24       A.   I'm hearing it for the first time these types

25  of allegations.  Correct.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.   Okay.   That pretty much ends it I think.   I

2   don't have anything else to ask you about.   Do you have

3   anything you would like to close with?

4      A.   Man, I think I've told you everything.   I can't

5   think of anything else.   All I'll tell you is, that this

6   was a true independent review and analysis of needs of

7   this organization, looking for fresh perspective in

8   multiple locations.   Doing an evaluation of where there

9   were either perceived or -- perceived weaknesses or

10   issues that need to be addressed at each of the ports,

11   each being unique in the sense --

12              MS. BLESSEY:   Maybe he could express that

13   more.   I mean, what issues did you want a fresh look at

14   in Brownsville?

15      A.   Enforcement issues.   What was happening with

16   the narcotics effort.   What was happening with the

17   trucks and the 40-foot, 20-foot carriers in the area of

18   narcotics and enforcement area.   Take a fresher look at

19   the numbers.   Were we doing enough from the standpoint

20   of targeting selection, type of examination technology,

21   bring in fresh perspective.

22              I have a theory of management of sometimes

23   you're so surrounded by the forest, you can't find one

24   tree.   In Blaine, it was not enough activity going on in

25   the commercial side.   I looked at the records, the

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    account management program, which I won't get into, but
2    it's not technical, but just takes too much time.
3            But working with companies in the aggregate.
4    Setting up accounts.  Setting up one-on-one
5    relationships and assigning managers to deal with the
6    work differently.  It wasn't happening.  It wasn't
7    happening.  And when you talk to them, they were trying
8    hard.  But they were so surrounded by the trees by the
9    forest, I don't think they could find one tree.  And
10   they have honest, sincere effort.  And I said, you know,
11   fresh view, fresh idea.  That was what I wanted in
12   Brownsville and Norfolk.
13           All kind of stories about they're not getting
14   enough attention.  Could their relationship be better.
15   Were the brokers being dealt with fairly, openly.  Was
16   there enough of that going one.  Needed a fresh
17   perceptive.  The guy that was there was a public
18   relations expert.  Good guy.  Very good.  But, you
19   **know, surrounded by the forest.  Would a fresh**
20   perspective open that up.
21           Atlanta.  Just having new ideas.  I sent a new
22   person in there.  Within 30 days, 30 days, two years of
23   angst, within 30 days, fresh perspective, things settled
24   right now.  Things were getting a fresh review.
25           The man who was there was outstanding.  He was

1    an educator, he worked at our academy, he was

2    well-respected, he had been around for a long time, he

3    was seasoned, but you know what, he was surrounded by

4    the forest.  It wrapped him up so much, that I wasn't

5    sure he was seeing what some of the issues were.  And

6    they were right in front of him.  I needed a fresh

7    perspective.  I sent a lady down there for -- within 30

8    days, you can't believe what happened.  The level of

9    angst dropped.

10        Q.   Angst?

11        A.   Angst.  Upset.

12        Q.   Anxiousness.

13        A.   Anxiousness.  Just dropped.  Complaints, things

14   got settled.  And the person I sent out, Anita, was

15   tough.  She was not a pushover.  She's a tough person.

16   But she had a different perspective.  Same thing in

17   Chicago.

18        So my theory is, that sometimes fresh

19   perspective, fresh review, new eyes, different

20   experiences, bringing into a different environment, you

21   see different things.  And I wanted each of those

22   people -- and by the way, I brought in each of the

23   assigned, reassigned port directors.  I personally

24   talked to them on the phone.  I personally met with

25   them.  I personally explained what I was trying to do

1    and why.

2            And then, I had each of them come here at

3    headquarters in two different groups because we couldn't

4    do everybody at the same time because of personnel

5    reasons.  But I brought them up here to work with my

6    headquarters folks so the headquarters folks could sit

7    with each of them and explain to them what the issues

8    were in that specific location, the type of things we

9    needed them to look at.  The new programs that were

10   either coming out or out in the policies that would most

11   affect the things we needed them to address.

12           Then I personally met with them each year and

13   explained to them what I did you, maybe not in the

14   detail I did, but what I just explained to you.  And

15   then they went and worked from the headquarters folks.

16   And the headquarters folks built an agenda for them, for

17   the day they spent, during the day and a half they spent

18   there, built an agenda for them that focused on the

19   issues that most affected that port.

20           So, therefore, Margie Gutierrez's session was

21   more in line with the enforcement issues.  Flores'

22   issue -- Flores' agenda was more in line to some of the

23   commercial issues and some of the external trade issues,

24   et cetera, that were affecting Norfolk.  The

25   El Paso guy, his little agenda was more focused on some

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    of the internal union negotiation personnel issues.

2              Although they all got, these are the

3    philosophies of Customs for administration, trade,

4    enforcement, et cetera, I tried to have my staff tailor

5    certain portions of their one-on-ones or their little

6    group meetings up here based on what we thought needed

7    to be addressed in the new location.  The Blaine guy, if

8    he would have decided to move, he decided to retire.

9    The guy from New Orleans decided to retire.  His would

10   have been more in the area of trade, comp management,

11   and that kind of stuff.

12             So we tried to tailor their mini briefing up

13   here around the things that we saw that we thought

14   needed to have a fresh view, fresh perspective.

15        Q.   So the decision of who to move where was in

16   your head.  No one else -- you didn't confer with

17   Trotter, McNamara --

18        A.   No.

19        Q.   -- anyone else?

20        A.   No.  I did not.  I did not.  Confer in a sense,

21   one, I didn't ask them; two, I did not lay out, until

22   after the fact, my thinking.  I did not ask for a lot of

23   input from them.  As a matter of fact, I will tell you,

24   some people don't think this is right, but the field

25   directors, the guys that run the ports, like Maria Reba

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1  runs Laredo and Brownsville, et cetera.  Pat Duffey runs

2  New Orleans.  Now, she's new.  Paul Hardy oversees

3  Blaine, Washington, et cetera, et cetera, et cetera.  I

4  didn't ask for their opinion either.

5       What I did as a courtesy, though, I called each

6  of them in turn and explained to them what I was doing,

7  why I was doing it, and how it affected them, and who

8  they were either losing or receiving.

9       MS. BLESSEY:  I guess, how did you know

10 there was an enforcement issue that needed to be

11 addressed in Brownsville?

12      A.   You look at the numbers.  You look at the

13 seizure reports.  I have a whole staff over here that

14 focuses on data, trends, success rates, large loads of

15 narcotics.  And I asked them to give me a generic

16 report.  As a matter of fact, I can show you.  This one

17 won't show specifically Brownsville.  But I have maps

18 made all the time.  I'm a picture kind of guy.  Words

19 drive me crazy.

20      This is not reflective, this won't answer your

21 question, but this is the type of stuff I ask for all

22 the time.  They don't know why I'm asking for it.  I

23 just want to know.  But I made them do this.  This is a

24 new map we made and I'll show you this in a second.

25 This is a new map we made that they didn't have before I

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1   got here.

2       Q.    Joint narcotics interdiction plan report.

3       A.    Yeah.

4       Q.    Seizure data.

5       A.    Seizure data.  I get this one every month.

6   Now, when I got here, they didn't have such a thing.

7   What they had was they had a very generic map that just

8   showed national totals.  How much heroin was seized,

9   previous year to this year.  How much cocaine was

10  seized, previous year, this year.  How much marijuana.

11  And then we also, I asked them to add outbound seizures

12  because we have a major money operation for outbound

13  money.  I asked them for things outside of heroin,

14  cocaine, and marijuana like (inaudible).  You know, that

15  meth --

16      Q.    Yeah.

17      A.    -- whatever you call it.  I can't pronounce it.

18  Whatever.  And other kind of drugs, I asked them to give

19  me a report on that.  What they used to get when I got

20  here, the report they prepared that people would look at

21  periodically, was a very generic report.  It

22  had -- just had this.  They had a map of the United

23  States and they had this banner at the top.  And it

24  showed last year versus this year.  Percentage up,

25  percentage down.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1      Q.   And not by region.

2      A.   No.  Not by location.  So I asked for it by

3   geographic location.  I asked for breaking it down in

4   different areas when I first got here.  I've also asked

5   for this in trade.  Where is the revenue collection.

6   Where are the IPR violations.  Where are the, you know,

7   all that trade stuff.  I asked for maps like this on

8   where are our account managers, how many do we have, how

9   many companies have we worked with.  You know, I want

10  pictures.  They don't know why I'm asking for it.  It's

11  information for me.  So these are the types of things I

12  went through in my own head looking at data and

13  information as to what might be happening around the

14  country.

15        And then I took into account personnel issues,

16  management issues, vacancies, where vacancies were going

17  to be, what jobs were critical, and what needed

18  immediate attention to get filled.  And rather than

19  **worry about transferring people, just without taking**

20  that into account, I did that first.  I will tell you,

21  there's going to be another series of moves.  I'm

22  working on my next set.  It's only in my head.

23        I will then do this same type of thing,

24  analysis.  Do we need a fresh perspective.  Do we need

25  other people to look at a new port from a different

1    angle.  You walked in there on the phone call.  I just

2    transferred somebody while you were sitting here.  I

3    need a fresh perspective in a port.  Putting an acting

4    guy in.  Putting this guy in a job, give him a chance to

5    do something else for a while.

6         The issue in this particular place is so

7    inbred, that people can't talk to each other anymore.

8    They're all good people.  They all worked hard.  But

9    they are so much imbued for the last two years of

10   fighting with each other, that they can't say good

11   morning to each other.  Good morning.  What do you mean

12   by that.  So I said, you know what, give everybody a

13   break.  Put them on another job.  Bring a fresh

14   perspective in.  That happened while you were sitting

15   here.

16        So this is the kind of information I took into

17   account.  And that's where I come up with this idea that

18   Brownsville needs maybe a fresh perspective, a different

19   look on some of the enforcement issues and equipment

20   issues, versus external issues.  Sorry I get a little

21   long-winded, but you can see I've given this a lot of

22   thought.  (Pause in tape.) ...from January until the

23   actual decision was made.

24        Q.   May.

25        A.   Yeah.  That's what I did for almost two months.

CONTINENTAL COURT REPORTERS, INC. (713)522-5080

1    So this was not kind of fast.  This was -- I had to

2    contemplate this.  I had to think about these things.

3    So two months seems fast.  To me, it seems like a long

4    time.

5        Q.   Oh, okay.  So when you were told that you were

6    going to be in this position, that's when you started

7    focusing on thinking about what you would do in January.

8        A.   Right away.

9        Q.   But you made the decision to move, specifically

10   Flores.  When was that decision more or less?

11       A.   January, February, March --

12       Q.   Because this letter is May 3rd.

13       A.   Right.  Sometime, let me think.  I started

14   thinking about the reorganization in January.  Took care

15   of headquarters in February.  So probably have to be

16   somewhere around April.  I mean, I done all this stuff.

17   And then April, around April -- I mean, I can't give you

18   a hard date, but around April, the picture was formed in

19   my head.  The locations were laid out in my head.

20       Q.   So as far as the group meetings and getting the

21   people -- the candidates in tune with what the needs

22   were and the place where they were moving to, that was

23   after you sent them?

24       A.   Oh, absolutely.

25       Q.   Yeah.

1    A.   Oh, absolutely.  Oh, absolutely.  Yeah, yeah.
2  You can't do that until you know where they're going and
3  whether or not they accept.  I had to send the letters
4  and then I had to wait to see if they were going to
5  accept.  As I said, all five, five of the six accepted.
6  The letters came in right on time.  They were signing as
7  accepting.  Based on that, I authorized -- except for
8  one.  One guy called and said he thought about it.  He
9  decided to retire.  So we worked out a retirement date
10  for him.  So that was separate.  The other five signed
11  their letters.
12       And based on that, I gave word.  I said
13  whatever they need as far as site visits, port visits,
14  house-hunting trips, take care of it.  And just about
15  everybody at least took one visit to their new location,
16  looked around to check on housing.  They all got taken
17  care of.  And it was after these letters.  And after
18  they were signed and accepted, then we started talking
19  about site visits, housing trips, whatever they needed,
20  it was being taken care of.
21       And then we also then had this one-day session
22  up here.  I thought it would be good to make them get in
23  tune with what's happening in different locations.  That
24  all happened after the letter, after they signed.  After
25  they signed.

1     Q.    Well, that's all that I have to cover then.

2  All right.

3     A.    Okay.

4     Q.    I'll turn off the tape then.

5                    (END OF INTERVIEW)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 311 of 318

FILED
'99 NOV 17 P 4 14
CLERK U.S. DISTRICT
COURT WESTERN DISTRICT
OF TEXAS
BY _____
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

JEWALINE C. SMITH,             §
                              §
            Plaintiff,         §
                              §
v.                            §     No. EP-99-CA-72-H
                              §
LAWRENCE H. SUMMERS, Secretary §
of the United States           §
Department of the Treasury,    §
                              §
            Defendant.         §

## J U D G M E N T

In accordance with the Order this day entered in the above-styled and numbered cause,

It is ORDERED, ADJUDGED, and DECREED that judgment be, and it is hereby, ENTERED in favor of the Defendant, and that the Plaintiff take nothing by her suit.

SIGNED AND ENTERED this 17th day of November, 1999.

HARRY LEE HUDSPETH
UNITED STATES DISTRICT JUDGE

DEFENDANT'S
EXHIBIT
7

Case 1:01-cv-00057 Document 18 Filed in TXSD on 11/15/2001 Page 312 of 318

FILED

1999 NOV 17 P 4 14

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS CLERK U.S. DISTRICT
COURT WESTERN DISTRICT
OF TEXAS

BY_____
DEPUTY

JEWALINE C. SMITH,                    §
                                      §
            Plaintiff,                §
                                      §
v.                                    §    No. EP-99-CA-72-H
                                      §
LAWRENCE H. SUMMERS, Secretary        §
of the United States                  §
Department of the Treasury,           §
                                      §
            Defendant.                §

### ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a civil action for damages and other relief under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.
Plaintiff Jewaline C. Smith claims that Defendant, the U.S. Customs
Service ("Customs"),[1] unlawfully discriminated against her on
account of race and sex.   In addition, Plaintiff claims that
Defendant wrongfully retaliated against her for filing an Equal
Employment Opportunity ("EEO") complaint.   On October 26, 1999,
Defendant filed its motion for summary judgment, and on November 8,
1999, Plaintiff responded.   This case is now ripe for decision.

The facts of this case, viewed in light most favorable to the
nonmovant, are as follows: Plaintiff is an African-American woman
who began working with Customs on December 7, 1986, as an
inspection officer in El Paso, Texas.  (Am. Compl. At ¶7.)   In

---

[1]   The United States Customs Service is a division of the
United States Department of the Treasury.  Robert E. Rubin was
originally named as the defendant.  He retired as Secretary in
May, 1999.  Although the Court directed the parties to change the
style of this case to name Lawrence H. Summers as Secretary of
the Treasury, no such action was taken. The Court therefore, sua
sponte, has substituted the proper defendant.

24

1990, Plaintiff filed an EEO complaint against the Defendant for sex discrimination; that se is still pending at the administrative level. (Id. at ¶8.) Between 1992 and 1996, Plaintiff stopped working while she underwent therapy for depression. (Id. at ¶9). On May 7, 1996, Plaintiff's doctor, Arthur L. Ramirez, recommended that she resume work, but also that she remain on "light duty" (i.e. less than forty hours per week). Subsequently, Dr. Ramirez recommended that she return to full-time duty, provided that she restrict her overtime to eight hours per week. (Pl. Resp. App. 5 Ex. 1.) Dr. Ramirez memorialized this recommendation in a letter dated September 13, 1996; however, he neither specified the duration of the overtime restriction, nor described plaintiff's medical condition. (Id.)

On September 17, 1996, Plaintiff asked Kenneth Squires, the assistant port director, whether she could return to full-time duty with the overtime restriction. (Squires Dep. at 8-13.) Previously, Plaintiff had kept the chief port director, Arthur Pitts, apprised of her medical condition; after Pitts left Customs, Squires acquired Pitt's responsibilities and duties, but was not informed of Plaintiff's condition. (Id. at 17). Nonetheless, Squires was aware of Plaintiff's 1990 EEO case. (Pl. Resp. App. 5. Ex. 4.) After reviewing Dr. Ramirez's letter, Squires informed Plaintiff that further information was required before he could grant her request. (Id.) Squires also reminded her that overtime was a condition of employment, and stated that if the restriction continued for too long, "she might have to be placed in another

2

position." (Id. at 22; Pl. Resp. App. 5 Ex. 4 (employment contract).) Although both parties behaved professionally at the meeting, Squires felt that he had angered Plaintiff with his instructions. (Id at 62.) He believed that Plaintiff was likely to file an EEO complaint, since such an action was "par for the course in El Paso." (Id. at 62-63.)

A few minutes after the meeting, Squires contacted Frank Fuentes, chief customs inspector, and asked him to speak with Plaintiff regarding the doctor's letter. (Fuentes Dep. at 8-9.) Fuentes, believing that Squires was uncomfortable with the situation, decided to confront Plaintiff. (Id. at 10-11.) On September 18, 1996, Fuentes called Plaintiff into his office and asked her to submit another doctor's letter specifying the duration of her restricted overtime. (Id. at 12.) Like Squires, he informed Plaintiff that Customs was obligated to find new positions for personnel who stayed on restricted overtime for one year. (Id. at 17.) Plaintiff claims that when she asked Fuentes under which regulation he could require her to disclose more information, Fuentes grew angry. (Am. Compl. at ¶14.) After Plaintiff left the office, she began crying. (Fuentes Dep. at 26.)

Upon hearing of the outcome of Plaintiff's meeting with Fuentes, Squires sent an electronic mail message to Joe Elsworth, the Labor Management Relations ("LMR") specialist. (Squires Dep. at 51-52.) In the message, Squires stated that Plaintiff was "emotionally unbalanced" and "might have a nervous breakdown." (Pl. Resp. App. 1.) He questioned whether Plaintiff should handle

3

a weapon, given her reaction to a simple request for more information. (Id.) He also guessed that she might file an EEO complaint or other grievance. (Id.) According to Squires, his primary reason for sending the message to Elsworth was his frustration over the general problem of understaffing, given that between 40 and 50 customs inspectors were on restricted overtime or light duty at that time. (Squires Dep. at 60.)

On September 19, 1996, Plaintiff handed Fuentes a new letter in which Dr. Ramirez asked Customs to restrict Plaintiff's overtime to eight hours per week for exactly six months. (Pl. Resp. App. 5 Ex. 2.) Eventually, this letter was sent to Squires' office, and an unknown employee drafted a "fitness for duty" letter.[2] In the letter, Squires granted Plaintiff's request for restricted overtime, but warned her that she would eventually be required to return to "full-duty status."[3] The letter contained a section of Plaintiff's labor agreement stating that employees recovering from a medical illness would be considered for "light duty." Normally such letters are approved by the LMR before being sent to Customs personnel; however, this letter received no such approval.

---

[2] Although his name appears at the bottom, Squires swears to never having seen the letter. (Squires Dep. at 34-36.) The letter was signed (and possibly drafted) by Arnulfo Valdes, Squires' first line supervisor, without Squires's authorization. (Id.) Nonetheless, Squires claims he probably would have signed it had it appeared on his desk. (Id. at 95.)

[3] This statement was inaccurate insofar as Plaintiff was being allowed to return to "full-duty," albeit with the overtime restriction. It is clear, however, that the letter's author intended to inform Plaintiff that her overtime restriction could only be temporary if she wished to remain in the same position.

(Squires Dep. at 72-73.) Although Plaintiff received the letter on November 21, 1996, none of the other 40 to 50 workers on overtime restriction received a "fitness for duty" letter until months later. (Pl. Resp. at ¶17.)

On May 21, 1997, an unknown Customs official prepared a list of El Paso inspectors who were on light duty. (Pl. Resp. App. 5. Ex. 9.) Next to the name of each person on the list was a letter code to indicate whether the inspector was white, Hispanic, or black. (Id.) Neither Squires nor Fuentes knew about the document, nor could either one explain the purpose for the classifications. (Fuentes Dep. at 41-44; Squires Dep. at 85-89). Plaintiff notes that only three out of four-hundred-and-eleven El Paso customs inspectors are black females. (Am. Compl. at ¶23.)

Plaintiff subsequently filed a formal discrimination charge against Defendant. After more than 180 days had passed, Plaintiff filed the present suit on March 2, 1999.

The Court now addresses the motion for summary judgment. In order to overcome a motion for summary judgment on a Title VII discrimination or retaliation claim, Plaintiff must establish a prima facie case. See Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 (5th Cir. 1999). A prima facie case of discrimination requires the plaintiff to show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; and (3) that others similarly situated were not subjected to the same treatment. See Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997). In a retaliation claim, the prima facie case

Case 1:01-cv-00057   Document 18   Filed in TXSD on 11/15/2001   Page 317 of 318

requires a showing that (1) the plaintiff engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between participation in the activity and the adverse employment action. **See Mattern v. Eastman Kodak Co.**, 104 F.3d 702, 707-08 (5th Cir. 1997).

The common thread in both claims is the "adverse employment action." An adverse employment action requires proof that the defendant's behavior or decision effected a "materially adverse change in the terms and conditions of [a plaintiff's] employment." **See Crady v. Liberty Nat'l Bank & Trust Co.**, 993 F.2d 132, 136 (7th Cir. 1993). This change must be more than a mere inconvenience or an alteration of job responsibilities, but rather a disruptive event, such as termination, demotion, loss of benefits or salary, decrease in responsibility, or suspension. **See id.; Boriski v. City of College Station**, 1999 WL 728336 at 9-10 (S.D.Tex. 1999). Employment actions are not adverse where pay, benefits, and level of responsibility remain the same. See **Watts v. Kroger Co.**, 170 F.3d 505, 512 (5th Cir. 1999). A verbal threat of being fired or demoted does not constitute an adverse employment action, since it has no concrete effect on the person's employment until the employer acts upon it. **See Mattern**, 104 F.3d at 708. Similarly, negative performance evaluations, even if undeserved, are not adverse employment actions. **See, e.g., Smart v. Ball State Univ.**, 89 F.3d 437, 442 (7th Cir. 1996); **Meredith v. Beech Aircraft Corp.**, 18 F.3d 890, 896 (10th Cir. 1994); **Montandon v. Farmland Indus., Inc.**, 116 F.3d at 355, 359 (8th Cir. 1997); **Boriski**, 1999 WL 728336

6

at 10.

Under no stretch of the legal imagination can Plaintiff satisfy the "adverse employment action" requirement. Even if the request for additional medical information or racial classification could be characterized as "threats" or "negative performance evaluations," neither one would be sufficient to satisfy Title VII. See Mattern, supra; Boriski, supra. Furthermore, the reference to "light duty" in the letter from Squires appears to have been a mistake, and did not lead to Plaintiff's demotion. Moreover, the conduct in this case is far less severe than what is generally required to establish retaliation or discrimination. Accord Boriski, 1999 WL 728336 at 10-11 (collecting cases). Given the absence of any material change in the conditions of her employment, the Court finds no basis for Plaintiff to proceed against Defendant.

It is therefore ORDERED that Defendant's motion for summary judgment be, and it is hereby, GRANTED.

It is further ORDERED that judgment in the above-styled and numbered cause be, and it is hereby, ENTERED in favor of the Defendant, and that the Plaintiff take nothing by her suit.

SIGNED AND ENTERED this ___17th___ day of November, 1999.

HARRY LEE HUDSPETH
UNITED STATES DISTRICT JUDGE

7